EDWARD G. POPLAWSKI (SBN 113590)
epoplawski@wsgr.com
OLIVIA M. KIM (SBN 228382)
okim@wsgr.com
WILSON SONSINI GOODRICH & ROSATI, P.C.
633 West Fifth Street, Suite 1550
Los Angeles, CA 90071
Telephone: (323) 210-2901
Facsimile: (866) 974-7329

RYAN R. SMITH (SBN 229323)
rsmith@wsgr.com
CHRISTOPHER D. MAYS (SBN 266510)
cmays@wsgr.com
WILSON SONSINI GOODRICH & ROSATI, P.C.
650 Page Mill Road
Palo Alto, CA 94304-1050
Telephone: (650) 493-9300
Facsimile: (650) 493-6811

*Attorneys for Defendant*
QUALYS INC.

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE NORTHERN DISTRICT OF CALIFORNIA**

**OAKLAND DIVISION**

FINJAN, INC.,

Plaintiff,

v.

QUALYS INC.,

Defendant.

CASE NO.: 4:18-cv-07229-YGR

**DEFENDANT QUALYS INC.'S RESPONSIVE CLAIM CONSTRUCTION BRIEF**

Date: May 1, 2020[1]
Time: 10:00 AM
Place: Courtroom 1, 4th Floor
Before: Hon. Yvonne Gonzalez Rogers

[1] Subject to the Court's March 12, 2020 Order (D.I. 48) suspending in-person appearances.

# TABLE OF CONTENTS


I. INTRODUCTION ..... 1

II. GOVERNING LAW ON CLAIM CONSTRUCTION ..... 1

III. '408 PATENT ..... 3

A. '408 Patent Overview ..... 3

B. Term 1: "instantiating, by the computer, a scanner for the specific programming language" ..... 3

IV. '968 PATENT ..... 4

A. '968 Patent Overview ..... 4

B. Term 2: "dynamically generating a policy index" ..... 5

C. Term 3: "known to be allowable relative to a given policy" ..... 6

D. Term 4: "memory storing a cache of digital content" ..... 8

V. '731 PATENT ..... 9

A. '731 Patent Overview ..... 9

B. Term 5: "incoming files from the internet" ..... 10

VI. '844 PATENT ..... 11

A. '844 Patent Overview ..... 11

B. Term 6: "web client" ..... 12

VII. '154 PATENT ..... 13

A. '154 Patent Overview ..... 13

B. Term 7: "a content processor" ..... 14

C. Term 8: "security computer" ('154 patent) ..... 17

VIII. INDEFINITENESS ..... 18

A. Legal Background on Indefiniteness ..... 19

B. Terms 9 and 10: "receiver" and "transmitter" ..... 20

IX. CONCLUSION ..... 23

# TABLE OF AUTHORITIES

## CASES

*Al-Site Corp. v. VSI Intern., Inc.*, 174 F.3d 1308, 50 U.S.P.Q.2d 1161 (Fed. Cir. 1999) .....16, 19

*Alloc, Inc. v. Int'l Trade Comm'n*, 342 F.3d 1361 (Fed. Cir. 2003) .....6, 9

*Apple Inc. v. Motorola, Inc.*, 757 F.3d 1286 (Fed. Cir. 2014), *overruled on other grounds by Williamson*, 792 F.3d 1339 .....20

*Astrazeneca AB v. Mut. Pharm. Co.*, 384 F.3d 1333 (Fed. Cir. 2004) .....3

*Aventis Pharma S.A. v. Hospira, Inc.*, 675 F.3d 1324 (Fed. Cir. 2012) .....3

*David Netzer Consulting Eng'r LLC v. Shell Oil Co.*, 824 F.3d 989 (Fed. Cir. 2016) .....11

*EnOcean GmbH v. Face Int'l Corp.*, 742 F.3d 955 (Fed. Cir. 2014) .....21

*Finjan, Inc. v. Cisco Sys.*, 2018 U.S. Dist. LEXIS 122951, 2018 WL 3537142 (N.D. Cal. July 23, 2018) .....12

*Finjan, Inc. v. Juniper Networks, Inc.*, 387 F. Supp. 3d 1004 (N.D. Cal. May 8, 2019) .....15, 16

*Finjan, Inc. v. Juniper Networks, Inc.*, N.D. Cal. Case No. C 17-05659-WHA .....15, 16

*Finjan, Inc. v. Proofpoint, Inc.*, No. 3:13-cv-5808-HSG, Dkt. No. 321 .....7

*Finjan, Inc. v. Proofpoint, Inc.*, No. 3:13-cv-5808-HSG, Dkt. No. 462 .....7, 16

*Finjan, Inc. v. Rapid7, Inc.*, No. CV 18-1519 (MN), 2020 WL 565377 (D. Del. Feb. 5, 2020) .....16

*Finjan, Inc. v. Sonicwall, Inc.*, Case No. 17-cv-04467-BLF .....3, 4

*Finjan, Inc. v. Sophos, Inc.*, 2016 U.S. Dist. LEXIS 68128 (N.D. Cal. May 24, 2016) .....7

*Finjan, Inc. v. Symantec Corp.*, 2017 U.S. Dist. LEXIS 19526, 2017 WL 550453 (N.D. Cal. February 10, 2017) .....12, 16

*Kinik Co. v. Int'l Trade Comm'n*, 362 F.3d 1359 (Fed. Cir. 2004) .....2

*Luminara Worldwide, LLC v. Liown Elecs. Co.*,
814 F.3d 1343 ........................................................ 11

*Medrad, Inc. v. MRI Devices Corp.*,
401 F.3d 1313 (Fed. Cir. 2005) ........................................................ 2

*Metabolite Labs., Inc. v. Lab. Corp. of Am. Holdings*,
370 F.3d 1354 (Fed. Cir. 2004) ........................................................ 2

*O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*,
521 F.3d 1351 (Fed. Cir. 2008) ........................................................ 12, 17

*On Demand Mach. Corp. v. Ingram Indus., Inc.*,
442 F.3d 1331 (Fed. Cir. 2006) ........................................................ 3

*Pacing Techs. LLC v. Garmin Int'l, Inc.*,
778 F.3d 1021 (Fed. Cir. 2015) ........................................................ 11

*Phillips v. AWH Corp.*,
415 F.3d 1303 (Fed. Cir. 2005) ........................................................ 2

*Poly-America, L.P. v. API Indus., Inc.*,
839 F.3d 1131 (Fed. Cir. 2016) ........................................................ 5, 7, 8, 16

*Regents of Univ. of Minnesota v. AGA Med. Corp.*,
717 F.3d 929 (Fed. Cir. 2013) ........................................................ 15

*SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.*,
242 F.3d 1337 (Fed. Cir. 2001) ........................................................ 3

*Techtronic Indus. Co. v. Int'l Trade Comm'n*,
944 F.3d 901 (Fed. Cir. 2019) ........................................................ 5, 7, 8, 16

*Thorner v. Sony Computer Entm't Am. LLC*,
669 F.3d 1362 (Fed. Cir. 2012) ........................................................ 2, 3, 5

*Trustees of Columbia Univ. in City of New York v. Symantec Corp.*,
811 F.3d 1359 (Fed. Cir. 2016) ........................................................ 3, 13, 16

*UltimatePointer, L.L.C. v. Nintendo Co.*,
816 F.3d 816 (Fed. Cir. 2016) ........................................................ 10

*Unitherm Food Sys., Inc. v. Swift–Eckrich, Inc.*,
375 F.3d 1341 (Fed. Cir. 2004) ........................................................ 2

*V–Formation, Inc. v. Benetton Group SpA*,
401 F.3d 1307 (Fed. Cir. 2005) ........................................................ 2

*Verizon Servs. Corp. v. Vonage Holdings Corp.*,
503 F.3d ........................................................ 15

*VirnetX, Inc. v. Cisco Sys., Inc.*,
767 F.3d 1308 (Fed. Cir. 2014) ........................................................ 11, 12, 13

*Visto Corp. v. Sproqit Techs., Inc.*,
445 F. Supp. 2d 1104 (N.D. Cal. 2006) ........................................................ 16

*Williamson v. Citrix Online, LLC*,
792 F.3d 1339 (Fed. Cir. 2015) .......... 19, 21, 22

*World Class Tech. Corp. v. Ormco Corp.*,
769 F.3d 1120 (Fed. Cir. 2014) .......... 11

**STATUTES**

35 U.S.C. § 112, ¶ 2 .......... 19, 20

35 U.S.C. § 112, ¶ 6 .......... 19, 20, 21, 22

## I. INTRODUCTION

This case is one of many patent infringement actions filed by Finjan involving the patents-in-suit. In the Case Management Statement (filed February 14, 2019), Finjan represented that the damages in this case exceeded $100 million. D.I. 23 at 11. For a case of such value, one would expect Finjan to have carefully mapped-out its proposed claim constructions and to maintain those claim constructions across its many cases. In fact, during the case management conference, Finjan informed the Court that it would "just appl[y] the same claim construction so that there would be consistency across those" numerous cases it has filed. D.I. 28 at 2:20-25; see also *id*. at 12:24-13:13. Finjan went on to explain that "it's the other side" that will "challenge either existing rulings or try to modify existing rulings." Not so.

In several instances, Finjan has refused to stipulate to constructions issued by other courts in this District and proposes now that "no construction is necessary" for *any* disputed term. Take, for example, the term "web client." In a previous litigation, Finjan proposed the exact same construction that Qualys now proposes. However, Finjan refused to stipulate to that construction in this case and now argues against its own former position.

Finjan's contentions that "no construction is necessary" for any disputed claim terms is unhelpful, does not resolve the parties' disputes as to the meaning of these terms, and will almost certainly lead to further claim construction disputes down the road. Rather than crystallizing its theories through the claim construction process as the local rules contemplate, Finjan is trying to take no positions whatsoever, even at the risk of contradicting its prior statements.

As discussed more fully below, Qualys has proposed constructions for ten terms from five of the seven patents-in-suit: U.S. Patent Nos. 6,154,844 ("the '844 patent"); 6,965,968 ("the '968 patent); 8,141,154 ("the '154 patent"); 7,418,731 ("the '731 patent"); and 6,154,844 ("the '844 patent"). Qualys' proposed construction are consistent with prior rulings and that are fully supported by the intrinsic and extrinsic evidence.

## II. GOVERNING LAW ON CLAIM CONSTRUCTION

The words of a patent claim are generally given their "ordinary and customary meaning." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (quotations omitted). The

"ordinary and customary meaning" of a claim term "is the meaning that the term would have to a person of ordinary skill in the art ["POSITA"] in question at the time of the invention, i.e., as of the effective filing date of the patent application." *Id.* (citations omitted). The POSITA "is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification." *Id.*; *see also Medrad, Inc. v. MRI Devices Corp.*, 401 F.3d 1313, 1319 (Fed. Cir. 2005) ("We cannot look at the ordinary meaning of the term . . . in a vacuum. Rather, we must look at the ordinary meaning in the context of the written description and the prosecution history."); *V–Formation, Inc. v. Benetton Group SpA*, 401 F.3d 1307, 1310 (Fed. Cir. 2005) (intrinsic record "usually provides the technological and temporal context to enable the court to ascertain the meaning of the claim to one of ordinary skill in the art at the time of the invention"); *Unitherm Food Sys., Inc. v. Swift–Eckrich, Inc.*, 375 F.3d 1341, 1351 (Fed. Cir. 2004) (proper definition is the "definition that one of ordinary skill in the art could ascertain from the intrinsic evidence in the record").

Patent claims "must be read in view of the specification, of which they are a part." *Phillips*, 415 F.3d at 1315. The specification "aids in ascertaining the scope and meaning of the claims inasmuch as the words of the claims must be based on the description." *Id.*; *see also Kinik Co. v. Int'l Trade Comm'n*, 362 F.3d 1359, 1365 (Fed. Cir. 2004) ("The words of patent claims have the meaning and scope with which they are used in the specification and the prosecution history."); *Metabolite Labs., Inc. v. Lab. Corp. of Am. Holdings*, 370 F.3d 1354, 1360 (Fed. Cir. 2004) ("In most cases, the best source for discerning the proper context of claim terms is the patent specification wherein the patent applicant describes the invention.").

A patent's specification may, for example, clearly express an intent to redefine a term. *Thorner v. Sony Computer Entm't Am. LLC*, 669 F.3d 1362, 1365 (Fed. Cir. 2012). The specification may also "make[] clear that the invention does not include a particular feature," in which case "that feature is deemed to be outside the reach of the claims of the patent, even though the language of the claims, read without reference to the specification, might be considered broad enough to encompass the feature in question." *Id.* (*citing SciMed Life Sys., Inc.*

*v. Advanced Cardiovascular Sys., Inc.*, 242 F.3d 1337, 1341 (Fed. Cir. 2001)). Express statements of redefinition or disavowal are not required. *Trustees of Columbia Univ. in City of New York v. Symantec Corp.*, 811 F.3d 1359, 1363 (Fed. Cir. 2016). The expression required by *Thorner* "may be inferred from clear limiting descriptions of the invention in the specification or prosecution history." *Id.* (*quoting Aventis Pharma S.A. v. Hospira, Inc.*, 675 F.3d 1324, 1330 (Fed. Cir. 2012)); *see also Astrazeneca AB v. Mut. Pharm. Co.*, 384 F.3d 1333, 1340 (Fed. Cir. 2004) ("the patentee's choice of preferred embodiments can shed light on the intended scope of the claims."); *On Demand Mach. Corp. v. Ingram Indus., Inc.*, 442 F.3d 1331, 1340 (Fed. Cir. 2006) ("[W]hen the scope of the invention is clearly stated in the specification, and is described as the advantage and distinction of the invention, it is not necessary to disavow explicitly a different scope.").

## III. '408 PATENT

### A. '408 Patent Overview

The '408 patent describes a particular way of scanning content at a destination computer as the content arrives on the computer from the Internet, using three different components: a tokenizer, a parser, and an analyzer. *See* '408 patent at Fig. 2. As the content arrives on the computer, the scanner uses a tokenizer to identify tokens, a parser to identify patterns of tokens in a parse tree, and an analyzer to find exploits based on this parsed information. The patent thus envisions breaking-down code into its component parts in order to analyze the code.

### B. Term 1: "instantiating, by the computer, a scanner for the specific programming language"

| '408 Claims | Qualys' Proposed Construction | Finjan's Proposed Construction |
|---|---|---|
| 1 | Substituting specific data, instructions, or both into a scanner to make it usable for scanning the specific programming language | No construction necessary – plain and ordinary meaning |

Qualys' proposed construction is identical to the construction adopted by Judge Freeman in *Finjan, Inc. v. Sonicwall, Inc.*, Case No. 17-cv-04467-BLF ("*Sonicwall*"). *See* 2019 WL 1369938, at *15 (N.D. Cal. Mar. 26, 2019). There, Judge Freeman determined that the plain and ordinary meaning of this term is "substituting specific data, instructions, or both into a scanner to

make it usable for scanning the specific programming language," the same as Qualys now proposes. *Sonicwall*, 2019 WL 1369938 at *16. Judge Freeman criticized Finjan's "no construction necessary" position as unhelpful to the jury. *Id.* Judge Freeman explained that the '408 patent "uses an adaptive rule-based content ('ARB') scanner, which dynamically scans and diagnoses incoming Internet content." *Id.* at *15 (citing 1:65-2:24).[2] Judge Freeman determined that the claimed scanner "is customized using language-specific data substituted into a generic module to allow the scanning of a specific programming language." *Id.* (citing 1:65-2:1; 6:17-24; 8:7-9). Consequently, she found the construction that Qualys now proposes is consistent with the term's plain and ordinary meaning and would be helpful to the jury. *Id.* at *16.[3]

Here, while Finjan again refuses to take a position on a construction for this term, it does concede that the plain and ordinary meaning should govern. Br.[4] at 5. Finjan does not argue that Judge Freeman's construction is incorrect or inconsistent with the plain and ordinary meaning. Finjan also concedes that Judge Freeman's construction should be given ***deference***. *Id.* ("Courts grant even more deference to prior claim constructions from within their Districts, as is the case here.").

In sum, Finjan presents no reason for doing anything other than adopting Judge Freeman's construction in this case.

## IV. '968 PATENT

### A. '968 Patent Overview

The '968 patent is generally directed to a cache (or repository) of digital content (such as web-pages from the Internet) with a corresponding policy index to indicate whether a given piece

---

[2] Citations to "XX:YY" refer to the column and line numbers of the patent to which the term belongs, unless otherwise indicated.

[3] Finjan incorrectly states in its brief that "Judge Freeman [in *Sonicwall*] rejected the same construction . . . that Qualys proposes here." Br. at 5. In that decision, Judge Freeman rejected a proposal by the defendants that Qualys has not advanced here. Qualys proposes the same construction that Judge Freeman ultimately adopted.

[4] "Br." refers to Plaintiff Finjan, Inc.'s Opening Claim Construction Brief, D.I. 42 (Feb. 10, 2020).

of content is allowable. Dkt. 42-5 '968 patent at 1:63-64; 2:3-6. The policy-based based index is a data structure indicating allowability of cached content relative to a plurality of policies. *See, e.g., id.* at 2:3-6. The cache uses the policy-based index to control access to the cached content by checking the policy-based index to determine whether cached content is allowable for a different user than the original user who requested it. *See, e.g., id.* at 6-11. That way, the digital content need not be evaluated against a policy each time the content is requested by an end-user.

**B. Term 2: "dynamically generating a policy index"**

| **'968 Claims** | **Qualys' Proposed Construction** | **Finjan's Proposed Construction** |
|---|---|---|
| 26, 32, and 33 | creating or updating a policy index in response to user requests for cached or non-cached content | No construction necessary – plain and ordinary meaning |

Qualys' construction seeks to clarify how the claimed policy index is "dynamically generated." The '968 patent's specification makes clear that the policy index is dynamically generated only in response to a user request for content. *See Thorner*, 669 F.3d at 1365. For example, the '968 patent states that "***[t]he present invention*** allows for policy-based cache index 190 to be updated dynamically ***as user requests for cached and non-cached content arrive***." Dkt. 42-5 '968 patent at 5:66-6:2. In other words, ***dynamic generation*** occurs when the policy index receives a user request for cached and non-cached content and creates or updates the policy index accordingly.

Finjan incorrectly describes this limitation as pertaining to merely "a preferred embodiment of the invention." Br. at 6. To the contrary, the specification refers to this feature as part of "the present invention," effectuating a disavowal of scope. *See Techtronic Indus. Co. v. Int'l Trade Comm'n*, 944 F.3d 901, 907 (Fed. Cir. 2019) ("It is axiomatic that, where the specification describes ***the present invention*** as having a feature, that representation may disavow contrary embodiments."); *Poly-America, L.P. v. API Indus., Inc.*, 839 F.3d 1131, 1136 (Fed. Cir. 2016) ("[A]n inventor may disavow claims ***lacking a particular feature*** when the specification describes 'the present invention' as having that feature."). Moreover, ***every*** embodiment in the patent describes dynamic generation as occurring through receiving a user's

content request. *See* Dkt. 42-5 '968 patent at Figure 2 (showing an initial user content request at step 205 causing the policy-based cache index to be updated at steps 250 and 265); *see also id.* at 6:22, 6:31-35, 8:17-18 and 8:33-40 (describing embodiments for updating policy index after receiving a user's content request). The inclusion of this feature in every embodiment underscores that the inventors intended for "dynamic generation" to occur in response to a user's content request. *See Alloc, Inc. v. Int'l Trade Comm'n*, 342 F.3d 1361, 1370 (Fed. Cir. 2003) (finding relevant that "all the figures and embodiments disclosed in the asserted patents imply play, or, as in the case of Figure 1b, expressly disclose play.").

Finjan's arguments miss the mark. First, Finjan presents a straw man argument that "dynamically generating" does not mean "creating or updating." Br. at 6. This argument omits the critical portion of Qualys' proposal – i.e., that dynamic generation is creating or updating ***in response to a user request for content***. Second, Finjan identifies what it contends are "alternative situations," such as an empty policy index, building the policy index "on-the-fly," or "synchronizing/resetting." *Id.* at 6 (citing 5:64-6:13, 6:7-13, and 7:57-63). On their face, these seem to merely be examples of ways that the policy can be created or updated, and do not contradict Qualys' proposed construction. Importantly, in each example the policy index first ***received a user content request***. The Court should therefore adopt Qualys' construction.

### C. Term 3: "known to be allowable relative to a given policy"

| '968 Claims | Qualys' Proposed Construction | Finjan's Proposed Construction |
|---|---|---|
| 1, 12, 13, 23, 26, 32, and 33 | Whether the given digital content may be sent to the web client | No construction necessary – plain and ordinary meaning |

Qualys seeks clarification about what it means for digital content to be "allowable relative to a given policy." Qualys contends that this term refers to whether a piece of digital content may be sent to a user, i.e. a web client.

Qualys' construction is firmly rooted in the intrinsic record. For example, the '968 patent's specification describes that under "the present invention" an "allowable" determination indicates whether to send or block content to a user:

> Using the policy-based index ***of the present invention***, a cache manager can check whether cached content is allowable for a different user than the

> original user who requested it, and thus ***block cached content from being delivered to users for whom it is not allowed***.

Dkt. 42-5 '968 patent at 2:6-10; *see also* 2:39-67 (describing embodiments of the "present invention" as receiving a content request from a user and determining whether that content is allowable for that user); *Id.* at 5:19-30 ("if policy-based cache index 190 indicates that the content is allowable, then ***the content is delivered from cache to the user***."); *Id.* at 6:22-7:2 (providing the algorithms for sending or blocking content to a user upon allowability determination); *Id.* at 7:14-15. By describing these features as part of "the present invention," it is appropriate to construe this term consistent with Qualys' proposal. *See also Techtronic*, 944 F.3d at 907; *Poly-America*, 839 F.3d at 1136.

Dkt. 42-5 '968 patent at Figure 2 depicts the above-described process in greater detail. First, the system receives a user request for content (at step 205). It makes an allowability determination at step 245. If the content is allowable based on the user's policy group, the system sends the content to the user (at step 255). If the content is not allowable based on the user's policy group, the system blocks the user from receiving the content (at step 270). *See Id.* at Fig. 2; 8:17-55 (describing steps).

Finjan takes issue with Qualys' inclusion of the term "web client" in the proposed construction. But Finjan has consistently argued across multiple litigations that "web client" means an end user's computer. *See Finjan, Inc. v. Sophos, Inc.,* 2016 U.S. Dist. LEXIS 68128 at *71 (N.D. Cal. May 24, 2016) ("[Finjan] argues that the web clients in the accused products are the end users, not the accused products themselves."); Ex. A (Finjan's supplemental claim construction brief for the term "web clients" from the '844 patent in *Finjan, Inc. v. Proofpoint, Inc.*, No. 3:13-cv-5808-HSG, Dkt. No. 462) at 1-5 (arguing that the plain and ordinary meaning of "web client" is the "end user's computer"); Ex. B (Finjan's opposition to motion for summary judgment of noninfringement of the '844 patent, inter alia, in *Finjan, Inc. v. Proofpoint, Inc.*, No. 3:13-cv-5808-HSG, Dkt. No. 321) at 10 ("The only logical interpretation, which is fully supported with the documentary and testimony evidence, is that the end user is the web client."). Moreover, the '968 Patent's specification synonymizes "web client" with an end user who

requests content. *See* Dkt. 42-5 '968 patent at Fig. 2; 8:8-32. Thus, whether the Court's ultimate construction uses "web-client" or "end user," the critical point is that "allowability" refers to whether content may be sent to an end user/web-client.

**D. Term 4: "memory storing a cache of digital content"**

| '968 Claims | Qualys' Proposed Construction | Finjan's Proposed Construction |
|---|---|---|
| 1, 13, 23, 26, and 32 | A memory storing [memory for storing] a collection of digital content previously requested and retrieved for a web client | No construction necessary – plain and ordinary meaning |

For this term, Qualys again seeks clarification about what type of digital content is stored in the cache's memory. Qualys' position is that the cache contains digital content that has been previously requested by a web client. Finjan apparently contends that the cache's content need have no relationship to any user requests.

The specification makes clear that digital content stored in the cache is content previously requested and retrieved for a web client. *See* Dkt. 42-5 '968 patent at 2:6-9 ("Using the policy-based index of the ***present invention***, a cache manager can check whether cached content is allowable for a different user than the ***original user who requested it***…"); *see Techtronic*, 944 F.3d at 907 (describing invention in terms of the "present invention" effectuates a disavowal of scope); *Poly-America*, 839 F.3d at 1136. Consistent with the specification's description of the "present invention" including a cache filled with digital content requested by users, the specification provides specific steps by which the cache's memory is filled with requested content:

> 1. A first user, governed by policy A, requests content #1.
>
> 2. Cache manager 150 checks its cache 140 and indicates that content #1 is not resident therein.
>
> 3. Content filter 160 requests content #1 from web server 120.

Dkt. 42-5 '968 patent at 6:22-26 (describing Figure 1). These steps are graphically depicted in the flow chart of Figure 2:




Fig. 2 (edited); *see also id.* at 8:17-26 (describing the above steps). Importantly, the steps of Figure 2 are the only way described in the specification to fill the cache. *See Alloc*, 342 F.3d at 1370.

Qualys' proposed construction is fully consistent with how the specification describes the invention and should be adopted.

## V. '731 PATENT

### A. '731 Patent Overview

The '731 patent is generally directed to a computer gateway for an intranet of computers, including a scanner for scanning incoming files from the Internet and deriving security profiles for the incoming files. Dkt. 42-6 '731 patent at Abstract; claim 1. In other words, the computer gateway protects computers within the Intranet of computers (for example, computers within an office building) from potentially malicious files from the Internet.

The security profiles include lists of computer commands that the files are programmed to perform. *Id.* The computer gateway also has a file cache for storing the files and a security profile cache for storing security profiles for the files. *Id.* The computer gateway may also have a security policy cache for storing security policies for client computers within an intranet. *Id.* The security policies consist of lists of restrictions for files that are transmitted to the intranet computers. *Id.* at Abstract. The '731 patent also discloses, for example, a computer gateway for scanning outgoing files and deriving the same type of security profiles for the outgoing files. *Id.* at claim 18.

**B. Term 5: "incoming files from the internet"**

| '731 Claims | Qualys' Proposed Construction | Finjan's Proposed Construction |
|---|---|---|
| 1 | Internet files requested by an intranet computer | No construction necessary – plain and ordinary meaning |

Much like the previous terms, Qualys' proposed construction seeks to clarify that "incoming files" refers to files on the Internet that have been requested by a computer on the intranet. The claims and specification make clear that an "incoming file" is a file that has been requested by an intranet computer. Claim 1 claims a "computer gateway for an intranet of computers." Dkt. 42-6 '731 patent at 11:36. The "Background of the Invention" explains that a gateway "serves as a proxy between a group of inter-connected computers, referred to as an intranet." *Id.* at 1:25-27. Further, "[t]he gateway computer is networked with the intranet computers in such a way that ***outgoing requests*** and responses from the intranet computers to the Internet, and ***incoming*** . . . ***responses*** from the Internet to the intranet computers are routed through the gateway computer." *Id.* at 1:28-34.

What's more, every embodiment in the specification discussing an "incoming file" describes sending a file to an intranet computer that requested it. *See Id.* at 2:1-4; 2:14-16; 2:33-34; 2:38-39; 2:60-62; 3:9-10; 3:22-24; 3:55-56; 4:10-11. Similarly, both Figures 1 and 2 (depicting the architecture of a gateway and a flow-chart for its operation, respectively) show the claimed gateway receiving a file from the Internet in response to an intranet computer's request. *See Id.* at Figs. 1-2; 5:27-30 ("Specifically in FIG. 1, gateway computer 110 intervenes between requests for web pages originating from an intranet 120 of clients 123, 125 and 127, and responses originating from Internet servers 133, 135 and 137."); *Id.* at 7:27-33 ("when a client computer requests a web page, P, from a server computer, the request is first transmitted to gateway computer 110 . . . gateway forwards the request to the server computer, which in turn sends the requested web page, P, to gateway computer 110 within a response."); *Id.* at 8:63-65 ("As shown in FIG. 2, at step 205 an intranet client computer requests an Internet web page."). Since the specification consistently treats "incoming files" as files that have been requested by an intranet computer, the term should be so construed. *See UltimatePointer, L.L.C. v. Nintendo Co.*,

816 F.3d 816, 822-24 (Fed. Cir. 2016) ("hand-held device" was properly limited to a direct-pointing device where specification repeatedly stated that the invention was a direct pointing system); *VirnetX, Inc. v. Cisco Sys., Inc.*, 767 F.3d 1308, 1317-19 (Fed. Cir. 2014) (anonymity feature was "repeatedly and consistently used to characterize the invention," thus "strongly suggest[ing] that it should be read as part of the claim"); *David Netzer Consulting Eng'r LLC v. Shell Oil Co.*, 824 F.3d 989, 993-97 (Fed. Cir. 2016); *World Class Tech. Corp. v. Ormco Corp.*, 769 F.3d 1120, 1123-25 (Fed. Cir. 2014) ("construction that aligns with the description of the invention" affirmed); *Luminara Worldwide, LLC v. Liown Elecs. Co.*, 814 F.3d 1343, 1353; *Pacing Techs. LLC v. Garmin Int'l, Inc.*, 778 F.3d 1021, 1024-25 (Fed. Cir. 2015). Finjan's attempt to broaden the scope of "incoming files" to include files that have not been requested by an intranet computer is unsupported by the written description and should be rejected.

Finjan argues that "incoming files" should not be limited to files requested by an intranet computer because Claim 6, which depends on Claim 1, recites the step of the gateway "receiv[ing] a request for a file stored among the intranet of computers." Dkt. 42-6 '731 patent at 12:1-3. But this is *non-sequitur* and is inconsistent with both the claims and the specification. Claim 1 (which contains the term for construction here) specifically states that it scans "incoming files ***from the Internet***." Claim 6, on the other hand, refers to receiving a request for a file "stored among the ***intranet*** of computers." These claims refer to different files in different locations. The specification clearly distinguishes the Internet and the intranet computers. *See id.* at Fig. 1 (depicting Internet as including servers 133, 135, and 137; and the Intranet 120 as including clients 123, 125, and 127); *Id.* at 5:22-30 (describing the same). As such, the fact that the computer receives Internet files does not preclude the same computer from also receiving files from intranet computers. Qualys' proposed construction should, therefore, be adopted.

## VI. '844 PATENT

### A. '844 Patent Overview

The '844 patent is generally directed towards a system where an "inspector" links a Downloadable security profile ("DSP") to a Downloadable before a "web server" makes the Downloadable available to web clients. Because the DSP is generated before the Downloadable

is made available on the internet—and is sent with the Downloadable when web clients request it— the network gateways in the system can conduct a less resource-intensive analysis that simply determines whether to trust the DSP and/or compares it to the customer's particular security policies. *See, e.g.*, Dkt. 42-3 '844 patent, claims 22, 32. During prosecution, Finjan argued that its system is more efficient because it allows for the inspection to take place only once, instead of on each network gateway (as disclosed in the prior art). Ex. C at 5.

**B. Term 6: "web client"**

| '844 Claims | Qualys' Proposed Construction | Finjan's Proposed Construction |
|---|---|---|
| 1, 15, 22, 23, 32, and 41-44 | An application on the end-user's computer that requests a downloadable from the web server | No construction necessary – plain and ordinary meaning |

Finjan's "no construction necessary" position directly contradicts its positions in previous litigation. Previously, Finjan argued that the plain and ordinary meaning of "web client" is "an application on the end-user's computer that requests a downloadable from the web server." In other words, Qualys has proposed the same construction that Finjan previously proposed but inexplicably now opposes.

On February 10, 2017, Judge Gilliam of this District construed this term in *Finjan, Inc. v. Symantec Corp.*, 2017 U.S. Dist. LEXIS 19526, 2017 WL 550453 at *54 (N.D. Cal. February 10, 2017) ("*Symantec*"). He found that "to definitively avoid any claims of an *O2 Micro* violation at trial, [the Court] must instruct the jury as to the plain and ordinary meaning of the term 'web client.'" *Id.* Finjan's expert opined that "web clients are applications on the end user computers that originally request Internet content." *Id.* Judge Gilliam agreed with Finjan and held that "the plain and ordinary meaning of 'web client' for a person of ordinary skill in the art at the time the patent issued is 'an application on the computer of an end user that requests a Downloadable from the web server.'" *Id.* This is the same construction that Qualys now proposes.

A year later, Judge Freeman again addressed the plain and ordinary meaning of this term. *See Finjan, Inc. v. Cisco Sys.,* 2018 U.S. Dist. LEXIS 122951, 2018 WL 3537142 at *35 (N.D.

Cal. July 23, 2018) ("*Cisco*"). In *Cisco*, Finjan affirmatively argued that the "plain and ordinary meaning of 'web client' is "an application on the computer of an end user that requests a Downloadable from the web server" which is, again, the same construction that Qualys now proposes. *Id*. At the time, Finjan argued that this construction should be adopted "as it is exactly the same one adopted by Judge Gilliam in *Symantec* and is consistent with decision[s] of the Federal Circuit and numerous other orders in this District." *Id.* at *29. Judge Freeman agreed with Finjan, adopted Judge Gilliam's reasoning, and construed "web client" consistent with Finjan's arguments. *Id.* at *35.

Now, Finjan is arguing against its prior position by seeking "plain and ordinary meaning - ***no construction necessary***" instead of simply adopting the construction that it previously told two courts constituted was the plain and ordinary meaning of the term. In any event, since Finjan at least agrees that the plain and ordinary meaning of the term should govern, the Court should simply adopt Finjan's prior definition (and that Qualys now asserts). Doing so would also harmonize the Court's construction with *Symantec* and *Cisco*.

## VII. '154 PATENT

### A. '154 Patent Overview

The '154 patent is directed toward providing a network security system where code is "wrapped" (also called "instrumented" or "hooked") at a specialized "security computer." The patent notes that, in the prior art, code was typically inspected at (1) the client computer, (2) network gateway, or (3) both. The '154 inventors believed that there were drawbacks to each of these approaches. For example, inspecting software at the client computer is less secure because hackers can easily obtain copies of consumer (*i.e.*, client-side) antivirus software and reverse engineer the software in order to design viruses specifically to avoid those detection capabilities. Dkt. 42-4 '154 patent at 4:15-22. But inspecting software at a network gateway can miss threats because some viruses are undetectable until they begin executing at the client computer. A network gateway would have difficulty identifying these types of threats. *Id.* at 3:65-4:8. For example, "dynamically generated malicious code" can be difficult to detect at the gateway because the malicious code initially appears as static, non-executable text and only later, at

runtime, matures into commands that perform malicious operations. *Id.* at 3:31-4:8. Inspecting at both locations is more secure but is less efficient because the file must be analyzed twice.

To address these purported drawbacks, the '154 patent teaches inspecting software at a location other than the network gateway or the client computer, specifically at a third computer known as a "security computer." *Id.* at Abstract. To address the "dynamically generated malicious code" problem, the '154 patent leverages a well-known set of techniques referred to as "wrapping," "hooking," or "instrumenting." The general approach involves substituting the original function with a different, dummy function that instructs the computer to first inspect the input to the original function to make sure that the input is not malicious before executing the original function. *Id*. at 4:55-60 ("the present invention operates by replacing original function calls with substitute function calls within the content, at a gateway computer, prior to the content being received at the client computer.").

**B. Term 7: "a content processor"**

| '154 Claims | Qualys' Proposed Construction | Finjan's Proposed Construction |
|---|---|---|
| 1 and 6 | A processor that processes modified content; the content processor is part of the computer being protected from dynamically generated malicious content | No construction necessary – plain and ordinary meaning |

Qualys' construction for this term seeks to clarify two disputes over its meaning: (1) whether the content processor must process ***modified*** content; and (2) which computer the claimed content processor is located on. The first dispute was already addressed in a prior litigation. The second dispute is unique to this case and is an issue of first impression.

**1. The Content Processor Processes Modified Content.**

The first dispute regarding this term has already been addressed by another court in this District, and Qualys proposes that prior construction be adopted here. On May 8, 2019, Judge Alsup in *Finjan, Inc. v. Juniper Networks, Inc.*, N.D. Cal. Case No. C 17-05659-WHA, determined that both the claim language and specification of the '154 patent made evident "[t]hat the 'content' being processed in Claim 1 [of the '154 Patent] has been modified." *Finjan, Inc. v. Juniper Networks, Inc.,* 387 F. Supp. 3d 1004, 1010 (N.D. Cal. May 8, 2019) ("*Juniper*"). As

Judge Alsup explained, claim 1 of the '154 Patent teaches that the content processed by the content processor includes a "first function." *Id.* (citing claims 1, 4, 6, and 10; and 9:13-28). Reviewing the specification, however, Judge Alsup determined that the claimed first function involves a "substitute function" that only exists after the original content is modified. *Id.* Accordingly, he concluded, the claimed "content" "necessarily refers to ***modified content***." *Id.* Judge Alsup also noted that the '154 Patent's own description of the "present invention" stated that it processed modified content:

> This reading is made all the more apparent by the '154 patent's own description of the "present invention" ('154 patent at 4:55–60):
>
> "To enable the client computer to pass function inputs to the security computer and suspend processing of content pending replies from the security computer, ***the present invention operates by replacing original function calls with substitute function calls within the content***, at a gateway computer, prior to the content being received at the client computer."
>
> When a patent describes the features of the present invention as a whole, this description limits the scope of the invention.

*Id.* at 1011 (emphasis in original) (citing *Regents of Univ. of Minnesota v. AGA Med. Corp.*, 717 F.3d 929, 936 (Fed. Cir. 2013); *Verizon Servs. Corp. v. Vonage Holdings Corp.*, 503 F.3d 1295, 1308 (Fed. Cir. 2007)); *see also* Techtronic, 944 F.3d at 907; *Poly-America*, 839 F.3d at 1136. Judge Alsup also noted that the Patent Office similarly interpreted Claim 1. *Id*. at 1011-1012 (citing Ex. D *Finjan Inc. v. Juniper Networks, Inc.,* 3:17-cv-05659-WHA, Dkt. No. 390-19 at 14). Accordingly, Judge Alsup construed "content processor" to process modified content. *Id.*

Surprisingly, Finjan's Opening Brief completely ignores Judge Alsup's ruling in *Juniper* as if it did not even exist. *See* Br. at 10-12.[5] Instead, Finjan tries to sidestep the issue by pointing to four cases where Judges held that 'a content processor' should be given its plain and ordinary meaning." *Id.* at 11. But this is misleading. As Judge Alsup noted, in three of those four cases (*Proofpoint*, *Symantec*, and *Bitdefender*), the issue of whether the content processor

[5] Finjan also neglects to address the fact that it is presently challenging Judge Alsup's construction before the Federal Circuit. *See* D.I. 41.

must process modified content was not before the Court. *Juniper*, 387 F. Supp. 3d at 1013. The fourth order comes from *Finjan, Inc. v. Rapid7, Inc.*, No. CV 18-1519 (MN), 2020 WL 565377, at *8 (D. Del. Feb. 5, 2020) ("*Rapid7*"). There, the Delaware court adopted "plain and ordinary meaning" based on (1) an amendment during prosecution where Finjan struck a reference to "modified" content and (2) the existence of claims in a related patent that expressly mention "modified content."

Judge Alsup, however, considered both arguments and rejected them as unpersuasive given the clear waiver of scope in '154 patent's specification describing the "present invention" as processing modified content. *Juniper*, 387 F. Supp. 3d at 1012. The court in *Rapid7* does not address Judge Alsup's reasoning, the waiver of scope he identified, or even mention his order. *See Rapid7*, 2020 WL 565377 at *7-8. In any event, as Finjan acknowledged, it is appropriate for courts to "grant even more deference to prior claim constructions from within their Districts, as is the case here." Br. at 5 (citing *Symantec*, 2017 WL 550453, at *3; *Visto Corp. v. Sproqit Techs., Inc.*, 445 F. Supp. 2d 1104, 1107–08 (N.D. Cal. 2006)).

Finjan finally argues that content need not be "modified" because claims 6, 7, 9, and 10 use the word "modified." Judge Alsup also considered—and rejected—this argument. As he stated in *Juniper*, these other claims "refer to ***modified input variable***, which is distinct from Claim 1's ***modified content***." *Juniper*, 387 F. Supp. 3d at 1012 (emphasis in original).

In light of the foregoing, the Court should adopt Judge Alsup's reasoning and his construction that the content processor processes ***modified*** content.

**2. The Content Processor is Located on the Computer Being Protected.**

The parties also have a second material dispute pertaining to the construction of this term for which Qualys seeks the Court's resolution. *See O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1360 (Fed. Cir. 2008) ("When the parties raise an actual dispute regarding the proper scope of these claims, the court, not the jury, must resolve that dispute."). The dispute centers around where the claimed "content processor" is located. This is an issue of first impression for the '154 patent – the question does not appear to have been raised in any

prior claim construction proceedings for this patent, so no prior court has had an opportunity to address it.

Qualys contends that the content processor is located on the computer that is being protected. This is consistent with the clear teachings of the specification. For example, the specification states that in "[t]he present invention," the client computer "process[es] the network content." Dkt. 42-4 '154 patent at 4:35-43. The '154 Patent also explains that it is the client computer that is the computer being protected. *See* Abstract ("A method for ***protecting a client computer*** from dynamically generated malicious content…"); *Id.* at 5:4-25 (describing the objective of the "present invention" as "protecting a client computer"). The figures also depict the content processor being located on the client computer. *See Id.* at Fig. 2 (showing "content processor" 270 located on "client computer" 210; *Id.* at Fig. 3 (showing at 320 and 328 content being sent to the client for processing); *Id.* at 9:6-12 and 13:63-14:16 (describing the same).

Finjan does not materially dispute this point. In its Brief at 12, Finjan concedes that the embodiments of the '154 Patent each describe the content processor as "limiting the computer [with the content processor] to the specific computer that will ultimately receive the content." This is a distinction with no difference. The specification makes clear that the computer being protected is the client computer, which is also the computer that will ultimately receive the content. *See* Dkt. 42-4 '154 patent at 5:4-25, 13:63-14:16, Fig. 3, Abstract. In other words, Qualys and Finjan appear to be using different words to describe the same end-user/client computer.

For these reasons, the Court should adopt Qualys' construction as to both issues for this term.

**C. Term 8: "security computer" ('154 patent)**

| '154 Claims | Qualys' Proposed Construction | Finjan's Proposed Construction |
|---|---|---|
| 1 and 6 | A computer that determines whether the content received by the content processor is malicious | No construction necessary – plain and ordinary meaning |

Finjan contends that "security computer" should be given its plain and ordinary meaning because it contends the separate words "security" and "computer" are "clear and

unquestionable." However, Finjan presents no evidence to support this statement, which is merely attorney argument. Importantly, Finjan does not cite to any portion of the specification of the '154 patent, offers no expert testimony, and does not even cite any extrinsic sources such as technical dictionaries that might inform how a POSITA, at the time of the invention and reading the specification and claims, would understand what the plain and ordinary meaning of "security computer" is. Indeed, Finjan cannot even explain what it contends the plain and ordinary meaning of a "security computer" is within the context of this patent.

Qualys' proposed construction, on the other hand, is consistent with the plain and ordinary meaning of the invention as described by the inventors. For example, the '154 patent's specification states that in "the present invention," the client computer passes code to the security computer "for inspection." Dkt. 42-4 '154 patent at 4:34-50. The response from the security computer tells the client computer whether it can run the inspected code. *Id.*; *see also* 5:18-20. Figure 3 depicts the algorithmic steps by which the security computer determines whether the code received from the client computer is safe to run. *See Id.* at Fig. 3 at boxes 340, 344, 348, 352, 356, 360, 364, 368, 372, 378, and 380; *see also* 13:63-14:60 (describing the algorithm of Figure 3). The abstract similarly states that the security computer determines "whether it is safe for the client computer to invoke the original function with the input." Taken together, the specification teaches that the plain and ordinary meaning of the security computer is "a computer that determines whether the content received by the content processor is malicious."

Finjan also contends that construing the security computer to detect malicious code is too narrow, and that the correct construction should cover whether the content is "potentially malicious or dangerous." Qualys does not object to the construction covering potentially malicious content, which is supported by the specification. *See* Dkt. 42-4 '154 patent at 11:10-26 (discussing the security computer scanning input to determine potentially malicious operations). However, the phrase "dangerous" is not found in the specification or the claims and is therefore unsupported. The Court should not include "dangerous" in the construction of this term. Qualys' proposed construction should, therefore, be adopted.

## VIII. INDEFINITENESS

### A. Legal Background on Indefiniteness

When a claim element invokes purely functional terms without the additional recital of specific structures or materials for performing that function, then the claim element must be construed under the legal standards for "means-plus-function" terms under 35 U.S.C. § 112, ¶ 6 ("§ 112, ¶ 6"). *See Al-Site Corp. v. VSI Intern., Inc.*, 174 F.3d 1308, 1318, 50 U.S.P.Q.2d 1161 (Fed. Cir. 1999). One category of claim terms that fall under § 112, ¶ 6 are so-called "nonce terms." A nonce term is a generic term that "reflect[s] nothing more than verbal constructs . . . [and] typically do not connote sufficiently definite structure." *Williamson v. Citrix Online, LLC*, 792 F.3d 1339, 1350 (Fed. Cir. 2015). When a claim term falls under § 112, ¶ 6, it must be construed to identify both the claimed function and the corresponding structure (and equivalents thereof). *See Al-Site*, 174 F.3d at 1320 ("These claim limitations 'shall be construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof.'" (quoting § 112, ¶ 6)). However, if the patent fails to disclose adequate corresponding structure for the term, then the patent claim is invalid as indefinite under § 112, ¶ 2. *Williamson*, 792 F.3d at 1352 ("If the patentee fails to disclose adequate corresponding structure, the claim is indefinite."). To qualify as corresponding structure, the specification must "clearly link[] or associate[] that structure to the function recited in the claim." *Id.* Computer software, such as the products at issue here, presents a special case. As the Federal Circuit explained

> "Structure" to a person of ordinary skill in the art of computer-implemented inventions may differ from more traditional, mechanical structure. For example, looking for traditional "physical structure" in a computer software claim is fruitless because ***software does not contain physical structures***. Indeed, the typical physical structure that implements software, a computer, cannot be relied upon to provide sufficiently definite structure for a software claim lacking "means." Rather, to one of skill in the art, the "structure" of computer software is understood through, for example, an ***outline of an algorithm, a flowchart, or a specific set of instructions or rules***.

*Apple Inc. v. Motorola, Inc.*, 757 F.3d 1286, 1298-99 (Fed. Cir. 2014); *see also Williamson*, 792 F.3d at 1352 ("We require that the specification disclose an algorithm for performing the claimed function. The algorithm may be expressed as a mathematical formula, in prose, or as a flow chart, or in any other manner that provides sufficient structure." (citations omitted)). Here, the

terms "receiver" and "transmitter" are nonce terms in the field of computer software and lack any corresponding structure in the patents' respective specifications. The terms are, therefore, indefinite under §112, ¶ 2.

**B. Terms 9 and 10: "receiver" and "transmitter"**

| Term | Patent (Claims) | Qualys' Proposed Construction | Finjan's Proposed Construction |
|---|---|---|---|
| Receiver | '494 patent (10)<br><br>'968 patent (7)<br><br>'154 patent (1-2, 6-7) | Indefinite.<br><br>Governed by 35 U.S.C. § 112 ¶ 6 without corresponding structure | No construction necessary – plain and ordinary meaning |
| Transmitter | '968 patent (6)<br><br>'154 patent (1-3, 6-8) | | |

The terms "receiver" and "transmitter" are nonce words that lack structure, and thus fail the definiteness requirements under §112, ¶ 2.

**1. "Receiver" and "Transmitter" Are Nonce Words in the Field of Computer Software.**

Here, various claims of the '494, '968, and '154 patents include the terms "receiver" and "transmitter." But, in the field of computer software, the terms "receiver" and "transmitter" do not themselves connote any structure. *See* Declaration of Dr. Aviel Rubin ("Rubin Decl."), ¶¶ 4, 27-30, 33-37. Software algorithms routinely "receive" inputs and "transmit" outputs from innumerable sources and innumerable ways. There is no single way to design an algorithm to receive or transmit. *Id.* at ¶¶ 36-37. An algorithm that receives input and transmits output can do so in an arbitrary number of ways and from any of a number of sources, including the Internet, computers on the same network, devices connected to the computer on which the software is run, and even between different algorithms of the same computer program. *Id.* Thus, neither "receiver" or "transmitter" connotes a structure to a POSITA in the field of computer software. *Id.* at ¶¶ 4, 27-30, 33-37.

The claims of the '494, '968, and '154 patents likewise connote no structure for these terms. For example, claim 1 of the '154 patent generically recites a transmitter "for transmitting the input to the security computer for inspection," and a receiver "for receiving an indicator from the security computer." Dkt. 42-4 '154 Patent at 17:39-44; Rubin Decl. ¶¶ 40-41. The other

claims of the ’154, ’494, and ’968 Patents use similar language. *See* Dkt. 42-5 ’968 patent at 10:7-12; Dkt. 42-2 ’494 patent at 22:9; Dkt. 42-4 ’154 patent at 17:48-49, 18:17-18, 18:26-27; Rubin Decl. ¶¶ 46-47, 51-52. These claims are written in purely functional language, and do not provide any structure that a POSITA would recognize. Rubin Decl. at ¶ 40-41, 46-47, 51-52.

Underscoring Qualys’ point, Finjan itself fails to identify what structure(s) are connoted by a receiver and/or transmitter in the field of software. Instead, Finjan offers only more functional language. *See, e.g.*, Br. at 16 (“The ‘494 Patent also provides that the receiver must be of a type that is capable of receiving data or information including executable code.”); *id.* at 18 (“The specification states that this transmitter must be of a structure to communicate with the client computer and the cache and be structurally able to transmit digital web content from one to the other.”). Finjan’s reasoning is also circular. *See id.* at 16-17 (Unsupported attorney argument: “Thus, persons skilled in the art of computer security would understand that the ***receiver*** connotes the structure of a ***receiver*** for digital content from a web server”). Finjan’s inability to identify any structures confirms that these are nonce terms.

The cases on which Finjan relies to claim that a transmitter and/or receiver are not nonce words do not apply here. Those cases involved ***different fields***, such as electromagnetic, wireless, and radio devices. *See* Br. at 15 (*citing EnOcean GmbH v. Face Int’l Corp*., 742 F.3d 955, 959 (Fed. Cir. 2014)). Whether these terms connote structure in different fields says nothing about whether they connote structure to a POSITA in the field of computer software. *See Williamson*, 792 F.3d at 1349 (“The standard is whether the words of the claim are understood by persons of ordinary skill ***in the art*** to have a sufficiently definite meaning as the name for structure.”). Because “receiver” and “transmitter” do not connote structure in the field of computer software, they are nonce words and should be construed under § 112, ¶ 6.

**2. “Receiver” and “Transmitter” Are Indefinite**

Because “receiver and transmitter” are nonce words subject to § 112, ¶ 6, the second step of the inquiry is whether the patents’ specifications “disclose[] sufficient structure that corresponds to the claimed function.” *Williamson*, 792 F.3d at 1351. The specifications fail to provide structure, rendering the terms indefinite. *Id.* at 1351.

’154 Patent. In the ’154 Patent, the claims disclose that the “transmitter” performs the function of “transmitting the input to the security computer for inspection.” Dkt. 42-4 ’154 Patent at 17:39-41. The “receiver” performs the function of “receiving an indicator from the security computer whether it is safe to invoke the second function with the input.” As discussed, this claim language is purely functional and connotes no structure. Moreover, the specification provides no algorithm, flow-chart, or any rules that a POSITA in the field of software would recognize as corresponding to the claimed functions. Rubin Decl. ¶¶ 39-45. For example, Figure 3 provides a flow chart where steps 380 and 384 recite the claimed functions for the transmitter and receiver:




These boxes, however, do not show the operations that the software must perform to fulfill the stated functions, and thus do not provide structure. Rubin Decl. at ¶ 43. Similarly, the specification repeatedly recites the same functional language, but again provides no steps for how software would perform the function. *See* Dkt. 42-4 ’154 Patent at 6:50-65, 14:59-62; Rubin Decl. at ¶¶ 42-44.

Finjan argues the patent identifies “receivers in a gateway” and “in a client computer.” Br. at 17 (citing ’154 Patent at 2:54-63). But these say only where the receiver and transmitter are located, and do not disclose structure. *See* Rubin Decl. at ¶ 44. Moreover, these passages expressly pertain to prior art devices, not the claimed invention. *See* Dkt. 42-4’154 Patent at 2:46-63 (“Reference is now made to FIG. 1, which is a simplified block diagram of prior art systems for blocking malicious content”).

’968 Patent. Claim 6 of the ’968 Patent recites a “transmitter” that performs the claimed function of “transmitting allowable content from the cache to a client computer.” Similarly, claim 7 recites a “receiver” that performs the function of “receiving digital content from a web server.” These are functional statements that do not convey structure. *See* Rubin Decl. ¶¶ 46-50.

Moreover, the terms "receiver" and "transmitter" appear nowhere in the specification. *Id.* ¶ 47. And, while the specification does reference the claimed functions, it does not identify any structure for performing that function. *See, e.g.,* Dkt. 42-5 '968 Patent at Fig. 2:




*See also* Dkt. 42-5'968 Patent at 8:24-25, 8:37-40, 8:50-53; Rubin Decl. at ¶ 49.

'494 Patent. Claim 10 of the '494 Patent states that the receiver performs the claimed function of "receiving an incoming Downloadable." (Dkt. 42-2 '494 patent). The claim provides no structure, and "receiver" appears nowhere in the specification. *See* Rubin Decl. at ¶ 52. The specification again simply repeats the claimed function but fails to connote any structure to perform that function. *See id.* at ¶¶ 51-56.

Finjan points to examples such as where the receiver may reside and what functions the receiver may perform. *See* Br. at 16 (citing '494 Patent at 3:4-8 and 9:38-46). But such statements do not connote any structure showing an algorithm, flow-chart, or set of rules that the receiver must follow to perform the claimed function. *See* Rubin Decl. at ¶ 53-54.

Because none of the patents' specifications provide structure that a POSITA in the field of computer software can recognize, the terms "receiver" and "transmitter" are indefinite.

## IX. CONCLUSION

For the foregoing reasons, Qualys respectfully submits that its proposed constructions for each of the ten terms discussed above should be adopted.

Respectfully submitted,

WILSON SONSINI GOODRICH & ROSATI

Dated: March 16, 2020 By: */s/ Christopher D. Mays*

*Counsel for Defendant*
QUALYS INC.