PAGES 1 - 72

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

**BEFORE THE HONORABLE YVONNE GONZALEZ ROGERS, JUDGE**

| | | |
|---|---|---|
| FINJAN, INC., | ) | |
| | ) | |
| PLAINTIFF, | ) | NO. C-18-7229 YGR |
| | ) | |
| VS. | ) | WEDNESDAY, MAY 27, 2020 |
| | ) | |
| QUALYS, INC., | ) | OAKLAND, CALIFORNIA |
| | ) | |
| DEFENDANT. | ) | CLAIMS CONSTRUCTION |
| _____ | ) | |

<u>**REPORTER'S TRANSCRIPT OF ZOOM PROCEEDINGS**</u>

<u>**APPEARANCES VIA ZOOM:**</u>

**FOR PLAINTIFF:**            KRAMER LEVIN NAFTALIS & FRANKEL
                             990 MARSH ROAD
                             MENLO PARK, CALIFORNIA 94025
                    BY:  AARON FRANKEL, ESQUIRE
                         JAMES HANNAH, ESQUIRE


**FOR DEFENDANT:**           WILSON SONSINI GOODRICH & ROSATI
                             650 PAGE MILL ROAD
                             PALO ALTO, CALIFORNIA 94304
                    BY:  CHRISTOPHER D. MAYS, ESQUIRE
                         RYAN R. SMITH, ESQUIRE

                             WILSON SONSINI GOODRICH & ROSATI
                             633 WEST FIFTH STREET, SUITE 1550
                             LOS ANGELES, CALIFORNIA 90071
                    BY:  EDWARD G. POPLAWSKI, ESQUIRE


**REPORTED BY:**            DIANE E. SKILLMAN, CSR 4909, RPR, FCRR
                            OFFICIAL COURT REPORTER


TRANSCRIPT PRODUCED BY COMPUTER-AIDED TRANSCRIPTION

2

```
 1    WEDNESDAY, MAY 27, 2020                        2:11 P.M.

 2                  Z O O M   P R O C E E D I N G S

 3                             O0O

 4         THE CLERK:  SO I'LL GO AHEAD AND CALL THE CASE?

 5         THE COURT:  YES, PLEASE.

 6         THE CLERK:  CALLING CIVIL ACTION 18-7229 FINJAN, INC.

 7    VERSUS QUALYS, INC.

 8       COUNSEL, PLEASE STATE YOUR APPEARANCES.  START WITH THE

 9    PLAINTIFF.

10         MR. HANNAH:  GOOD AFTERNOON, YOUR HONOR.

11         THE COURT:  MR. HANNAH, GOOD AFTERNOON.  GOOD TO SEE

12    YOU AGAIN.

13         MR. HANNAH:  GOOD TO SEE YOU, TOO.

14       SO JAMES HANNAH, AND I HAVE AARON FRANKEL WITH ME ON

15    BEHALF OF FINJAN.

16         THE COURT:  OKAY.

17         MR. FRANKEL:  GOOD AFTERNOON.

18         THE COURT:  GOOD AFTERNOON.

19       AND FOR THE DEFENSE?

20         MR. SMITH:  THIS IS RYAN SMITH HERE FOR THE DEFENSE

21    AS WELL.  AND WE HAVE CHRISTOPHER MAYS AS WELL FOR THE

22    DEFENDANT'S SIDE.  AND THEN ALSO MY COLLEAGUE, ED POPLAWSKI,

23    WHO IS ON THE CONFERENCE BUT NOT PARTICIPATING.  AND THEN WE

24    ALSO HAVE BRUCE POSEY FROM QUALYS WHO'S ALSO ON BUT NOT

25    PARTICIPATING.
```

1          **THE COURT:**  OKAY.  THANK YOU.

2       ALL RIGHT.  WE WILL GET STARTED HERE.  I DO NEED TO LET

3    YOU KNOW THAT I NEED TO FINISH UP BY 4:15.  IF I HAD TO, I

4    COULD DO A BIT SOME OTHER DAY, BUT I DON'T THINK I'M GOING TO

5    HAVE TO GIVEN MY REVIEW.  BUT WE'VE GOT A GOING LIVE TEST

6    HAPPENING IN THIS COURTROOM AT 4:30, SO THAT'S ALL THE TIME I

7    HAVE.

8       ALL RIGHT.  IN TERMS OF THE -- LET ME JUST FIGURE OUT

9    WHO'S GOING TO DO WHICH OF THE TERMS.

10       ARE WE STARTING FROM THE TOP IN TERMS OF THE BRIEFING?

11          **MR. HANNAH:**  YES, YOUR HONOR.  WE HAD PLANNED TO

12    START IN THE ORDER OF THE BRIEFING AND JUST FOLLOW THAT ORDER.

13       I WAS JUST GOING TO GIVE SOME INTRODUCTORY REMARKS AND

14    THEN TURN IT OVER TO MY PARTNER, MR. FRANKEL.  AND THEN HE'LL

15    BE DOING TERMS 1 THROUGH 5 AND I'LL DO TERMS 6 THROUGH 10.

16    AND I UNDERSTAND YOUR HONOR WANTS TO PING-PONG BACK AND FORTH

17    WITH THE DEFENSE, SO I THINK WE ARE BOTH PREPARED -- BOTH

18    PARTIES ARE PREPARED TO DO IT THAT WAY.

19          **THE COURT:**  ALL RIGHT.  AND WHAT'S THE BREAKDOWN

20    GOING TO LOOK LIKE WITH RESPECT TO THE OTHER -- TO THE

21    DEFENSE?

22          **MR. SMITH:**  SO, YOUR HONOR, MR. MAYS IS DOING TERMS 1

23    THROUGH 5 AND I WAS GOING TO DO TERMS 6 THROUGH 10.

24          **THE COURT:**  TIME IS SHORT.  IS THERE SOMETHING THAT

25    YOU WANTED TO SAY, MR. HANNAH, THAT IS NOT IN THE BRIEFING AND

```
1    NOT -- THAT SOMEHOW I NEED TO KNOW THAT IS NOT VERY SPECIFIC

2    TO THE TERMS THAT WE ARE DEALING WITH?

3         MR. HANNAH:  NO, YOUR HONOR.  WE CAN GO AHEAD AND GET

4    STARTED AND LET MR. FRANKEL TAKE IT.

5         THE COURT:  ALL RIGHT.  LET'S DO THAT.

6      SO WITH RESPECT TO THE FIRST TERM, WHICH IS

7    DOWNLOADABLE -- I'M SORRY, WRONG LINE.

8      FINJAN WANTS TO HAVE THE PLAIN AND ORDINARY MEANING.

9    QUALYS -- AM I SAYING THAT RIGHT, MR. FRANKEL?  NO.  MR. --

10        MR. SMITH:  YOUR HONOR, QUALYS IS, I THINK, HOW THAT

11   IS PRONOUNCED, THE DEFENDANT'S COMPANY.

12        THE COURT:  QUALYS?

13        MR. SMITH:  QUALYS.

14        THE COURT:  OKAY.  -- IS RECOMMENDING A SPECIFIC

15   CONSTRUCTION.  SO WHY DON'T YOU START, ON THE DEFENSE.

16        MR. MAYS:  YOUR HONOR, I'LL SHARE MY SCREEN HERE.

17                  (DISPLAYED ON SCREEN.)

18     YOUR HONOR, CAN YOU SEE OUR SLIDE NO. 1.1, WHICH HAS A

19   PICTURE OF THE '408 PATENT?

20        THE COURT:  I CAN.

21        MR. MAYS:  OKAY.  THANK YOU, YOUR HONOR.

22     AS YOU CORRECTLY NOTED, QUALYS IS PROPOSING THE

23   CONSTRUCTION FOR THIS TERM SUBSTITUTING SPECIFIC DATA,

24   INSTRUCTIONS, OR BOTH INTO A SCANNER TO MAKE IT USABLE --

25        THE COURT:  MR. MAYS, I'M GOING TO ASK YOU TO
```

1    SPECIFICALLY IDENTIFY WHY I SHOULD -- ONE OF THE MAIN

2    ARGUMENTS FINJAN IS MAKING IS THAT TWO JUDGES HAVE ALREADY

3    REJECTED YOUR CONSTRUCTION.

4        CAN YOU DEAL WITH THAT TOPIC?

5        **MR. MAYS:**  ABSOLUTELY, YOUR HONOR.  THAT IS

6    CATEGORICALLY INCORRECT.

7        QUALYS' PROPOSAL IS THAT THE COURT SHOULD ADOPT THE EXACT

8    SAME CONSTRUCTION THAT JUDGE FREEMAN ADOPTED IN THIS DISTRICT.

9    SHE ADOPTED IT IN THE *SONICWALL* CASE, WHICH IS A LEADING CASE

10   IN THIS DISTRICT.  SO THERE IS A CHANCE THAT THAT CASE COULD

11   GO TO TRIAL BEFORE US, COULD REACH FINAL JUDGMENT BEFORE US,

12   OR SETTLE BEFORE US, POTENTIALLY CREATING ISSUES DOWN THE ROAD

13   OF COLLATERAL ESTOPPEL.

14       BUT WE ARE NOT SEEKING TO MODIFY THE CONSTRUCTION AT ALL

15   FROM WHAT JUDGE FREEMAN PROPOSED.  JUDGE FREEMAN RULED ON THIS

16   CONSTRUCTION BASED ON THE PLAIN AND ORDINARY MEANING.  AND AS

17   YOU CAN SEE HERE IN SLIDE 1.3, YOUR HONOR, IT IS THE EXACT

18   SAME CONSTRUCTION THAT JUDGE FREEMAN OFFERED.

19       FINJAN, IN IT'S OPENING BRIEF, INITIALLY ARGUED THAT JUDGE

20   FREEMAN'S CONSTRUCTION SHOULD BE GIVEN DEFERENCE.  THAT'S AT

21   THEIR OPENING BRIEF AT PAGE 5.  IN THE REPLY BRIEF, THEY WALK

22   BACK FROM THAT AND FOCUSED ON A DIFFERENT CASE, THE *RAPID*7

23   CASE, WHICH IS A DELAWARE CASE FROM OUTSIDE OF THE DISTRICT.

24       AND, YOUR HONOR, FOR THE SAKE OF BREVITY, I WILL JUST JUMP

25   TO THE DISCUSSION OF THAT SLIDE.  AND I'M GOING TO PULL

1     SLIDE 11 FROM WHAT FINJAN SUBMITTED YESTERDAY.

2         THIS IS A QUOTE FROM THE *RAPID7* DECISION.  AND FINJAN HAS

3     HIGHLIGHTED THE TWO PASSAGES HERE.  THE ISSUE, YOUR HONOR, IS

4     THAT THE *RAPID7* DECISION IS INCOMPLETE AND UNRELIABLE IN A

5     NUMBER OF WAYS.

6         FIRST OF ALL, THE *RAPID7* DECISION DID NOT ADDRESS JUDGE

7     FREEMAN'S ANALYSIS AT ALL.  IT -- THE *RAPID7* DECISION STATED

8     THAT THE CONSTRUCTION CAME FROM THE PATENT OFFICE, WHICH IS

9     CORRECT, IN A SEPARATE IPR PROCEEDINGS.  BUT JUDGE FREEMAN DID

10    AN INDEPENDENT ANALYSIS BASED UNDER THE PLAIN AND ORDINARY

11    MEANING STANDARD AND DETERMINED THAT THE CONSTRUCTION THAT SHE

12    PROPOSED WAS THE CORRECT ONE.

13        ESPECIALLY PROBLEMATIC IN THE *RAPID7* DECISION, ASIDE FROM

14    THE FACT THAT IT DIDN'T ADDRESS WHAT JUDGE FREEMAN SAID AT

15    ALL, IS THAT IT APPEARS TO HAVE CONFUSED A CRITICAL TERM.

16        AT THE BOTTOM OF THIS SLIDE THAT YOU CAN SEE, THE JUDGE IN

17    THE *RAPID7* CASE STATED THAT SHE FOUND THAT THE CONCEPT OF

18    REQUIRING SUBSTITUTION APPEARS TO BE INCONSISTENT WITH THE

19    DESCRIPTION OF A SCANNER REPOSITORY.

20        YOUR HONOR, THIS WAS AN ISSUE THAT JUDGE FREEMAN -- IT WAS

21    SPECIFICALLY BRIEFED BY FINJAN AND THE PARTIES IN THE

22    *SONICWALL* CASE, AND JUDGE FREEMAN REJECTED THAT POSITION.

23        LOOKING AT WHAT FINJAN HAS SUBMITTED AS SLIDE 9, THEY HAVE

24    HIGHLIGHTED THE SPECIFIC PASSAGE WHICH, AGAIN, WAS BRIEFED IN

25    THE *SONICWALL* CASE.  THIS PASSAGE IS NOT DISCUSSING

1    INSTANTIATION OF A SCANNER.  IT'S TALKING ABOUT INSTANTIATION

2    OF A SCANNER REPOSITORY.

3        JUDGE FREEMAN ANALYZED THIS AND DETERMINED THAT THIS

4    PASSAGE SPECIFICALLY DID NOT REFER TO THE CLAIM LANGUAGE OF

5    INSTANTIATING A SCANNER FOR THE SPECIFIC PROGRAMMING LANGUAGE.

6    SHE DETERMINED THAT THIS LANGUAGE APPLIED TO INITIALIZING A

7    SCANNER THAT HAD ALREADY BEEN INSTANTIATED PREVIOUSLY.  AND

8    SHE DETERMINED THAT, THEREFORE, THE INSTANTIATION OF THE

9    CLAIMS WAS SOMETHING THAT HAPPENED BEFORE THIS SPECIFIC

10   PASSAGE.

11           **THE COURT:**  SO IN COLUMN -- HERE WE ARE.  COLUMN 15,

12   FIGURE 6, SPECIFICATION DESCRIBES THE ARB SCANNER FACTORY THAT

13   INSTANTIATES A REPOSITORY OF ARB SCANNERS FOR DIFFERENT

14   LANGUAGES.

15       HOW DOES THAT AFFECT YOUR CONSTRUCTION?

16           **MR. MAYS:**  SO, YOUR HONOR, WHAT THIS PASSAGE IS

17   TALKING ABOUT -- ACTUALLY, FIRST, LET ME SAY IT DOESN'T IMPACT

18   OUR CONSTRUCTION OR JUDGE FREEMAN'S CONSTRUCTION AT ALL.

19       WHAT THIS PASSAGE IS REFERRING TO IS, A SEPARATE COMPONENT

20   CALLED A SCANNER REPOSITORY.  THAT IS NOT THE SAME THING AS A

21   SCANNER.  THE SCANNER REPOSITORY HOLDS INDIVIDUAL COPIES OF

22   SCANNERS THAT HAD PREVIOUSLY BEEN INSTANTIATED.

23       SO WHAT THIS PASSAGE IS REFERRING TO IS SOMETHING DOWN THE

24   ROAD AFTER A SCANNER HAS BEEN INSTANTIATED AND HAS BEEN USED

25   IN THE SYSTEM.  IT NEEDS SOMEPLACE TO BE STORED SO THAT THE

1    PROCESS DOESN'T HAVE TO GO THROUGH A NEW INSTANTIATION.  SO IT

2    STORES A COPY OF THAT SCANNER IN THIS SCANNER REPOSITORY.

3        THAT'S WHAT THIS PASSAGE IS TALKING ABOUT.  IT'S NOT

4    TALKING ABOUT HOW YOU ACTUALLY INSTANTIATE A SCANNER, WHICH IS

5    WHAT JUDGE FREEMAN DETERMINED.

6            **THE COURT:**  THEN THE COMMENT WITH RESPECT TO

7    FIGURE 6, DO YOU HAVE THAT?

8        **MR. MAYS:**  YES, YOUR HONOR.

9        FIGURE 6, AGAIN, IT'S TALKING ABOUT A SCANNER FACTORY

10    MODULE, WHICH IS -- WHICH IS DIFFERENT FROM THE SCANNER

11    ITSELF.  IF I COULD DIRECT YOUR HONOR'S ATTENTION, I'VE

12    FLIPPED BACK TO WHAT WE SUBMITTED AS SLIDE 1.9.

13        THIS IS THE EXEMPLARY EMBODIMENT THAT LAYS OUT THE

14    COMPONENTS OF THE SCANNER.  AND I BELIEVE DR. RUBIN SHOWED

15    THIS AT THE PRESENTATION LAST WEEK.  THE SCANNER HAS

16    ESSENTIALLY THREE COMPONENTS:  IT'S GOT A TOKENIZER, A PARSER,

17    AND AN ANALYZER.

18        AND AS JUDGE FREEMAN DETERMINED, WHAT'S HAPPENING IS, WHEN

19    YOU'RE INSTANTIATING A NEW SCANNER, THERE ARE -- IT STARTS OFF

20    AS KIND OF A -- WHAT THE SPECIFICATION CALLS A GENERIC MODULE.

21    KIND OF LIKE A BLANK SLATE.  THE SCANNER AT THAT POINT DOESN'T

22    KNOW HOW TO SCAN OR READ ANY KIND OF LANGUAGE.

23        AND SO WHAT IS -- WHAT HAPPENS IS, THAT A FILE CALLED A

24    RULE FILE, WHICH IS ESSENTIALLY THE GRAMMATICAL LANGUAGE OF A

25    FILE, IS SUBMITTED TO THE SCANNER AND --

```
1              THE COURT:  BUT DO YOU HAVE A SLIDE WITH FIGURE 6?

2      CAN YOU ADDRESS FIGURE 6 SPECIFICALLY?

3              MR. MAYS:  YOUR HONOR, IF YOU GIVE ME ONE MOMENT, I

4      CAN ABSOLUTELY PULL UP FIGURE 6 FOR YOU.

5                        (PAUSE IN THE PROCEEDINGS.)

6                        (DISPLAYED ON SCREEN.)

7              MR. MAYS:  CAN YOUR HONOR SEE THE FIGURE 6 ON THE

8      SCREEN?

9              THE COURT:  NO.  I JUST SEE YOUR FIGURE 2, PAGE 1.9.

10             MR. MAYS:  LET ME RE-SHARE.

11                       (DISPLAYED ON SCREEN.)

12        CAN YOUR HONOR SEE FIGURE 6 NOW?

13             THE COURT:  I CAN.

14             MR. MAYS:  OKAY.  SO, YOUR HONOR, WHAT WE HAVE HERE

15     IS AND WHAT THE PASSAGE IN THAT PARTICULAR COLUMN WAS

16     REFERRING TO IS, YOU HAVE AN ARB SCANNER FACTORY 630 AND THEN

17     THE SCANNER REPOSITORY 640.  THESE ARE NOT THE SCANNERS

18     THEMSELVES.  THESE ARE MECHANISMS FOR CREATING THE SCANNERS

19     AND THEN A MECHANISM FOR STORING SCANNERS ONCE THEY HAVE BEEN

20     CREATED.

21             THE COURT:  OKAY.  SO, MR. FRANKEL, A QUESTION.

22        YOU ARGUED OR FINJAN ARGUED THAT JUDGE NOREIKA -- OR, I'M

23     SORRY, YOU ARGUED TO JUDGE NOREIKA THAT THE PLAIN AND ORDINARY

24     MEANING OF INSTANTIATING MEANS GENERATING OR REQUESTING.

25        ARE YOU ARGUING SOMETHING ELSE NOW?
```

1        **MR. FRANKEL:**  NO, YOUR HONOR.  IT'S... I MEAN, THE

2   WAY WE'VE PHRASED IT --

3        **THE COURT:**  MR. FRANKEL, YOU HAVE TO COME CLOSER TO

4   THE MIC, YOUR COMPUTER, SO I CAN HEAR YOU PROPERLY.

5      THANK YOU.

6        **MR. FRANKEL:**  CAN YOU HEAR ME NOW, YOUR HONOR?

7        **THE COURT:**  MUCH BETTER.  THANK YOU.

8        **MR. FRANKEL:**  OKAY.  WHAT WE'RE SAYING HERE IS, THAT

9   INSTANTIATING MEANS CREATING AN INSTANCE OF.  AND THAT'S THE

10  SAME THING THAT JUDGE NOREIKO FOUND IN DELAWARE AND

11  ESSENTIALLY THE SAME WAY THAT WE FRAMED THE ISSUE IN *RAPID7*.

12      IF I COULD ADDRESS THE *SONICWALL* DECISION, YOUR HONOR?

13  THE COURT IN THAT CASE DID NOT CONSIDER THE ISSUE OF THE

14  INCLUSION OF THE WORD "SUBSTITUTION."  THE FIGHT IN THAT CASE

15  WAS OVER DIFFERENT ASPECTS OF THE CLAIM CONSTRUCTION.  AND

16  THERE'S NOTHING SUBSTANTIVE IN THE COURT'S DECISION RELATING

17  TO SUBSTITUTION VERSUS SOME OTHER WAY OF PROCEEDING.

18      AND THAT, HOWEVER, WAS THE ISSUE THAT WAS PRESENTED TO

19  JUDGE NOREIKA IN DELAWARE IN THE *RAPID7* CASE.  AND IN THE

20  PARTIES' BRIEFING, THERE WAS A SUBSTANTIAL DISCUSSION OF THE

21  MERITS OF THE *SONICWALL* DECISION.  JUDGE NOREIKA, IN

22  CONSIDERING THAT ISSUE IN PARTICULAR, FOUND THAT THERE'S NO

23  REFERENCE TO SUBSTITUTION ANYWHERE WITHIN THE FOUR CORNERS OF

24  THE PATENT, AND SHE FOUND NO SUPPORT FOR ADDING THAT

25  LIMITATION TO THE CLAIMS.

1    AND THAT'S NOT AN ISSUE WHERE THE *SONICWALL* DECISION IS IN

2    DISAGREEMENT WITH THE *RAPID7* DECISION.  NOTHING THAT QUALYS

3    HAS POINTED TO, IN THE FIRST PLACE, COMPELS IMPORTING A

4    SUBSTITUTION LIMITATION INTO THE CLAIMS, BUT IN THE SECOND

5    INSTANCE, EVERYTHING THAT THEY POINT TO IN THEIR SLIDES AND IN

6    THEIR BRIEFING ARE JUST CERTAIN EMBODIMENTS.

7         **THE COURT:**  WELL, THE SPECIFICATION REPEATEDLY

8    DESCRIBES THE QUOTE, "THE PRESENT INVENTION AS USING ARB

9    SCANNERS THAT ADAPT TO DIFFERENT LANGUAGES USING RULES FILES

10   WITHOUT CHANGING SOURCE CODE."

11   SO DON'T THESE DESCRIPTIONS THEMSELVES LIMIT THE SCOPE OF

12   THE CLAIMS?

13        **MR. FRANKEL:**  WELL, THERE'S QUITE SOME DISTANCE

14   BETWEEN WHAT YOU JUST READ AND THE CONCEPT OF ACQUIRING

15   SUBSTITUTION.  CREATING AN INSTANCE OF, MEANS CREATING A, YOU

16   KNOW, ONE VERSION OF THE SOFTWARE THAT'S RUNNING, AND THE

17   CLAIM ITSELF -- IF I COULD PUT OUR SLIDES UP, YOUR HONOR?

18        **THE COURT:**  YOU MAY.

19             (DISPLAYED ON SCREEN.)

20        **MR. FRANKEL:**  DO YOU HAVE OUR SLIDES ON YOUR SCREEN?

21        **THE COURT:**  I DO.

22        **MR. FRANKEL:**  THE CLAIM ITSELF EXPLAINS WHAT IT MEANS

23   TO INSTANTIATE.  IT'S TO CREATE A VERSION OR AN INSTANCE OF

24   THE SCANNER AND TO GIVE IT THE PARSER RULES AND ANALYZER RULES

25   FOR THAT PARTICULAR LANGUAGE.

1      SO THAT'S THE -- THAT'S WHAT THE PORTIONS OF THE

2  SPECIFICATION THAT YOU READ ARE REFERRING TO.  WHAT THE

3  SPECIFICATION DOESN'T REQUIRE AND WHAT THE CLAIM DOESN'T

4  REQUIRE IS SUBSTITUTION, WHICH MEANS TAKING SOMETHING OUT AND

5  PUTTING SOMETHING ELSE IN.

6      THAT'S WHERE THE REAL DISAGREEMENT IS BETWEEN THE PARTIES.

7  AND THAT'S NOT AN ISSUE THAT WAS ADDRESSED IN *SONICWALL*.  IT

8  WAS DECIDED BY JUDGE NOREIKA IN THE *RAPID7* CASE.

9                  (DISPLAYED ON SCREEN.)

10         **MR. FRANKEL:**  IN HER DECISION, SHE NOTED, AS WE HAVE,

11  THAT SUBSTITUTING DOESN'T APPEAR ANYWHERE IN THE PATENT.  THE

12  REFERENCES TO GENERIC ARCHITECTURE ARE EMBODIMENTS.  AND SHE

13  FOUND, AS WE'VE ARGUED, THAT REQUIRING SUBSTITUTION IS

14  INCONSISTENT WITH THE SCANNER REPOSITORY EMBODIMENTS.

15         **THE COURT:**  OKAY.

16      ONE OTHER QUESTION.  WHAT ABOUT PROVIDING RULES FILES TO

17  GENERIC SCANNERS?

18         **MR. MAYS:**  YOUR HONOR, IS THAT DIRECTED AT ME OR

19  MR. FRANKEL?

20         **THE COURT:**  I THINK IT WAS -- HOLD ON JUST A MINUTE.

21  OKAY.  I AM JUGGLING A COUPLE OF DIFFERENT ISSUES HERE.  I

22  WANTED TO MAKE SOME EDITS.

23      ALL RIGHT.  MR. FRANKEL, COULD YOU ADDRESS THAT ISSUE?

24         **MR. FRANKEL:**  YES, YOUR HONOR.

25      THAT'S CAPTURED BY THE LANGUAGE THAT'S ALREADY IN THE

1  CLAIMS.  IT SAYS THAT THE SCANNER COMPRISES PARSER RULES AND

2  ANALYZER FOR THE SPECIFIC PROGRAMMING LANGUAGE.

3       **THE COURT:**  OKAY.  JUST A MINUTE.

4       **MR. FRANKEL:**  IF I COULD DIRECT THE COURT'S ATTENTION

5  TO THE PARTIES' COMPETING PROPOSALS FOR A MINUTE.

6    IT'S THE FIRST PART OF QUALYS' PROPOSAL WHERE WE REALLY

7  DISAGREE; SUBSTITUTING SPECIFIC DATA, INSTRUCTIONS, OR BOTH

8  INTO THE SCANNER.  IT'S THAT ACTIVE SUBSTITUTION THAT'S

9  UNSUPPORTED.

10   YOU KNOW, MAKING IT USABLE FOR SCANNING A SPECIFIC

11  PROGRAMMING LANGUAGE IS ALREADY IN THE -- WE DON'T DISAGREE

12  WITH THAT, IT'S JUST ALREADY IN THE CLAIM.  IT SAYS IT'S A

13  SCANNER FOR THE SPECIFIC PROGRAMMING LANGUAGE.

14       **THE COURT:**  LET ME ASK THIS:  WHAT ABOUT -- WHAT

15  WOULD YOU SAY TO A CONSTRUCTION, IN LIGHT OF WHAT YOU JUST

16  SAID, THAT WAS ONE WHERE YOU WOULD -- GENERATING OR REQUESTING

17  A SCANNER THAT CAN SCAN THE PROGRAMMING LANGUAGE; HOW ABOUT

18  THAT WAY OF DESCRIBING IT RATHER THAN SUBSTITUTING?

19       **MR. FRANKEL:**  WELL, YOUR HONOR, I'M NOT SURE WHAT THE

20  PURPOSE IS OF REPLACING THE WORD "INSTANTIATING."  I MEAN, IF

21  WE -- IF THAT'S A WORD THAT'S NOT QUITE IN THE COMMON PARLANCE

22  OF THE LAY PERSON, WE CAN SAY, CREATING AN INSTANCE OF.  BUT

23  GENERATING AND REQUESTING ARE MORE NARROW THAN JUST CREATING

24  AN INSTANCE OF.

25       **THE COURT:**  MR. MAYS?

```
 1              MR. MAYS:  THANK YOU, YOUR HONOR.

 2         FIRST OFF, WITH RESPECT TO WHAT FINJAN PROPOSES, CREATING

 3    AN INSTANCE OF, THE CONCERN WE HAVE THERE IS THAT THE CONCEPT

 4    OF AN INSTANCE HAS A SPECIFIC MEANING IN THE FIELD OF THE

 5    COMPUTER ARTS.  SO, SIMPLY, YOU KNOW, CONSTRUING INSTANTIATING

 6    TO MEAN CREATE AN INSTANCE OF WOULDN'T HELP THE JURY

 7    UNDERSTAND EXACTLY WHAT AN INSTANCE IS.

 8              THE COURT:  RIGHT.  WHAT ABOUT MY SUGGESTION,

 9    MR. MAYS, GENERATING OR REQUESTING A SCANNER THAT CAN SCAN THE

10    PROGRAMMING LANGUAGE BY PROVIDING A GENERIC SCANNER INSTANCE

11    WITH LANGUAGE-SPECIFIC DATA, RULES, OR BOTH?

12              MR. MAYS:  YOUR HONOR, IF THE CONSTRUCTION WAS AS YOU

13    JUST READ IT, I DO NOT BELIEVE QUALYS WOULD OPPOSE THAT.  WE

14    PROPOSED THE WORD "SUBSTITUTING" IN THE CONSTRUCTION FRANKLY

15    BECAUSE THAT'S WHAT JUDGE FREEMAN DETERMINED THE PLAIN AND

16    ORDINARY MEANING OF THE TERM MEANT.  WE FELT IT WAS IMPORTANT

17    TO REMAIN CONSISTENT WITH THAT CONSTRUCTION.

18         BUT IF YOUR HONOR WOULD LIKE TO MOVE OFF OF THE

19    SUBSTITUTING LANGUAGE, THEN WHAT YOU'VE PROVIDED IS SOMETHING

20    THAT WE WOULD NOT OBJECT TO.

21              THE COURT:  AND MR. FRANKEL?

22              MR. FRANKEL:  WELL, YOUR HONOR --

23              THE COURT:  IF I WAS TRYING TO DEAL WITH SOME OF THE

24    OBJECTIONS TO JUDGE FREEMAN'S APPROACH, WHAT ABOUT THAT

25    LANGUAGE THAT I JUST SUGGESTED?
```

1      **MR. FRANKEL:**  THE CONCERN THAT WE HAVE IS THAT THE

2  LANGUAGE, THE GENERIC ARCHITECTURE IS LIMITED TO CERTAIN

3  EMBODIMENTS, WHICH IS A FINDING THAT JUDGE NOREIKA MADE IN

4  REJECTING THIS TYPE OF CONSTRUCTION.

5      A GENERIC ARCHITECTURE THAT'S CUSTOMIZED ITSELF IS A VERY

6  SPECIFIC CONCEPT IN THE ART, AND THE CLAIMS ARE NOT DRAFTED TO

7  BE LIMITED IN THAT FASHION.

8      **THE COURT:**  ALL RIGHT.  LET'S MOVE ON.

9      NEXT TERM.  WITH RESPECT TO THE NEXT TERM, AGAIN, FINJAN

10  JUST WANTS THE PLAIN AND ORDINARY MEANING.  QUALYS HAS

11  SUGGESTED A CONSTRUCTION.  SO WE WILL GO AHEAD AND START WITH

12  QUALYS.  MR. MAYS.

13      **MR. MAYS:**  THANK YOU.

14      AARON, IF YOU WOULDN'T MIND UNSHARING YOUR SCREEN, THEN I

15  CAN SHARE MINE.

16                  (DISPLAYED ON SCREEN.)

17      YOUR HONOR, CAN YOU SEE OUR -- THE '968 PATENT AS THE

18  COVER SLIDE HERE, SLIDE NO. 2.1?

19      **THE COURT:**  YES.

20      **MR. MAYS:**  THANK YOU.

21      SO, YOUR HONOR, AND AGAIN, THIS TERM AS WELL AS, I THINK,

22  THE NEXT TWO OR THREE TERMS ARE ALL GOING TO BE TOUCHING ON

23  SIMILAR THEMES.

24      WHEN WE ARE TALKING ABOUT DYNAMICALLY GENERATING A POLICY

25  INDEX, WHAT DOES THE PATENT REFER TO?  WE BELIEVE THAT WHAT IT

1    IS DEALING WITH IS CREATING OR UPDATING THE POLICY INDEX IN

2    RESPONSE TO A USER REQUEST FOR CACHED AND NON-CACHED CONTENT.

3    IF WE LOOK AT CLAIM 32, WHICH WE BELIEVE IS REPRESENTATIVE FOR

4    THIS, THERE ARE TWO MAJOR COMPONENTS OF WHAT'S HAPPENING IN

5    THE ELEMENT.

6         YOU ARE DYNAMICALLY GENERATING A POLICY INDEX OF THE

7    CACHED CONTENT.  THAT'S IMPORTANT, YOUR HONOR, BECAUSE YOU ARE

8    NOT JUST CREATING ANY GENERIC INDEX, IT'S AN INDEX OF CACHED

9    CONTENTS.

10        SO IF YOU RECALL DR. RUBIN'S PRESENTATION LAST WEEK, HE

11   EXPLAINED THE CONCEPT OF A PROXY CACHE AND HOW A PROXY CACHE

12   STORES THINGS LIKE VIDEO FILES OR WEBSITES OR WHATNOT, THAT

13   HAD BEEN PREVIOUSLY REQUESTED; STORES THEM SO THAT THE NEXT

14   TIME THEY ARE REQUESTED, THEY CAN BE RETRIEVED MUCH FASTER

15   THAN HAVING TO GO BACK WAY OUT TO THE INTERNET.

16        THE SECOND MAJOR COMPONENT HERE, AND THIS IS ALSO A PART

17   OF THE NEXT TERM IS, THAT THE POLICY INDEX, ONCE IT'S

18   DYNAMICALLY GENERATED, IT INDICATES PIECES OF CACHED CONTENT

19   KNOWN TO BE ALLOWABLE RELATIVE TO A GIVEN POLICY.

20        SO THE IMPORTANT ASPECT HERE, AGAIN, YOUR HONOR, IS THAT

21   IN ORDER FOR THIS POLICY INDEX TO BE DYNAMICALLY GENERATED, WE

22   ARE TALKING ABOUT ASSOCIATING THE CONTENT AND POLICIES.  IT'S

23   NOT JUST -- IT'S NOT JUST THE GENERIC ACT OF CREATING SOME

24   KIND OF DATA STRUCTURE; IT'S WITHIN THE CONTEXT OF THIS

25   ASSOCIATION.

1              (DISPLAYED ON SCREEN.)

2         **MR. MAYS:**  THIS IS FIGURE 1 FROM THE PATENT.  AND AS

3    YOU CAN SEE, THERE'S THREE MAJOR COMPONENTS HERE.  THERE'S A

4    WEB CLIENT, WHICH SOME EMBODIMENTS REFER TO AS WEB CLIENT,

5    SOME EMBODIMENTS REFER TO AS THE USER.  HOWEVER YOU SLICE THAT

6    PIECE OF CAKE, YOUR HONOR, YOU ARE TALKING ABOUT THE DEVICE

7    THAT IS REQUESTING CONTENTS.

8        THEN YOU HAVE A WEB SERVER ON THE RIGHT.  THAT'S THE

9    DEVICE THAT IS PROVIDING THE CONTENT.

10        AND THEN IN THE MIDDLE, YOU HAVE A PROXY SERVER.  IT WORKS

11    AT A HIGH LEVEL THE WAY DR. RUBIN -- DR. RUBIN EXPLAINED.

12              (DISPLAYED ON SCREEN.)

13        THE SPECIFICATION DESCRIBES THE OPERATION OF THIS POLICY

14    INDEX WHICH THE SPECIFICATION CALLS THE POLICY-BASED CACHE

15    INDEX 190.  THE CLAIMS CALL THAT THE POLICY INDEX, BUT IT'S

16    THE SAME STRUCTURE.  IT DESCRIBES THAT OPERATION AND DOES SO

17    IN THE CONTEXT OF THE PRESENT INVENTION.

18        IMPORTANTLY, THERE'S TWO SENTENCES HERE.  THE FIRST

19    SENTENCE SAYS, "IN ACCORDANCE WITH THE PREFERRED EMBODIMENT OF

20    THE PRESENT INVENTION, IT IS NOT NECESSARY FOR POLICY-BASED

21    CACHE INDEX TO BE COMPLETE.  THE PRESENT INVENTION ALLOWS FOR

22    THE POLICY-BASED CACHE INDEX TO BE UPDATED DYNAMICALLY AS USER

23    REQUESTS FOR CACHED AND NON-CACHED CONTENT ARRIVE."

24        SO WHAT THESE TWO SENTENCES MEAN IS, THAT IT'S NOT

25    REQUIRED WHEN YOU CREATE THE POLICY INDEX FOR IT TO BE FULLY

1   FILLED WITH ALL THESE VARIOUS POINTERS BETWEEN THE POLICIES

2   AND THE CONTENT.  IT CAN BE BECAUSE THE INVENTION PROVIDES FOR

3   THIS DYNAMIC OPERATION, THOSE POINTERS, THOSE ASSOCIATIONS CAN

4   BE CREATED ON THE FLY DURING OPERATION OF THE SYSTEM.

5           **THE COURT:**  SO IT STATES THAT THE PRESENT INVENTION

6   ALLOWS.  IT DOESN'T STATE THAT THE PRESENT INVENTION REQUIRES,

7   RIGHT?

8           **MR. MAYS:**  CORRECT, YOUR HONOR.

9           **THE COURT:**  SO YOU'RE -- SO IT SEEMS TO ME WHAT IT

10  SAYS IS, THAT IT'S ALLOWING OR IT'S ADDING ALLOWABLE

11  INFORMATION AS OPPOSED TO CREATING OR UPDATING A POLICY.

12      IT SEEMS TO BE -- I DON'T SEE THAT YOU'VE GOT THE CONCEPT

13  OF ALLOWABILITY IN THERE.  IT SEEMS THE WORDS YOU'RE USING ARE

14  IMPLIED (AUDIO INTERRUPTION) --

15          **MR. MAYS:**  YOUR HONOR, WE READ IT A LITTLE --

16          **COURT REPORTER:**  IMPLIED WHAT --

17          **MR. MAYS:**  -- BIT DIFFERENTLY.  WE READ THE -- THOSE

18  TWO SENTENCES TOGETHER.

19      ALLOWS FOR REFERS BACK TO THE PREVIOUS SENTENCE WHERE IT'S

20  TALKING ABOUT IT IS NOT NECESSARY FOR THE POLICY CACHE INDEX

21  TO BE COMPLETE.  THAT'S BECAUSE THE PRESENT INVENTION ALLOWS

22  FOR THIS DYNAMIC UPDATING AS USER REQUESTS FOR CACHED AND

23  NON-CACHED CONTENT ARRIVE.

24      THE DYNAMIC OPERATION IS THE EMBODIMENT OF THE CLAIM.  SO

25  WHEN WE ARE TALKING ABOUT THE PRESENT INVENTION ALLOWS FOR

1    THIS DYNAMIC OPERATION, THAT IS THEN REFLECTED IN THE CLAIM

2    LANGUAGE ITSELF.  SO THAT'S WHY WE PULLED THIS --

3         **THE COURT:**  BUT, AGAIN, SO IF I CONSTRUED IT TO BE

4    INSTEAD OF CREATING OR UPDATING A POLICY, WHICH, AGAIN, SEEMS

5    TO ME TO SUGGEST A REQUIREMENT, AND INSTEAD PROVIDES THE

6    OPTION, RIGHT, THE ALLOWABLE OPTION, THAT BEING ADDING

7    ALLOWABLE INFORMATION, WHAT'S WRONG WITH THAT?

8       I MEAN, YOU SEEM TO -- YOUR CONSTRUCTION JUST SEEMS TO BE

9    MORE LIMITED, I GUESS, THAN I READ THAT LANGUAGE TO --

10        **MR. MAYS:**  WELL, YOUR HONOR, ABSOLUTELY.

11      OUR PRINCIPAL CONCERN WITH THIS TERM IS THE CONCEPT

12   THAT -- HOW DOES THIS POLICY-BASED INDEX GET DYNAMICALLY

13   GENERATED UNDER THE CLAIM?

14      IN OUR VIEW, THE ONLY TIME WHERE DYNAMIC GENERATION OCCURS

15   IS FOLLOWING A USER REQUEST FOR CONTENT.

16        **THE COURT:**  SO CAN AN EMPTY POLICY INDEX EXIST

17   WITHOUT REQUEST?

18        **MR. MAYS:**  NOT UNDER THE CLAIM LANGUAGE, YOUR HONOR.

19   BECAUSE THE CLAIM LANGUAGE REQUIRES THAT THE POLICY INDEX -- I

20   WILL GO BACK TO THE CLAIM LANGUAGE ITSELF.

21      THE POLICY INDEX MUST BE A POLICY INDEX OF THE CACHED

22   CONTENTS.  SO IF THERE ARE NO CONTENTS IN THE CACHE, YOU CAN'T

23   HAVE THE CLAIM POLICY INDEX.

24        **THE COURT:**  OKAY.  LET ME GET A RESPONSE, THEN, FROM

25   MR. FRANKEL.  AND IF YOU'LL ADDRESS MY SUGGESTED LANGUAGE AS

```
1    WELL.  I KNOW THAT YOU THINK THERE'S NO CONSTRUCTION

2    NECESSARY.

3            MR. FRANKEL:  CORRECT, YOUR HONOR.

4        OUR BIGGEST OBJECTION, AND THIS IS WHAT QUALYS SAYS IS THE

5    MOST IMPORTANT PART OF THEIR CONSTRUCTION IS, WHAT ARE THE

6    REQUIREMENTS ON HOW THE POLICY INDEX IS GENERATED AND WHAT

7    DOES IT MEAN TO BE DYNAMICALLY GENERATED.

8        OUR UNDERSTANDING, CONSISTENT WITH THE BROAD SCOPE OF THE

9    PATENT, IS DYNAMICALLY GENERATED MEANS IT'S GENERATED AS

10   THINGS ARE HAPPENING.

11       AND THE PROBLEM WITH QUALYS' POSITION IS, THEY ARE SAYING

12   IT CAN ONLY BE GENERATED WHEN THE USER REQUESTS CONTENT AND

13   THE CONTENT COMES IN.

14       NOW, THERE ARE EMBODIMENTS IN THE PATENT THAT ARE

15   CONSISTENT WITH THAT, BUT THERE ARE OTHER EMBODIMENTS THAT

16   DON'T REQUIRE ANY ACTION OR INPUT FROM THE USER.

17       IF I CAN TURN ON THE SCREEN SHARE, YOUR HONOR.

18           THE COURT:  YOU CAN.  AND IF YOU'LL, AS PART OF YOUR

19   PRESENTATION, EXPLAIN WHETHER THERE IS ANY EMBODIMENT WHERE

20   THE ALLOWABILITY DETERMINATIONS ARE ADDED TO THE POLICY INDEX

21   IN RESPONSE TO SOMETHING OTHER, OTHER THAN USER REQUEST.

22                   (DISPLAYED ON SCREEN.)

23           MR. FRANKEL:  RIGHT.

24       SO, YOUR HONOR, THERE ARE DIFFERENT WAYS THAT CONTENT CAN

25   COME INTO A SYSTEM.  ONE WAY IS THAT A USER CAN REQUEST
```

1    CONTENT, BUT THE SYSTEM CAN BE PROGRAMMED ITSELF TO JUST

2    AUTOMATICALLY AND ROUTINELY COLLECT INFORMATION.  AND

3    INFORMATION CAN BE PUSHED FROM THE OUTSIDE OR SENT INTO A

4    SYSTEM.

5         FOR EXAMPLE, THE COURT, I AM SURE, RECEIVES MANY EMAILS

6    EVERY DAY.  THAT IS INCOMING CONTENT THAT YOU HAVE NOT

7    SPECIFICALLY REQUESTED.  IT JUST COMES TO YOU.  AND THERE ARE

8    SYSTEMS THAT COLLECT WEATHER DATA OR ALL KINDS OF OTHER DATA

9    FROM EXTERNAL SOURCES, EITHER BY GOING OUT AND FETCHING IT AND

10   BRINGING IT IN OR BY RECEIVING THE DATA AS IT IS PUSHED IN.

11   SO THOSE ARE DIFFERENT WAYS THAT THE DATA CAN COME IN.

12        THE PATENT ITSELF TALKS ABOUT AN EMBODIMENT, FOR EXAMPLE,

13   WHERE WHEN A NEW POLICY IS ADDED, THE POLICY INDEX IS UPDATED.

14   SO, FOR EXAMPLE, THERE MAY BE A LIBRARY OF CONTENT THAT'S

15   ALREADY IN THE CACHE, AND THEN THE SYSTEMS ADMINISTRATOR COULD

16   COME UP WITH A NEW POLICY, ADD THAT POLICY TO THE SYSTEM, AND

17   THEN THE POLICY CACHE INDEX WILL DYNAMICALLY UPDATE ITSELF.

18        NOW, THE CACHE INDEX -- THE POLICY CACHE INDEX IS -- IT'S

19   A PRE-APPLIED ALL OF THE POLICIES TO ALL OF THE CONTENT THAT'S

20   IN THE CACHE.  SO ONE WAY TO TRIGGER THE INDEX TO REGENERATE

21   IS BY PUTTING IN NEW CONTENT.  BUT ANOTHER WAY TO DO IT IS BY

22   ADDING A NEW POLICY.  THAT WOULD BE ONE EXAMPLE OF UPDATING

23   THE POLICY INDEX WITHOUT ADDING ANY NEW CONTENT.  SO IT WOULD

24   NOT REQUIRE ANY ACTION FROM THE USER.

25        NOW, THE LANGUAGE THAT QUALYS HAS POINTED TO ON THEIR

1    SLIDES AND IN THEIR BRIEFING, AGAIN, IT'S ALL PREFERRED

2    EMBODIMENTS, OR EMBODIMENTS, OR THINGS THAT ALLOW THINGS TO

3    HAPPEN, BUT THERE'S NOT DEFINITIONAL STATEMENTS OR

4    REQUIREMENTS.

5        AND THEN LOOKING AT THE CLAIMS THEMSELVES, FOR EXAMPLE,

6    CLAIM 26, WHICH IS ONE OF THE ASSERTED CLAIMS, DOESN'T SAY

7    ANYTHING ABOUT A USER REQUEST FOR CONTENT.  IN CONTRAST,

8    CLAIM 13 REQUIRES THE USER JUST TO REQUEST THE DIGITAL

9    CONTENT.  SO UNDER THE DOCTRINE OF CLAIM DIFFERENTIATION, IT

10   WOULD BE ERROR TO READ THAT LIMITATION THAT'S NOT PRESENT IN

11   26 BUT IS PRESENT IN CLAIM 13 INTO 26, AND THAT'S EXACTLY WHAT

12   QUALYS IS ASKING THE COURT TO DO.

13       AND THEN HERE'S ANOTHER EXAMPLE WHERE THE POLICY INDEX

14   COULD BE CHANGED BY BEING SYNCHRONIZED OR RESET.  THAT DOESN'T

15   FIT INTO THEIR CLAIM CONSTRUCTION EITHER, WHICH WOULD REQUIRE

16   ONLY CREATION OR UPDATING AND ONLY IN RESPONSE TO USER

17   REQUESTS.

18       SO THERE ARE A NUMBER OF WAYS THAT CONTENT CAN COME IN

19   WITHOUT A USER REQUEST.  THERE ARE A NUMBER OF WAYS THAT THE

20   POLICY INDEX CAN BE UPDATED WITHOUT USER REQUESTS OR WITHOUT

21   CONTENT COMING IN.  AND THEN, FINALLY, THE QUALYS -- THE

22   PORTION OF THEIR CONSTRUCTION WHERE THEY SAY FOR CACHED OR

23   NON-CACHED CONTENT, THAT ALSO DOESN'T -- THAT DOESN'T EVEN

24   MAKE SENSE.  THAT'S JUST SAYING --

25           **THE COURT:**  SO, MR. FRANKEL, LET'S ASSUME WE ARE AT

1    TRIAL AND THE JURY SENDS BACK A QUESTION THAT SAYS, WHAT DOES

2    DYNAMICALLY MEAN?

3       WHAT IS YOUR ANSWER?

4          **MR. FRANKEL:**  WHAT OUR EXPERTS WOULD TELL THE JURY IS

5    THAT IN THE FIELD, DYNAMIC MEANS AS THINGS ARE HAPPENING AS

6    OPPOSED TO STATIC.

7       SO, HERE, WHENEVER NEW INFORMATION COMES INTO THE SYSTEM,

8    THE POLICY NEXT CAN BE UPDATED.  AND THAT CAN BE NEW CONTENT,

9    IT COULD BE NEW POLICIES, BUT IT'S NOT STATIC.  IT'S NOT A

10   PREDEFINED INDEX THAT DOESN'T CHANGE.

11          **THE COURT:**  OKAY.

12   NEXT.

13          **MR. MAYS:**  YOUR HONOR, IF I CAN HAVE A MOMENT TO JUST

14   RESPOND TO A FEW OF THOSE POINTS.

15          **THE COURT:**  BRIEFLY, MR. MAYS.

16          **MR. MAYS:**  THANK YOU.

17      FIRST, TAKING THE LAST FIRST, YOUR HONOR, THE CLAIM

18   LANGUAGE IS DYNAMICALLY GENERATED A POLICY INDEX OF THE CACHED

19   CONTENTS.

20      SO TO THE EXTENT THE JURY WOULD ASK, WHAT DOES IT MEAN FOR

21   THE WORD "DYNAMICALLY," I BELIEVE THE APPROPRIATE RESPONSE

22   WOULD BE, DYNAMICALLY HAS TO BE READ IN LIGHT OF THE CLAIM

23   LANGUAGE SURROUNDING IT.

24      SO IT'S -- TO TOTALLY DIVORCE THE WORD "DYNAMICALLY" FROM

25   THE REST OF THE CLAIM LANGUAGE IS INAPPROPRIATE, IN OUR VIEW,

1    BECAUSE YOU ARE NOT JUST TALKING ABOUT ANY KIND OF DYNAMIC

2    OPERATION; YOU ARE TALKING ABOUT DYNAMICALLY GENERATING THE

3    INDEX OF CACHED CONTENTS.

4         THE NEXT POINT I WOULD LIKE TO QUICKLY MAKE, WHICH WAS

5    WITH RESPECT TO FINJAN'S SLIDE 16, THEY PUT UP CLAIM 13.  THIS

6    WAS A BIT OF A NEW ARGUMENT.  FINJAN NEVER RELIED OR CITED TO

7    CLAIM 13 ANYWHERE IN ITS PAPERS.  BUT TO BRIEFLY RESPOND TO

8    THAT, THE FACT THAT CLAIM 13 MIGHT EXPRESSLY RECITE RECEIVING

9    A USER REQUEST FOR DIGITAL CONTENT DOESN'T CHANGE THE FACT

10   THAT WHEN THE PATENTEE DESCRIBED THE INVENTION, IT'S TALKING

11   ABOUT THE DYNAMIC OPERATION OF THIS POLICY CACHE.

12        AND FINALLY, YOUR HONOR, WITH RESPECT TO THE OTHER

13   EMBODIMENTS THAT FINJAN PUT UP, THOSE WERE NOT EXAMPLES OF

14   DYNAMIC GENERATION IN THE CLAIM LANGUAGE.  IT MIGHT BE AN

15   EXAMPLE OF SOME KIND OF GENERATION ACTIVITY, BUT WHAT FINJAN

16   SAID ABOUT THOSE EMBODIMENTS IS THAT YOU'RE CREATING A NEW

17   POLICY WITH A BASELINE OF NULL, SUCH THAT IT HAS NOT YET

18   PROCESSED ANY CONTENT.  AND THAT WAS IN FINJAN'S REPLY BRIEF

19   AT PAGE 3.  SO THOSE EMBODIMENTS THAT THEY ARE REFERRING TO

20   REALLY ARE UNTETHERED TO THE DYNAMIC OPERATION THAT'S BEING

21   DISCUSSED IN THE CLAIM.

22        **THE COURT:**  ALL RIGHT.  THANK YOU.

23        NEXT TERM.  START --

24        **MR. MAYS:**  YOUR HONOR, I ASSUME YOU WANT ME TO GO

25   FIRST ON THIS ONE.

1          **THE COURT:**  YES.

2          **MR. MAYS:**  YOUR HONOR, I WILL GO AHEAD AND SHARE MY

3     SCREEN HERE.

4                    (DISPLAYED ON SCREEN.)

5          **MR. MAYS:**  THE NEXT TERM IS RELATED TO THE PREVIOUS

6     TERM, AS I SAID, YOUR HONOR.  THE QUESTION HERE IS, WHAT DOES

7     IT MEAN FOR SOME BIT OF CONTENT TO BE ALLOWABLE RELATIVE TO A

8     GIVEN POLICY.

9         IN OUR VIEW, THAT ESSENTIALLY JUST MEANS WHETHER THAT

10    CONTENT CAN BE SENT TO THE USER OR THE CLIENT THAT REQUESTED

11    IT.  THE CLAIM LANGUAGE -- I DON'T NEED TO BELABOR THE POINT,

12    BUT, AGAIN, THE CLAIM LANGUAGE IS TALKING ABOUT, ESSENTIALLY,

13    THERE'S BEEN A REQUEST.  WE NEED TO DETERMINE WHETHER, ON THE

14    FLY, CAN THIS REQUEST BE SENT TO THE PERSON THAT REQUESTED IT.

15        IN SLIDE 3.3 HERE, YOUR HONOR, IT REFERS TO THE PRESENT

16    INVENTION.  AGAIN, USING THE POLICY INDEX OF THE PRESENT

17    INVENTION, THE CACHE MANAGER CAN CHECK WHETHER CACHED CONTENT

18    IS ALLOWABLE.

19         **THE COURT:**  WHAT ABOUT THE POINT THAT MR. FRANKEL

20    JUST MADE THAT CONTENT MAY COME IN WITHOUT USER REQUESTS?

21         **MR. MAYS:**  WELL, YOUR HONOR, WHAT I HAVE NOT SEEN

22    FROM FINJAN IS ANYWHERE IN THE SPECIFICATION THAT NOTION IS

23    SUPPORTED.  WHEN WE ARE TALKING ABOUT WHETHER CONTENT CAN BE

24    PUSHED, IT IS NOT, AS I UNDERSTAND THE TECHNOLOGY -- AND I AM

25    NOT TRYING TO PUT MYSELF IN THE SHOES OF AN EXPERT, BUT IT IS

1    NOT THE CASE THAT A SERVER JUST ARBITRARILY SENDS CONTENT.

2       A CLIENT DEVICE HAS TO FIRST GET IN CONTACT WITH A SERVER.

3    SO IF I'M AN EMAIL SERVER, FOR EXAMPLE, OR I'M ON MY EMAIL, I

4    OPEN UP OUTLOOK.  THE VERY FIRST THING OUTLOOK DOES IS REACHES

5    OUT TO MY FIRM'S SERVER AND ASKS THE SERVER, IS THERE ANY NEW

6    CONTENT?  IF SO, THE SERVER CAN THEN SEND IT.  BUT IT BEGINS

7    WITH A REQUEST ON THE CLIENT SIDE.

8       AND THAT'S WHAT THE SPECIFICATION IS TALKING ABOUT.  AND

9    I'M UNAWARE OF ANY PASSAGE IN THE SPECIFICATION WHERE A

10   COMMUNICATION BEGINS ON THE SERVER SIDE AND IT JUST

11   ARBITRARILY PUSHES THE CONTENT OUT TO THE... OUT TO THE

12   CLIENT.

13           THE COURT:  ALL RIGHT.  LET'S HAVE A RESPONSE ON THAT

14   PARTICULAR POINT.

15           MR. FRANKEL:  YOUR HONOR, MAY I PUT UP THE SCREEN

16   SHARE?

17           THE COURT:  YOU MAY.

18           MR. FRANKEL:  CHRIS, WOULD YOU MIND TAKING YOURS

19   DOWN?

20           MR. MAYS:  OH, I APOLOGIZE.  HERE WE GO.

21                   (DISPLAYED ON SCREEN.)

22           MR. FRANKEL:  YOUR HONOR, THE -- IF THE POINT I

23   SHOULD RESPOND TO IS, ARE THERE EMBODIMENTS WHERE THE CONTENT

24   DOES NOT COME IN THROUGH A REQUEST FROM A USER, THERE ARE

25   MULTIPLE EMBODIMENTS THAT DON'T SAY ANYTHING ABOUT REQUEST

1    FROM USERS.

2        THE FIRST PREFERRED EMBODIMENT IN THE PATENT, WHICH WE

3    HAVE UP ON THE SCREEN NOW, DOES NOT SAY THAT THE CONTENT IS

4    REQUESTED BY A USER.  THERE ARE DIFFERENT EMBODIMENTS.

5    THERE'S ONE THAT FOLLOWS THAT TALK ABOUT POLICIES AND CONTENT

6    FOR PARTICULAR USERS.  BUT THERE ARE -- IN THE WORLD OF

7    COMPUTERS, THERE ARE MANY WAYS TO EXCHANGE MESSAGES.

8        EVEN ON YOUR IPHONE WHEN YOU ARE RECEIVING EMAIL, YOU CAN

9    SET IT TO FETCH EMAIL FROM THE SERVER OR YOU CAN SET THE

10   SERVER TO PUSH THE EMAILS TO YOU.  ONE INVOLVES A REQUEST FROM

11   YOUR DEVICE; THE OTHER DOES NOT INVOLVE A REQUEST.

12       THERE'S JUST NO BASIS TO READ THIS LIMITATION FROM ONLY

13   CERTAIN EMBODIMENTS INTO THE CLAIMS.  IT'S THE SAME ISSUE AS

14   WITH TERM 2.

15       AND THERE ARE CERTAIN CLAIMS, FOR EXAMPLE, CLAIM 6, WHICH

16   IS NOT ASSERTED IN THIS CASE, THAT SPECIFICALLY TALK ABOUT

17   TRANSMITTING THE CONTENT TO A PARTICULAR CLIENT COMPUTER.

18   THERE ARE OTHER CLAIMS THAT NOT.  SO UNDER CLAIM

19   DIFFERENTIATION, IT WOULD BE INAPPROPRIATE TO READ THOSE

20   LIMITATIONS INTO THIS CLAIM.

21           **THE COURT:**  SO IN OTHER -- SOME OF -- ONE OF THE --

22   TWO OF THE OTHER TERMS YOU BOTH REALLY FOCUSED ON, WHAT THE

23   KIND OF PRIMARY DISPUTE IS HERE.  AFTER THE BRIEFING, IT'S NOT

24   CLEAR TO ME THAT I UNDERSTAND REALLY WHAT'S THE MAIN CONCERN

25   IN TERMS OF A CONSTRUCTION.

1      IS SOMEONE ARGUING THAT THE PATENT'S LIMITED TO CONTENT

2   MANAGEMENT OR WHAT ARE WE REALLY -- WHAT'S THE FIGHT REALLY

3   OVER HERE?

4           **MR. FRANKEL:**  YOUR HONOR, OUR PRIMARY OBJECTIONS TO

5   THE CONSTRUCTION PROPOSED HERE ARE QUALYS, FIRST, THAT THE

6   DIGITAL CONTENT HAS TO BE SENT TO A PARTICULAR WEB CLIENT.

7   SECOND, THAT THE POLICY HAS TO BE PARTICULAR TO ALLOWING

8   INFORMATION TO A PARTICULAR CLIENT.

9      AS I POINTED OUT, SOME CLAIMS DO REQUIRE TRANSMISSION;

10  OTHER CLAIMS DO NOT.  SO IT SHOULD NOT BE READ INTO THE CLAIMS

11  THAT DON'T INCLUDE IT.  AND THEN, AS YOU SEE HERE, SOME CLAIMS

12  HAVE USER POLICIES.  THOSE ARE POLICIES THAT ARE SPECIFIC FOR

13  A USER OR A GROUP OF USERS.  AND THAT'S WHAT QUALYS IS TALKING

14  ABOUT.  BUT THERE ARE OTHER CLAIMS THAT JUST SAY, GIVEN POLICY

15  OR POLICY.  AND THE DIFFERENT LANGUAGE IS MEANT TO CONVEY

16  DIFFERENT CLAIM SCOPE.  WHEN IT DOESN'T SAY USER POLICY, THE

17  POLICY IS NOT INTENDED TO BE LIMITED TO POLICIES FOR

18  PARTICULAR USERS.

19          **THE COURT:**  ALL RIGHT.

20          **MR. MAYS:**  YOUR HONOR, IF I CAN JUST BRIEFLY RESPOND

21  TO THOSE?

22          **THE COURT:**  YOU MAY.

23          **MR. MAYS:**  TAKING THE SLIDE THAT'S ON THE SCREEN

24  HERE, YOUR HONOR, CLAIMS 33 AND 32 REFER TO A POLICY VERSUS A

25  USER POLICY.

1    THESE WERE NOT TERMS THAT FINJAN HAS PROVIDED A

2    CONSTRUCTION OR ASKED THE COURT TO CONSTRUE.  THEY ARE ALSO

3    NOT TERMS THAT -- FRANKLY, I'M NOT SURE WHAT THE DIFFERENCE --

4    OFF THE TOP OF MY HEAD WHAT THE DIFFERENCE BETWEEN A POLICY

5    AND A USER POLICY IS.  IT SEEMS TO ME FINJAN IS DRAWING

6    INFERENCES WHERE PERHAPS IT'S NOT APPROPRIATE.

7    WITH RESPECT TO THEIR DISCUSSION OF CLAIM 6, CLAIM 6 OF

8    THE PATENT SPECIFICALLY REFERS TO THE ACTUAL TRANSMISSION OF

9    CONTENT.  THAT'S NOT THE TERM WE ARE TALKING ABOUT HERE.  WE

10   ARE TALKING ABOUT A PREDECESSOR STEP WHICH IS DETERMINING THE

11   ALLOWABILITY.  WHETHER OR NOT THE CLAIM ULTIMATELY REQUIRES

12   TRANSMISSION OF CONTENT IS A DIFFERENT QUESTION THAN WHAT IS

13   AT ISSUE WITH THIS PARTICULAR TERM.

14   THANK YOU.

15        **THE COURT:**  ALL RIGHT.  THANK YOU.

16   ALL RIGHT.  NEXT CLAIM.

17        **MR. MAYS:**  YOUR HONOR, I AM GOING TO ENDEAVOR TO

18   SHARE MY SCREEN AGAIN.

19        **THE COURT:**  ALL RIGHT, MR. MAYS.

20             (DISPLAYED ON SCREEN.)

21   SO WITH RESPECT TO AT LEAST PART OF YOUR PROPOSED

22   CONSTRUCTION, YOUR SUGGESTION THAT IT COME FROM A WEB CLIENT,

23   IS THAT ONE OF THE -- OR IS THAT JUST THE SAME ARGUMENT THAT

24   YOU ALL JUST MADE?

25        **MR. MAYS:**  I THINK WITH RESPECT TO EACH OF CLAIMS 2,

1    3, AND 4, THERE IS ABSOLUTELY AN ELEMENT HERE, YOUR HONOR,

2    THAT THE CONTENT HAS BEEN REQUESTED BY -- OUR INITIAL -- OUR

3    INITIAL PROPOSED CONSTRUCTION SAYS, "WEB CLIENT." SOME OF THE

4    EMBODIMENTS REFER TO A USER. WE ARE NOT WHETTED TO THAT

5    PARTICULAR ASPECT. LIKE I SAID BEFORE, HOWEVER YOU WANT TO

6    SLICE IT, IT'S THE ADVICE THAT IS REQUESTING CONTENT.

7         HERE, AGAIN, THIS KIND OF GOES MORE TO THE FUNDAMENTAL

8    NATURE OF WHAT A CACHE IS. CACHES GET FILLED, AS DR. RUBIN

9    DISCUSSED IN HIS PRESENTATION LAST WEEK, FINJAN'S EXPERT

10   GENERALLY AGREED WITH HOW DR. RUBIN DESCRIBED THE OPERATION OF

11   THESE THINGS.

12        CACHES GET FILLED WHEN SOMEONE REQUESTS CONTENT. AND THAT

13   CONTENT GOES TO THE USER, THE PERSON THAT REQUESTED IT, BUT

14   ALSO GETS STORED IN A CACHE SO THAT THE NEXT TIME IT GETS

15   REQUESTED -- THAT CONTENT GETS REQUESTED, YOU DON'T HAVE TO GO

16   ALL THE WAY OUT TO THE INTERNET AGAIN.

17                    (DISPLAYED ON SCREEN.)

18             **MR. MAYS:** HERE, AGAIN, YOUR HONOR, SPECIFICATION AT

19   COLUMN 2, LINES 3 THROUGH 10, AGAIN REFERS TO THIS CACHE

20   MANAGER. AND IT DOES SO IN THE CONTEXT OF THE PRESENT

21   INVENTION. WHAT WE ARE DETERMINING IS, IS THIS CONTENT

22   ALLOWABLE BASED ON EITHER THE CURRENT USER'S REQUEST OR

23   PREVIOUS USER'S REQUEST; HOWEVER IT IS, THE CACHE CONTENTS GET

24   FILLED WHEN SOMEONE HAS REQUESTED IT.

25             **THE COURT:** ALL RIGHT.

1          **MR. MAYS:**  I DON'T THINK I NEED TO BELABOR THE POINT.

2   THIS IS VERY SIMILAR TO THE PREVIOUS TWO TERMS, YOUR HONOR.

3          **THE COURT:**  MR. FRANKEL?

4          **MR. FRANKEL:**  YOUR HONOR, IT IS THE SAME ISSUES WITH

5   THE PREVIOUS TERMS.

6      MAY I PUT OUR SLIDES UP?

7          **THE COURT:**  YOU MAY.

8      GIVEN THAT YOU DON'T PROPOSE A CONSTRUCTION, AGAIN, IF THE

9   JURY CAME BACK AND ASKED ME, YOU KNOW, WHAT IS A CACHE OR

10  CACHING, HOW WOULD YOU RESPOND?

11         **MR. FRANKEL:**  WELL, I WOULD SAY THAT A MEMORY STORING

12  A CACHE OF DIGITAL CONTENT IS A... IS MEMORY FOR STORING

13  DIGITAL CONTENT.

14     THE -- I'LL NOTE TO THAT POINT THAT QUALYS' CONSTRUCTION,

15  THE FIRST PART OF IT, IS A MEMORY STORING A COLLECTION OF

16  DIGITAL CONTENT WHICH IS BASICALLY JUST THE SAME THING,

17  ALTHOUGH I GUESS THEY REPLACE CACHE WITH COLLECTION.

18     I DON'T THINK THERE'S A REAL DISPUTE BETWEEN THE PARTIES

19  AS TO CACHE OR COLLECTION IF THEY REALLY MEAN ANYTHING

20  DIFFERENT.

21         **THE COURT:**  IS IT WRONG -- LET ME ASK YOU THIS:  IS

22  IT WRONG TO SAY THAT IT IS PREVIOUSLY REQUESTED AND RETRIEVED

23  DIGITAL CONTENT?

24         **MR. FRANKEL:**  YES, THAT WOULD BE INCORRECT.

25         **THE COURT:**  WHY?

1        **MR. FRANKEL:**  IT IS NOT NECESSARY FOR A WEB CLIENT OR

2   ANYONE ELSE TO PREVIOUSLY REQUEST THE INFORMATION FOR IT TO BE

3   STORED IN THE CACHE.

4        **THE COURT:**  WELL, I DIDN'T SAY WEB CLIENT.

5        **MR. FRANKEL:**  IT IS NOT NECESSARY FOR ANYONE TO

6   REQUEST THE INFORMATION FOR IT TO BE STORED IN THE CACHE.

7      SO, FOR EXAMPLE, IF THE COURT IS FAMILIAR WITH NETFLIX OR

8   SIMILAR SERVICES, THEY HAVE VERY LARGE VIDEO CONTENT FILES.

9   AND THERE ARE SERVERS ALL OVER THE COUNTRY PROVIDED BY

10  COMPANIES LIKE AKAMAI THAT RECEIVE DATA PUSHED TO THEM BY

11  NETFLIX SO THAT WHEN PEOPLE WANT TO ACCESS THE CONTENT, IT'S

12  CLOSE TO WHERE THEY ARE LOCATED.

13       **THE COURT:**  OKAY.  HOLD ON, MR. FRANKEL.

14     YOU SAID THAT IT IS MEMORY STORING OF DIGITAL CONTENT.

15  BUT THAT'S NOT WHAT THE PHRASE SAYS.  THE PHRASE SAYS, MEMORY

16  STORING A CACHE OF DIGITAL CONTENT.  SO I CAN'T IGNORE THE

17  WORD "A CACHE OF."

18     AND AS I UNDERSTAND THIS TO OPERATE, A CACHE IS A DEVICE

19  THAT IS -- OR A LOCATION WHERE INFORMATION IS PUT SO THAT IT

20  CAN THEN BE RETRIEVED, WHICH IS WHY I SUGGESTED THE

21  CONSTRUCTION THAT I DID.  BECAUSE I'M TRYING TO -- I CAN'T

22  IGNORE WORDS.

23       **MR. FRANKEL:**  UNDERSTOOD, YOUR HONOR.  I AGREE WITH

24  WHAT YOU JUST SAID, WHICH I BELIEVE IS DIFFERENT FROM WHAT YOU

25  SAID BEFORE.  IF NOT, I MISHEARD.  IT CERTAINLY IS DIFFERENT

1    FROM WHAT QUALYS HAS PROPOSED.

2           **THE COURT:**  IT IS BECAUSE QUALYS HAS FROM A WEB

3    CLIENT, AND I HAVE HEARD ARGUMENT ON THAT, AND IT'S THE REASON

4    I ASKED THE QUESTION TO YOU THAT I DID.

5           **MR. FRANKEL:**  RIGHT.

6      SO WHAT YOU HAD JUST SAID IS THAT A CACHE IS A PLACE WHERE

7    YOU STORE CONTENT SO THAT IT MAY BE RETRIEVED LATER.  AND

8    THAT -- I AGREE, THAT IS THE CORRECT -- THAT IS THE TECHNICAL

9    DEFINITION OF A CACHE.  IT'S NOT MODIFIED BY THE PATENT HERE.

10   IT'S -- IT IS -- IT'S A LOCAL OR CONVENIENTLY PLACED MEMORY

11   FROM WHICH CONTENT CAN BE RETRIEVED.

12     WHAT I THOUGHT YOU HAD SAID BEFORE, THOUGH, IS THAT THE

13   INFORMATION IS RETRIEVED INTO THE CACHE.  AND THAT'S THE POINT

14   WHERE WE WANT TO CLARIFY.  THE INFORMATION CAN BE PUSHED OR

15   SENT TO THE CACHE; IT DOESN'T HAVE TO BE PULLED IN BY A

16   REQUEST.

17          **THE COURT:**  I DIDN'T SAY THAT, BUT JUST TO BE CLEAR,

18   RIGHT, A CACHE STORES -- I MEAN, THE POINT OF A CACHE IS TO

19   STORE A PREVIOUSLY REQUESTED CONTENT, RIGHT?  THAT IS KIND OF

20   THE POINT.

21          **MR. FRANKEL:**  IT DOESN'T HAVE TO BE PREVIOUSLY

22   REQUESTED CONTENT.  INFORMATION CAN BE PROVIDED TO A CACHE IN

23   ADVANCE, AND THEN IF THERE'S A REQUEST, IT CAN BE MADE

24   AVAILABLE.

25          **THE COURT:**  SO PREVIOUSLY STORED CONTENT WHICH THEN

CAN BE RETRIEVED.

**MR. FRANKEL:**  A CACHE STORES INFORMATION FOR POTENTIAL SUBSEQUENT RETRIEVAL.

**THE COURT:**  SO PREVIOUSLY RECEIVED CONTENT THEN.

**MR. FRANKEL:**  YES.  THE -- YES.

**THE COURT:**  OKAY.  WE ARE MAKING GOOD PROGRESS.  NEXT.

**MR. MAYS:**  YOUR HONOR, I'LL PULL UP TERM NO. 5.  AND, YOUR HONOR, IS IT ALL RIGHT IF I SHARE MY SCREEN?

**THE COURT:**  YOU MAY.

(DISPLAYED ON SCREEN.)

**MR. MAYS:**  AND, YOUR HONOR, HERE WITH THE FIFTH TERM, WE ARE GOING TO BE JUMPING TO A NEW PATENT, BUT THE ISSUE -- THE ISSUE REMAINS ESSENTIALLY THE SAME AS THE PREVIOUS, THE PREVIOUS TERMS.

THE QUESTION IS, WHAT DOES IT MEAN UNDER CLAIM 1 OF THE '731 PATENT FOR INCOMING -- WHAT DOES THE TERM "INCOMING FILES FROM THE INTERNET" MEAN.

OUR UNDERSTANDING, READING THE CLAIM LANGUAGE, IS WHAT WE'RE TALKING ABOUT, ARE INTERNET FILES THAT HAVE BEEN REQUESTED BY AN INTRANET COMPUTER.  FINJAN HAS PROVIDED A NUMBER OF EXAMPLES THAT THEY CLAIM WHERE CONTENT CAN BE PUSHED WITHOUT BEING REQUESTED.  WE HAVEN'T SEEN, EITHER IN THE '968 SPECIFICATION OR THE '731 SPECIFICATION, ACTUAL EXAMPLES OF THAT.  WHAT FINJAN HAS ALWAYS POINTED TO ARE SIMPLY HIGH LEVEL

1    DESCRIPTIONS OF THE ARCHITECTURE, NOT DESCRIPTIONS OF THE

2    OPERATION.

3         WITH RESPECT TO CLAIM 1 OF THE '731 PATENT, THE PREAMBLE

4    BEGINS THAT IT'S A -- IT CLAIMS A GATEWAY FOR AN INTERNET OF

5    COMPUTERS.  AND THEN THE VERY FIRST ELEMENT TALKS ABOUT

6    INCOMING FILES FROM THE ELEMENT -- FROM THE INTERNET.

7         IF WE LOOK AT THE BACKGROUND OF THE INVENTION, THE

8    BACKGROUND OF THE INVENTION DESCRIBES ESSENTIALLY TWO TYPES OF

9    COMMUNICATIONS:  ONE WHERE THE INTRANET COMPUTERS REQUEST

10   CONTENT FROM THE INTERNET AND THE INTERNET THEN SENDS THAT

11   CONTENT TO THE COMPUTER OR, ALTERNATIVELY, THE INTERNET

12   COMPUTER REQUESTS CONTENT AND THE INTRANET COMPUTERS SEND THAT

13   CONTENT OUT.

14        THE CLAIM LANGUAGE IS TALKING ABOUT THE FIRST TWO OF

15   THOSE, WHERE THE INTERNET IS SENDING THE FILE.  AND IT'S DOING

16   SO, AS THE SPECIFICATION EXPLAINS, IN RESPONSE TO THAT

17   INTRANET COMPUTER REQUEST.

18        FIGURE 1 OF THE PATENT KIND OF PROVIDES THE PREFERRED

19   EMBODIMENT, WHICH AT A HIGH LEVEL, THERE ARE THREE COMPONENTS.

20   YOU HAVE THE INTRANET, YOU'VE GOT THE INTERNET, AND YOU'VE GOT

21   A GATEWAY SITTING IN BETWEEN THEM.

22             **THE COURT:**  OKAY.

23        **MR. MAYS:**  SO JUST TOUCHING VERY QUICKLY, THIS IS

24   FROM SLIDE 30 OF FINJAN'S PRESENTATION, THEY ARE REFERRING TO

25   CLAIM 7.  AGAIN, THIS WAS NOT AN ISSUE THAT WAS IN THEIR

1    BRIEFING, BUT TO JUST TOUCH ON IT VERY QUICKLY.

2        CLAIM 7 REFERS TO RECEIVING A REQUEST FROM AN INTERNET

3    COMPUTER FOR A FILE.  THAT IS IN RESPONSE TO A METHOD CLAIM

4    THAT DESCRIBES THE OPERATION OF THE SYSTEM.  CLAIM 1, THE

5    ASSERTED CLAIM, HAS DIFFERENT LANGUAGE.  IT IS TALKING ABOUT

6    INCOMING FILES FROM THE INTERNET.  CLAIM 1 HAS THE LANGUAGE

7    THAT WE ARE SEEKING TO CONSTRUE; CLAIM 7 DOES NOT.

8    NEVERTHELESS --

9            **THE COURT:**  GO AHEAD.  FINISH.

10           **MR. MAYS:**  NEVERTHELESS, CLAIM 7 IS HELPFUL BECAUSE

11   IT IS DESCRIBING THE OPERATION OF WHAT THESE VARIOUS FILES ARE

12   DOING.  THEY ARE INCOMING FROM THE INTERNET FOLLOWING A

13   REQUEST FROM AN INTRANET COMPUTER.

14           **THE COURT:**  JUST A COUPLE OF QUESTIONS, AND THEN I

15   WILL GET FINJAN'S RESPONSE.

16       I ASSUME BY YOUR REFERENCE TO INTERNET FILES THAT YOU

17   SUGGEST, THAT WHAT YOU'RE SAYING ARE -- I MEAN, IT ALMOST

18   SUGGESTS LIKE THAT'S A NOUN OR SOMETHING; THAT WHAT YOU ARE

19   SAYING THEY ARE FILES FROM THE INTERNET.

20       IS THAT WHAT YOU MEAN?

21           **MR. MAYS:**  CORRECT, YOUR HONOR, FILES FROM THE

22   INTERNET.  IF YOU THINK BACK TO LAST WEEK'S -- I KNOW WITH THE

23   AIR OF QUARANTINE IT'S PROBABLY HARD TO RECALL, BUT

24   DR. RUBIN'S PRESENTATION, HE REFERRED TO TWO GENERAL TYPES OF

25   FILES:  YOU COULD HAVE EXECUTABLE CONTENT AND YOU COULD HAVE

1    NONEXECUTABLE CONTENT.

2        A FILE IS SIMPLY THE STRUCTURE THROUGH WHICH THAT, EITHER

3    THE EXECUTABLE OR NONEXECUTABLE CONTENT -- SO, FOR EXAMPLE,

4    ONE TYPE OF FILE COULD BE WORD.EXE.

5            **THE COURT:**  IT'S A PRETTY SIMPLE QUESTION.  JUST

6    CLARIFYING WHAT YOU ARE SAYING.

7            **MR. MAYS:**  SURE.

8            **THE COURT:**  THERE ARE TIMES WE USE TWO WORDS TO

9    DESCRIBE SOMETHING IN PARTICULAR, AND IT'S ALMOST A TERM OF

10   ART.  IT'S ACTUALLY NOT WHAT WE ARE TRYING TO DO, RIGHT, IN

11   CLAIM CONSTRUCTION.

12       SO I'M TRYING TO MAKE SURE THAT YOU'RE NOT TRYING TO SAY

13   SOMETHING OTHER THAN THESE ARE JUST FILES FROM THE INTERNET.

14           **MR. MAYS:**  THAT'S CORRECT, YOUR HONOR.

15           **THE COURT:**  OKAY.  AND THEN IN TERMS OF INCOMING

16   FILES, DOES THAT -- WOULD THAT EXCLUDE PUSH CONTENT?

17           **MR. MAYS:**  I BELIEVE IT WOULD BECAUSE, FIRST OFF,

18   PUSH CONTENT IS NOT DESCRIBED IN THE SPECIFICATION, EITHER FOR

19   THE '731 PATENT OR FOR '968 PATENT.

20       FINJAN ASSERTS THAT THAT IS SOMETHING THAT EXISTS.  THEY

21   DO NOT HAVE ANY EXTRINSIC OR EXPERT TESTIMONY ON THAT OR HOW

22   PUSH CONTENT OPERATES OTHER THAN MR. FRANKEL'S

23   CHARACTERIZATION OF IT.

24       AS I SAID EARLIER, I DON'T BELIEVE PUSH CONTENT OPERATES

25   THE WAY THEY ARE SUGGESTING, BUT IN ANY EVENT THERE IS NO

1   ACTUAL EVIDENCE IN THAT AND IT IS CERTAINLY NOT DESCRIBED IN

2   THE SPECIFICATION.  THE SPECIFICATION --

3           **THE COURT:**  RESPONSE.

4           **MR. MAYS:**  I'M SORRY, YOUR HONOR.

5           **MR. FRANKEL:**  MAY I SHARE THE SCREEN, YOUR HONOR?

6           **THE COURT:**  YOU MAY.

7               (DISPLAYED ON SCREEN.)

8       AND I KNOW THAT YOU AREN'T -- YOU ARE JUST INDICATING THE

9   PLAIN AND ORDINARY MEANING, BUT WHAT -- WHAT IS INCOMING?

10  WHAT DOES INCOMING MEAN IF NOT FILES FROM THE INTERNET?

11          **MR. FRANKEL:**  INTERNET FILES AND INCOMING FILES FROM

12  THE INTERNET ALL MEAN THE SAME THING.  I DON'T THINK THAT

13  QUALYS IS SUGGESTING THAT THE JURY WOULDN'T UNDERSTAND WHAT

14  FILES FROM THE INTERNET MEANS OR THAT INTERNET FILES HAS A

15  DIFFERENT MEANING THAN FILES FROM THE INTERNET.

16      SO THE, YOU KNOW, IT'S NOT -- JUST SHUFFLING THE WORDS

17  AROUND ISN'T INFORMING THE JURY OF WHAT IT MEANS.  THERE'S NO

18  SPECIAL MEANING TO IT.

19      IF WE LOOK AT THE CLAIM, THERE'S A GATEWAY THAT'S INTENDED

20  TO PROTECT AN INTRANET OF COMPUTERS.  SO THERE'S THE SMALLER

21  NETWORK, THE INTRANET, AND THEN THERE'S THE WILD WEST OF THE

22  INTERNET.  AND THE GATEWAY IS IN BETWEEN, AND THE GATEWAY WILL

23  LOOK AT WHAT COMES FROM THE OUTSIDE INTO THE INTRANET.

24      THE OBJECTION THAT WE HAVE TO QUALYS' CONSTRUCTION, IT'S

25  THE SAME ONE WE'VE HAD FOR THE OTHER TERMS, THEY WOULD LIMIT

1    IT TO FILES THAT ARE REQUESTED BY A COMPUTER WITHIN THE

2    INTRANET.

3        NOW, FOR EXAMPLE, A VERY -- ONE VERY COMMON USE OF THE

4    GATEWAY IS TO SCAN EMAILS TO COME IN.  IF YOU GET AN EMAIL

5    WITH A WORD FILE ATTACHED TO IT, OR A PICTURE, OR AN

6    EXECUTABLE FILE, AS IT PASSES THROUGH THE GATEWAY, THE GATEWAY

7    WOULD INSPECT THAT FILE.  THAT'S NOT CONTENT THAT THE USER IS

8    REQUESTING.

9        SO ANY -- IF WE LOOK AT THESE CLAIMS, SOME OF THE CLAIMS

10   ARE DRAFTED TO SPECIFICALLY REQUIRE REQUESTS AND OTHER CLAIMS

11   ARE NOT.  COUNSEL IS CORRECT THAT 7 IS A METHOD CLAIM AND

12   CLAIM 1 IS A SYSTEM CLAIM, BUT THAT DOESN'T CHANGE THE FACT

13   THAT CLAIM 1 WAS NOT DRAFTED TO REQUIRE REQUESTS.  IT COULD

14   HAVE SAID A SCANNER FOR SCANNING FILES REQUESTED BY A COMPUTER

15   WITHIN THE INTRANET, BUT IT DIDN'T.

16           **THE COURT:**  SO FROM YOUR PERSPECTIVE, INCOMING FILES

17   ARE NOT LIMITED FROM -- TO FILES FROM THE INTERNET TO THE

18   INTRANET.

19           **MR. FRANKEL:**  NO, I WOULD -- TO SATISFY AN INCOMING

20   FILE FROM THE INTERNET, THERE HAS TO BE A FILE FROM THE

21   INTERNET THAT COMES INTO THE INTRANET THROUGH THE GATEWAY.

22   THE DISTINCTION IS IT DOESN'T HAVE TO BE REQUESTED BY A FILE

23   WITHIN THE INTRANET.

24           **THE COURT:**  ALL RIGHT.

25           **MR. FRANKEL:**  THAT'S WHAT QUALYS IS TRYING TO ADD TO

1    THE CLAIM.

2              **THE COURT:** I SEE.  OKAY.

3              **MR. FRANKEL:** AND, AGAIN, IF WE LOOK AT THE PREFERRED

4    EMBODIMENTS, SOME OF THE EMBODIMENTS -- AND THEY ARE PREFERRED

5    EMBODIMENTS AND NOT DEFINITIONAL, ARE LIMITED TO CONTENT

6    THAT'S SPECIFICALLY REQUESTED BY A USER AND SOME OF THE OTHER

7    EMBODIMENTS ARE NOT.

8         SO, TOO, SOME OF THE CLAIMS ARE DRAFTED TO REQUIRE USER

9    REQUESTS AND OTHER CLAIMS ARE NOT.

10             **THE COURT:** OKAY.  SO IT'S MUCH OF THE SAME ARGUMENT.

11             **MR. FRANKEL:** YES, YOUR HONOR.

12             **MR. MAYS:** YOUR HONOR, IF I COULD JUST ADD.

13        I THINK THE PARTIES, WITH RESPECT TO WHAT MR. FRANKEL

14   SAID, IT SOUNDS LIKE THE PARTIES ARE AT LEAST IN AGREEMENT

15   THAT INTERNET FILES ARE FILES THAT ARE COMING FROM THE

16   INTERNET AND BEING SENT TO THE INTRANET.  SO I JUST WANTED TO

17   NOTE, YOU KNOW, THERE IS, AT LEAST IT SOUNDS LIKE, SOME AREA

18   OF AGREEMENT THERE.

19             **THE COURT:** THAT -- I GUESS THAT'S WHAT I AM

20   UNDERSTANDING.

21        IS THAT NOT RIGHT, MR. FRANKEL?

22             **MR. FRANKEL:** YOUR HONOR, THE ONLY CLAIM THAT'S

23   ASSERTED IN THE '731 PATENT IS CLAIM 1.  AND CLAIM 1 IS

24   LIMITED TO THE SCANNER.  SO TO SATISFY CLAIM 1 THERE'S NOT A

25   REQUIREMENT TO TRANSMIT THE FILES BEYOND THE SCANNER.

1      THERE ARE OTHER EMBODIMENTS AND CLAIMS THAT DEAL WITH THAT

2   PROCESS, BUT THAT SHOULDN'T BE IMPORTED INTO CLAIM 1.  IT'S

3   POSSIBLE THAT WHEREVER THE SCANNER IS, THAT COULD BE THE FINAL

4   DESTINATION OF THE FILES.

5      SO IT'S CONTENT FROM THE INTERNET THAT COMES TO THE

6   GATEWAY IN A SCAN, BUT THAT SHOULD BE THE END OF THE SCOPE OF

7   THIS CLAIM.

8          **MR. MAYS:**  I GUESS WE WOULD DISAGREE ABOUT THAT.

9          **THE COURT:**  ALL RIGHT.  THE '844 PATENT.  IT LOOKS

10   LIKE WE ARE STARTING WITH MR. SMITH?

11          **MR. SMITH:**  YES, YOUR HONOR.

12                  (DISPLAYED ON SCREEN.)

13      SO LET ME TALK ABOUT -- ON THE SCREEN, CAN YOU SEE -- DOES

14   IT SHOW THE '844 PATENT ON THE SCREEN?

15          **THE COURT:**  I DO.  I SEE THAT.  THANK YOU.

16          **MR. SMITH:**  THANK YOU, YOUR HONOR.

17      AND, AGAIN, THIS IS THE ONLY TERM AT ISSUE HERE IS THE

18   TERM WEB CLIENTS.  AND, AGAIN, FINJAN PROPOSES NO

19   CONSTRUCTION.  AND REALLY QUALYS' PROPOSAL, AND THIS IS GOING

20   TO SLIDE 6.4, TO CUT TO THE CHASE ON IT, IS THAT OUR

21   CONSTRUCTION IS THE SAME --

22          **THE COURT:**  MR. SMITH?

23          **MR. SMITH:**  GO AHEAD.

24          **THE COURT:**  I AM GOING TO ASK FINJAN A QUESTION HERE.

25   THIS MAY BE THE POINT YOU'RE TRYING TO MAKE.

1          SO, MR. HANNAH, WHY SHOULD THE COURT NOT FIND THAT YOU ARE

2     JUDICIALLY ESTOPPED FROM ADVANCING YOUR CURRENT POSITION GIVEN

3     THAT THE POSITION THAT IS BEING ADVANCED IS A POSITION YOU'VE

4     TAKEN IN THE PAST?

5          **MR. HANNAH:**  SURE, YOUR HONOR.  MAY IT PLEASE THE

6     COURT, THANK YOU FOR YOUR TIME.

7          TRADITIONALLY IN THE PAST AND I CAN SHARE THE SCREEN --

8     NO, I CAN'T SHARE BECAUSE RYAN YOU'VE GOT YOURS --

9          **MR. SMITH:**  I'M TRYING TO TURN IT OFF HERE.  THERE WE

10    ARE.

11         **THE COURT:**  GO AHEAD.

12                    (DISPLAYED ON SCREEN.)

13         **MR. HANNAH:**  OKAY.  I'M TRYING TO SHARE, YOUR HONOR.

14    CAN YOU SEE IT?

15         **THE COURT:**  YES, I CAN.  THANK YOU.

16         **MR. HANNAH:**  GREAT.

17         SO TRADITIONALLY IN THE PAST, THE ENTIRE PHRASE OF THIS

18    LINKING PHRASE HAS BEEN CONSTRUED AND IT'S BEEN CONSTRUED AS

19    PLAIN AND ORDINARY MEANING, AND THEN THERE WAS A DISPUTE IN

20    TERMS OF, OKAY, WHAT IS THE WEB CLIENT.  AND THERE WASN'T A

21    DISPUTE HERE.

22         SO I AGREE THAT THE ENTIRE PHRASE, "LINKING BY THE

23    INSPECTOR TO THE WEB CLIENT" MEANS LINKING -- MEANS -- JUST

24    HAS THE PLAIN AND ORDINARY MEANING.  AND THEN I WOULD ALSO

25    AGREE AND ADOPT THE SAME CONSTRUCTIONS THAT WE ARGUED FOR IN

1    THE PAST THAT IN LIGHT OF THAT, WEB CLIENT DOES MEAN AN

2    APPLICATION -- HAS THE PLAIN AND ORDINARY MEANING OF AN

3    APPLICATION ON THE COMPUTER OF AN END-USER THAT REQUESTS A

4    DOWNLOADABLE FROM A WEB SERVER.

5        I THINK THAT'S WHAT IT KIND OF CAME DOWN TO IS THAT ENTIRE

6    PHRASE BEFORE, YOU CAN EVEN LOOK AT -- I CAN PUT UP JUDGE

7    GILLIAM'S ORDER -- CAN YOU SEE THAT, YOUR HONOR?

8                        (DISPLAYED ON SCREEN.)

9            **THE COURT:**  I CAN.

10           **MR. HANNAH:**  SO WE'RE LOOKING AT THIS ENTIRE PHRASE

11   BEFORE, AND THIS IS THE SAME THING THAT JUDGE FREEMAN HAS ALSO

12   ADDRESSED.  SO WE ABSOLUTELY WILL MAINTAIN THAT POSITION.  I

13   ARGUED THAT POSITION MANY, MANY TIMES BEFORE, AND I AGREE WITH

14   IT, AND WOULD ADOPT IT.

15       THE ISSUE HERE WAS THAT WEB CLIENT BY ITSELF OUTSIDE OF

16   THE PHRASE, I THINK, DOES NOT HAVE -- IT HAS A PLAIN AND

17   ORDINARY MEANING THAT A COMPUTER SCIENTIST, A GOOD ENGINEER

18   KNOWS WHAT IT MEANS.  AND IF THERE'S NO DISPUTE, THEN

19   TYPICALLY WE STICK WITH THE PLAIN AND ORDINARY MEANING.

20       BUT IF WE NEED TO, IF THE REST OF THE PHRASE IS GOING TO

21   BE GIVEN ITS PLAIN AND ORDINARY MEANING AND WE STICK TO THE

22   SAME CLAIM CONSTRUCTIONS IN PREVIOUS CASES, THEN I'M FINE WITH

23   THAT.

24           **THE COURT:**  AGAIN, YOU KNOW, ONE OF THE QUESTIONS

25   THAT I'M ALWAYS WRESTLING WITH IS, TO THE EXTENT THAT I HAVE

1    TO ASK A JURY, IT DOESN'T SOUND LIKE -- WELL, LET ME JUST GO

2    BACK, THEN, TO MR. SMITH.

3        IS THERE ANY NEED TO CONSTRUE IT AT THIS POINT?

4        **MR. SMITH:**  WELL, YOUR HONOR, IT SOUNDS -- IT HAS

5    BEEN CONSTRUED PREVIOUSLY AND IT SOUNDS LIKE FROM FINJAN'S

6    STATEMENT THAT THEY AGREE TO THE CONSTRUCTION THAT WE HAD

7    PROPOSED, WHICH IS THE SAME AS WAS ADOPTED IN PRIOR CASES.

8        **THE COURT:**  BUT YOU ALL CAME TO SOME AGREEMENT ON

9    LOTS OF TERMS.  SO WHAT'S THE DISPUTE HERE THEN -- OR CAN WE

10   JUST MOVE ON?

11       **MR. SMITH:**  I THINK NOW THE DISPUTE IS RESOLVED.  UP

12   UNTIL NOW, THEY OPPOSED APPLICATION OF THE CONSTRUCTION FROM

13   THE PRIOR CASES, BUT THEY NOW APPEAR TO, UNLESS I AM

14   MISUNDERSTANDING MR. HANNAH, THEY NOW AGREE THAT WEB CLIENT IS

15   AS QUALYS HAS PROPOSED IT TO BE, SO THERE IS NO LONGER A

16   DISPUTE.

17       **MR. HANNAH:**  AGAIN, YOUR HONOR, JUST TO PICK UP ON

18   THAT.

19       I THINK THAT THE ISSUE IS THAT WE HAVE HAD IN THESE CASES

20   WHERE DEFENDANTS HAVE ASKED FOR SUBSEQUENT CONSTRUCTION OF

21   PHRASES AS THE CASE MOVES ON, WHICH IS -- TAKES A LOT OF

22   RESOURCES, AND IF THE ENTIRE PHRASE "BEFORE A WEB SERVER MAKES

23   THE DOWNLOADABLE AVAILABLE TO WEB CLIENTS" IS CONSTRUED AS NO

24   CONSTRUCTION NECESSARY, JUST AS JUDGE GILLIAM SAID, PLAIN AND

25   ORDINARY MEANING, AND THEN THE PLAIN AND ORDINARY MEANING OF

1   WEB CLIENT IS THIS, THAT'S THE CONSTRUCTION WE PROPOSED IN THE

2   BEGINNING.

3       I'LL STICK WITH THAT.  AGAIN, I MADE THAT ARGUMENT AND I

4   WILL STICK WITH IT, BUT I JUST DON'T WANT A DISPUTE THAT LATER

5   COMES ON SAYING, OKAY, WE ARE GOING TO HAVE A SPECIAL

6   CONSTRUCTION FOR THE REST OF THE PHRASE AND WITH WEB CLIENT

7   HAVING A DIFFERENT MEANING IN A DIFFERENT CONTEXT.

8           **THE COURT:**  MR. SMITH, IS THAT AGREEABLE?

9           **MR. SMITH:**  YOUR HONOR, THAT -- AS I UNDERSTAND IT,

10   THERE IS NO LONGER ANY DISPUTE ON WEB CLIENT --

11          **THE COURT:**  THAT IS NOT -- LOOK, IT'S NOT EXACTLY

12   WHAT HE SAID.

13      WHAT HE'S SAYING IS, DO YOU AGREE THAT THE TERM THAT THE

14   COURT WOULD BE REVIEWING IS THE WHOLE PHRASE, "BEFORE A WEB

15   SERVER MAKES THE DOWNLOADABLE AVAILABLE TO WEB CLIENTS," THAT

16   WHOLE PHRASE, AND, THEREFORE, ADOPTING THE GILLIAM

17   CONSTRUCTION, WHICH IS NO CONSTRUCTION NECESSARY, PLAIN AND

18   ORDINARY MEANING, AND PLAIN AND ORDINARY MEANING OF WHAT WEB

19   CLIENT IS, AN APPLICATION ON THE COMPUTER OF AN END-USER THAT

20   REQUESTS A DOWNLOADABLE FROM THE WEB SERVER.

21      IS THAT AGREEABLE?

22          **MR. SMITH:**  YES, YOUR HONOR.

23          **THE COURT:**  ALL RIGHT.  SO WE WILL PUT THAT WHOLE

24   THING IN THE ORDER.

25      NEXT.

1          **MR. SMITH:**  OKAY, YOUR HONOR.  NEXT TERM I'M GOING TO

2    TALK ABOUT HERE IS -- THERE'S A FEW TERMS HERE FROM -- I DON'T

3    THINK YOU ARE SEEING MY SCREEN.

4        ARE YOU SEEING THE '154 --

5          **THE COURT:**  NOT QUITE YET.

6          **MR. SMITH:**  -- PATENT?

7          **THE COURT:**  DO YOU HAVE SCREEN CONTROL?

8                    (DISPLAYED ON SCREEN.)

9          **MR. HANNAH:**  YES, YOUR HONOR, I RELINQUISHED CONTROL.

10          **THE COURT:**  THANK YOU.

11          **MR. SMITH:**  OKAY.  THANK YOU.

12        SO NOW TURNING TO THE '154 PATENT, THERE ARE A COUPLE OF

13    DISPUTED TERMS HERE:  THE CONTENT PROCESSOR, WHICH I WILL TALK

14    ABOUT NOW AND THEN WE'LL GET TO THE OTHER TERMS SUBSEQUENTLY.

15        AND TO RECAP, JUST SO WE HAVE SOME CONTEXT HERE, THIS IS

16    FIGURE 2 FROM THE '154 PATENT.  AND IT HAS AS CLAIMED, THERE'S

17    BASICALLY THESE THREE -- THERE'S A GATEWAY COMPUTER, CLIENT

18    COMPUTER, AND THEN THE SECURITY COMPUTER.  AND THEN AS

19    DISCUSSED AT THE TECHNOLOGY TUTORIAL, BASICALLY, THE CONTENT

20    COMES IN TO THE GATEWAY AND SO THAT THE CLIENT COMPUTER

21    DOESN'T RUN CONTENT THAT COULD BE DANGEROUS, IT GETS MODIFIED

22    WITH THE MODIFICATION BEING, HEY, GO CHECK WITH THE SECURITY

23    COMPUTER BEFORE YOU TRY TO RUN THIS CONTENT.  MAKE SURE IT'S

24    SAFE.  AND THEN AFTER YOU GET THE OKAY FROM THE SECURITY

25    COMPUTER, GO AHEAD AND RUN THE CONTENT.

1          AND THIS -- THIS IS --

2                    (SIMULTANEOUS COLLOQUY.)

3          **MR. SMITH:**  GO AHEAD.

4          **THE COURT:**  LET ME ASK WHETHER MY UNDERSTANDING OF

5     THIS ISSUE IS CORRECT.  SO IT SEEMS TO ME THAT THERE ARE TWO

6     DISPUTES:  THE FIRST IS WHETHER -- OR AT LEAST IN TERMS OF A

7     CONSTRUCTION.

8          ONE, WHETHER THE CONTENT PROCESSOR MUST PROCESS MODIFIED

9     CONTENT AND, TWO -- THERE IT IS, AND THEN, TWO, WHETHER THE

10    CONTENT PROCESSOR MUST BE PART OF THE COMPUTER BEING

11    PROTECTED.

12         NOW WITH THE FIRST ONE, GIVEN THAT JUDGE ALSUP'S

13    CONSTRUCTION IS UP AT THE FEDERAL CIRCUIT AND GIVEN THAT WE

14    ARE NOT IN TRIAL, MY INCLINATION IS JUST TO WAIT.  I CAN

15    ALWAYS DO IT LATER, BUT I'M GOING TO BE BOUND BY WHAT THE

16    FEDERAL CIRCUIT SAYS.  SO I'M INCLINED NOT TO DO ANYTHING.

17         DOES ANYONE WANT TO MAKE ANY ARGUMENT ON THAT FRONT?  IF

18    NOT, LET'S JUST FOCUS ON PART TWO.

19         **MR. SMITH:**  YOUR HONOR, I AGREE THAT'S A GOOD WAY TO

20    GO.

21         **THE COURT:**  MR. HANNAH?

22         **MR. HANNAH:**  YOUR HONOR, I DON'T THINK WE EVEN NEED

23    TO GET TO PART TWO THEN.  BECAUSE THE ENTIRE PHRASE THAT WENT

24    UP IS "CONTENT PROCESSOR" TO THE FEDERAL CIRCUIT.  SO IF

25    YOU -- IF IT COMES BACK AND YOU ARE BOUND, IT'S GOING TO TAKE

1    CARE OF PART ONE AND PART TWO.

2              **THE COURT:**  OKAY.  SO DO YOU AGREE WITH THAT?

3          **MR. HANNAH:**  I AGREE --

4              **THE COURT:**  I MEANT MR. FRANKEL -- I'M SORRY,

5    MR. SMITH.

6          **MR. HANNAH:**  HE'S ON MY SIDE.

7              **THE COURT:**  MR. SMITH.

8          **MR. SMITH:**  YES.  THANK YOU, YOUR HONOR.

9        I DISAGREE, AND I THINK IF WE LOOK AT SLIDE 7.5 HERE, THE

10   ISSUE REALLY IS THAT JUDGE ALSUP'S DECISION WAS AS TO THIS

11   FIRST ISSUE.  HE CONCLUDED THE PROCESSOR THAT PROCESSES

12   MODIFIED CONTENT.  BUT THEN IN A FOOTNOTE IN HIS ORDER HE

13   SAID, HE FINDS THE ISSUE OF PROCESSING MODIFIED CONTENT

14   DISPOSITIVE, AND HE DIDN'T -- AND ALTHOUGH JUNIPER MADE A

15   STRONG ARGUMENT ABOUT BASICALLY WHERE THE CONTENT PROCESSOR

16   RESIDES, HE DIDN'T ADDRESS THAT ISSUE.

17       SO OUR VIEW IS THAT THAT ISSUE IS NOT BEFORE THE FEDERAL

18   CIRCUIT SO THERE COULD BE A SUBSEQUENT CONSTRUCTION THAT

19   PROVIDES ADDITIONAL CLARIFICATION FOR CERTAIN DISPUTED ISSUES

20   THAT MAY ARISE IN A CASE INVOLVING THE CLAIM TERM.

21             **MR. HANNAH:**  YOUR HONOR, I MEAN, IF YOUR INCLINATION

22   IS TO WAIT TO SEE WHAT CONTENT PROCESSOR IS, THEN I THINK IT

23   MAKES SENSE TO WAIT ON THE WHOLE ENTIRE TERM.  IF WE NEED TO

24   REVISIT IT, WE REVISIT IT.

25       OBVIOUSLY I'VE GOT VERY STRONG ARGUMENTS AGAINST THE

1    MODIFIED CONTENT AND BOTH THE CONTENT PROCESSOR BEING ON THE

2    CLIENT COMPUTER, BUT I'M JUST FOLLOWING YOUR LEAD, YOUR HONOR.

3        IF YOU WANT TO PUT THIS TO ANOTHER DAY WHEN THE FEDERAL

4    CIRCUIT COMES BACK, THEN I THINK THAT WE ARE GOING TO HAVE TO

5    SEE WHAT THE FEDERAL CIRCUIT SAYS.  I'M HAPPY TO ARGUE IT

6    EITHER WAY.

7            THE COURT:  I HAVEN'T DECIDED YET, SO I'M GOING TO

8    HAVE YOU -- AND WE HAVE TIME.

9            MR. HANNAH:  OKAY.

10           THE COURT:  I AM GOING TO HAVE YOU GO AHEAD AND ARGUE

11   IT, BUT DOES ANYBODY HAVE A SENSE AS TO WHEN -- YOU KNOW, HOW

12   LONG IT IS TAKING THE FEDERAL CIRCUIT TO GET DECISIONS OUT

13   ONCE BRIEFED?

14           MR. HANNAH:  WE ARE SEEING ABOUT A YEAR, YOUR HONOR,

15   IN TERMS OF ONCE EVERYTHING -- I MEAN, I SHOULD SAY ONCE IT

16   HAS BEEN BRIEFED.  ONCE WE HAVE ACTUALLY SUBMITTED THE

17   APPENDIX AND WE'VE STARTED THE BRIEFING SCHEDULE, WE HAVE SEEN

18   ABOUT A YEAR UNTIL THEY COME BACK.

19       WE HAVE SEEN RECENTLY THAT THEY ARE DOING THE ORAL

20   ARGUMENTS VIA VIDEO, AND WE HAVE ALSO SEEN ON SEVERAL

21   OCCASIONS THEY START TAKING POSITIONS ON THE PAPERS.  SO I

22   THINK IT'S GOING TO START MOVING ALONG A LITTLE BIT FASTER

23   AGAIN, BUT THAT'S WHAT I HAVE PERSONALLY SEEN.

24           THE COURT:  SO YOU ARE THINKING ABOUT A YEAR THEN OR

25   A LITTLE LESS THAN A YEAR?

1      **MR. HANNAH:**  I'M THINKING LESS THAN A YEAR ON THIS

2   ISSUE.

3           **THE COURT:**  OKAY.

4           **MR. SMITH:**  YOUR HONOR, IT HAS BEEN FULLY BRIEFED AS

5   I UNDERSTAND IT RECENTLY, SO THEY ARE JUST LITERALLY AWAITING

6   A DATE FOR ORAL ARGUMENTS.

7           **THE COURT:**  ALL RIGHT.  WHY DON'T YOU GO AHEAD AND

8   ARGUE THIS.  AND I'LL ASK MR. HANNAH, WHEN YOU DO YOUR

9   ARGUMENT, WHETHER YOU CAN EXPLAIN TO ME HOW THE INVENTION

10   PROTECTS A COMPUTER IF THE CONTENT PROCESSOR RESIDED SOMEWHERE

11   OTHER THAN THE PROTECTED COMPUTER.

12      ALL RIGHT.  SO IF YOU WILL MAKE SURE TO ADDRESS THAT.

13           **MR. HANNAH:**  SURE.  YOU WANT ME TO ADDRESS THAT NOW?

14           **THE COURT:**  WHO HAS -- WELL, MR. SMITH ALREADY HAS

15   THE SCREEN.  LET'S GO AHEAD, MR. SMITH.

16           **MR. SMITH:**  AND, YOUR HONOR, JUST TO CLARIFY, SHOULD

17   I -- I'M GOING TO SKIP OVER THE FIRST ISSUE?

18           **THE COURT:**  YES.

19           **MR. SMITH:**  SO SKIPPING OVER THAT ISSUE, I THINK

20   REALLY THE CRUX OF OUR ARGUMENT IS THAT EVERYWHERE -- I THINK

21   REALLY, IF YOU START OFF REALLY AT CLAIM (AUDIO LAG) --

22           **COURT REPORTER:**  CLAIM WHAT?

23           **MR. SMITH:**  -- YOU HAVE A CONTENT.  IT'S A SYSTEM FOR

24   PROTECTING A COMPUTER FROM A DYNAMICALLY GENERATED MALICIOUS

25   CONTENT.  AND IT'S TALKING ABOUT A CONTENT PROCESSOR.  AND I

1    THINK TO YOUR POINT, THIS CLAIM IS ABOUT PROTECTING A

2    COMPUTER.

3        AND SO THE WAY THAT YOU WOULD PROTECT THE COMPUTER IS BY

4    REALLY EVERY EMBODIMENT THAT IS CAPTURED BY THIS CLAIM

5    LANGUAGE, IT IS -- THE COMPUTER BEING PROTECTED IS SENDING

6    COMMUNICATIONS TO THE SECURITY COMPUTER, AND THEN THE SECURITY

7    COMPUTER IS GIVING THE OKAY OR TELLING THE COMPUTER BEING

8    PROTECTED DON'T EXECUTE THE CONTENT.  IT IS REALLY NECESSARILY

9    THAT THE CONTENT PROCESSOR HAS TO BE ON THE COMPUTER BEING

10   PROTECTED.

11       IF WE GO TO... I THINK IT IS BORNE OUT IN -- WE CAN EVEN

12   GO TO THE FIGURE WE WERE TAKING A LOOK AT BEFORE, FIGURE 3, IT

13   SHOWS CLEARLY HERE THAT THE CONTENT PROCESSOR IS WITHIN THE

14   CLIENT COMPUTER, WHICH IS THE COMPUTER BEING PROTECTED.

15       I THINK WE USE THE TERM "COMPUTER BEING PROTECTED" JUST TO

16   BE A LITTLE BROADER EVEN THAN WHAT IS DISCLOSED IN THE

17   SPECIFICATION AS A CLIENT COMPUTER.  I THINK IN *JUNIPER*, THE

18   DEFENDANT THERE SAID CLIENT COMPUTER.  OURS IS SLIGHTLY

19   BROADER THAN WHAT WAS ARGUED IN *JUNIPER* BUT IT IS THE SAME

20   CONCEPT.

21       THEN GOING TO THE SPECIFICATION AS WELL, YOU HAVE

22   STATEMENTS -- FOR EXAMPLE, THIS STATEMENT WHICH IS AT

23   COLUMN 4, LINES 55 THROUGH 60, IT SAYS IN THE HIGHLIGHTED

24   PORTION, THE PRESENT INVENTION OPERATES BY REPLACING THE

25   ORIGINAL FUNCTION CALLS WITH THE SUBSTITUTE FUNCTION CALLS

1   WITHIN THE CONTENT, AT A GATEWAY COMPUTER, PRIOR TO THE

2   CONTENT BEING RECEIVED AT THE CLIENT COMPUTER.

3       SO IT'S TALKING ABOUT THIS IS THE INVENTION IS, THE

4   GATEWAY IS DOING THE SUBSTITUTION, AND THEN IT'S GOING TO THE

5   CLIENT COMPUTER, AND THAT IS WHERE THE CONTENT PROCESSOR WOULD

6   NECESSARILY HAVE TO BE.  IT WOULDN'T MAKE SENSE ANY OTHER WAY.

7       AND SIMILARLY AT COLUMN 5, LINES 4 THROUGH 10 TALKS ABOUT

8   THE PRESENT INVENTION IS A METHOD FOR PROTECTING A CLIENT

9   COMPUTER --

10          **THE COURT:**  MR. SMITH?

11      **MR. SMITH:**  YES.

12          **THE COURT:**  IT JUST SO HAPPENED TO BE YOU, BUT A

13  REMINDER, THAT WHEN YOU START READING, YOU START -- AND MANY

14  LAWYERS DO -- THEY TALK VERY FAST.  MY COURT REPORTER NEEDS TO

15  GET EVERYTHING DOWN.  SO SLOW DOWN WHEN YOU READ, PLEASE.

16      **MR. SMITH:**  UNDERSTOOD.  SORRY ABOUT THAT, MADAME

17  COURT REPORTER.

18      AND THEN JUST FINALLY LOOKING AT COLUMN 9, LINES 13

19  THROUGH 28 AND, AGAIN FIGURE 2, IT'S AGAIN EXPLAINING THIS

20  WHOLE PROCESS AS THERE BEING A CONTENT MODIFIER, SCANNING THE

21  CONTENT, AND THEN SENDING IT TO THE CLIENT COMPUTER WHERE THE

22  CONTENT PROCESSOR EXECUTES THE SUBSTITUTE FUNCTION AND

23  INTERACTS WITH THE SECURITY COMPUTER.

24      IT REALLY IS THE ONLY EMBODIMENT THAT'S CLAIMED.  THERE IS

25  ANOTHER EMBODIMENT THAT TALKS ABOUT NOT NECESSARILY HAVING A

1    SECURITY COMPUTER, BUT THIS PARTICULAR CLAIM AFFIRMATIVELY

2    REQUIRES THERE TO BE A SECURITY COMPUTER.  SO IT'S -- BECAUSE

3    IT ACTUALLY USES THE TERM "SECURITY COMPUTER."  SO IT'S NOT

4    THE SCENARIO OR EMBODIMENT WHERE THERE'S JUST A CLIENT DEVICE

5    AND A GATEWAY.

6              **THE COURT:**  ALL RIGHT.  MR. HANNAH.

7              **MR. HANNAH:**  I'M TRYING TO STOP SHARING HERE.

8              **MR. SMITH:**  THERE WE GO.

9                   (DISPLAYED ON SCREEN.)

10             **MR. HANNAH:**  CAN YOU SEE MY SCREEN, YOUR HONOR?

11             **THE COURT:**  I CAN.  THANK YOU.

12             **MR. HANNAH:**  SO JUST TO SIMPLY ANSWER YOUR QUESTION,

13   YOUR QUESTION WAS, HOW DO YOU PROTECT A COMPUTER IF THE

14   CONTENT PROCESSOR ISN'T ON THE COMPUTER YOU'RE PROTECTING?

15   YOU PUT IT ON THE GATEWAY.

16       SO THE SYSTEM FOR PROTECTING A COMPUTER IS ON A GATEWAY

17   COMPUTER BEFORE THE CONTENT EVER GETS TO THE CLIENT COMPUTER.

18   THE CONTENT PROCESSOR PROCESSES THE CONTENT, AS IT'S REQUIRED

19   IN THE CLAIMS, WILL SEND THE INPUT OVER TO A SECURITY COMPUTER

20   TO SEE IF THE -- IF IT IS SAFE TO INVOKE IT.  IF IT IS, IT

21   ALLOWS IT TO GO.  IF IT'S NOT, THEN IT TELLS IT THAT IT'S NOT

22   SAFE.

23       AND THEN THAT'S THE VERY SIMPLE ANSWER TO YOUR QUESTION IN

24   TERMS OF HOW YOU CAN PROTECT A CLIENT COMPUTER WITHOUT PUTTING

25   THE CONTENT PROCESSOR ON THE CLIENT COMPUTER.  YOU SIMPLY JUST

1    PUT IT ON THE GATEWAY COMPUTER.

2        THIS IS CONSISTENT WITH OTHER LITIGATIONS IN WHICH YOU'VE

3    HAD JURY VERDICTS AFFIRMED.  THIS ALSO IS CONSISTENT WITH THE

4    PROSECUTION HISTORY IN TERMS OF WHAT HAS -- WHAT WAS REMOVED

5    FROM THE CLAIMS.  THIS KIND OF GETS INTO ALSO THE MODIFIED

6    CONTENT, BUT --

7            **THE COURT:**  SO IT'S YOUR ARGUMENT, THEN, THAT THE

8    GATEWAY COMPUTER IS NOT THE PROTECTED COMPUTER?

9            **MR. HANNAH:**  THE GATEWAY COMPUTER DOES NOT HAVE TO BE

10   THE PROTECTED COMPUTER.  IT COULD BE THE PROTECTED COMPUTER,

11   BUT IT WOULD BE ANY CLIENTS THAT ARE BEHIND THE GATEWAY WOULD

12   BE PROTECTED COMPUTERS.

13       THIS IS -- IF WE LOOK AT THE -- THERE'S A LITTLE CONTEXT

14   THAT IS REQUIRED WHEN WE TALK ABOUT THE '154 THAT IS HELPFUL,

15   IS YOU LOOK AT THE '289 PATENT.

16                   (DISPLAYED ON SCREEN.)

17       SO THE '289 PATENT, WHICH I PUT ON THE SCREEN HERE, THIS

18   IS THE PARENT APPLICATION.  AND I'M SURE YOUR HONOR HAS

19   PROBABLY HEARD THIS BEFORE, BUT THE '154 IS WHAT'S CALLED A

20   BROADENING CONTINUATION; IN THAT THE '289 WAS ALLOWED AND

21   OVERCOME THE PRIOR ART, AND THEN IT WAS DETERMINED WHICH

22   ELEMENTS WERE ACTUALLY, YOU KNOW, MOST RELEVANT AND GOT OVER

23   THE PRIOR ART.  SO THE '154 WAS FILED, AND IT ELIMINATED ALL

24   OF THE ELEMENTS THAT WERE NOT NECESSARILY REQUIRED IN ORDER TO

25   GET OVER THE PRIOR ART.  AND THIS HAS BEEN CONFIRMED -- THE

1    '154 HAS BEEN CONFIRMED IN A DOZEN IPR'S TWICE BY THE FEDERAL

2    CIRCUIT.

3         AND AS YOU CAN SEE HERE IN THE '289, THIS TALKS ABOUT

4    RECEIVING AT A GATEWAY COMPUTER CONNECTED TO THE CONTENT BEING

5    SENT TO A CLIENT COMPUTER, AND THEN IT MODIFIES THE CONTENT AT

6    THE GATEWAY, AND THEN IT TRANSMITS THE MODIFIED CONTENT TO THE

7    CLIENT COMPUTER AND THEN PROCESSES THE MODIFIED CONTENT AT THE

8    CLIENT COMPUTER.  ALL THESE ELEMENTS ARE REMOVED FOR THE '154

9    PATENT.

10        THIS IS WHERE JUDGE NOREIKA SPECIFICALLY SAID, BASED ON

11   CLAIM DIFFERENTIATION, YOU CAN'T IMPORT BOTH THE MODIFYING,

12   BUT ALSO THE SAME ARGUMENT WOULD APPLY TO PROCESSING CONTENT

13   AT THE CLIENT COMPUTER.  CLAIM DIFFERENTIATION BASED -- THE

14   DOCTRINE SAYS THAT BASED ON THIS PATENT, THE '289 PATENT, THE

15   PARENT APPLICATION, YOU CAN'T IMPORT THOSE LIMITATIONS INTO

16   THE OTHER PATENT.  SO THAT'S JUST AN ADDITIONAL REASON THAT

17   YOU WOULDN'T HAVE TO PROCESS IT.

18        OUR BRIEFING'S ALSO, I THINK, PRETTY CLEAR OTHER THIS.  WE

19   HAVE CITATIONS STARTING IN COLUMN 6 AND, YOU KNOW, THEY

20   CONTINUE TO COLUMN 6 AT LINE 27, COLUMN 6 AT LINE 68, COLUMN 7

21   AT LINE 8, COLUMN 7 AT LINE 32, COLUMN 7 AT LINE 20.  ALL OF

22   THESE RECITE JUST A COMPUTER.  THEY DO NOT -- OTHER

23   EMBODIMENTS MAY TALK ABOUT WHAT'S HERE IN THE '289, TALKING

24   ABOUT PROCESSING AT A CLIENT COMPUTER, BUT THOSE REQUIREMENTS

25   ARE NOT IN THE '154.

1        AND SO BY VIRTUE OF THEIR CONSTRUCTION, THEY'RE TRYING TO

2    IMPORT TWO LIMITATIONS:  ONE IS MODIFYING THE CONTENT, WHICH I

3    DISAGREE WITH AND I STILL DISAGREE WITH, BUT THEN ALSO THIS

4    PROCESSING AT THE CLIENT COMPUTER, WHICH IS A LIMITATION THAT

5    WAS SPECIFICALLY REMOVED IN THE CONTINUATION.

6        **THE COURT:**  SO I THINK WHILE THIS IS ARGUED -- YOU

7    MAKE REFERENCE TO JUDGE NOREIKA'S DECISION AND TO SOME OTHER

8    CASES, BUT IT DOES -- I THOUGHT I UNDERSTOOD THEIR ARGUMENT TO

9    BE THAT THIS SPECIFIC ISSUE WAS NEVER ADDRESSED.

10        **MR. HANNAH:**  THAT'S CORRECT, YOUR HONOR.  THIS

11    SPECIFIC ISSUE OF THE LOCATION OF THE PROCESSING OF THE CLIENT

12    COMPUTER WAS NOT SPECIFICALLY ADDRESSED.

13        MY POINT WAS THAT THE ISSUE IS VERY SIMILAR IN THAT IN

14    THE -- BEFORE JUDGE NOREIKA AND BEFORE THE OTHER JUDGES THAT

15    WE CITED IN OUR BRIEF, THEY ALL FOUND THAT IT SHOULD BE

16    MODIFIED -- MODIFIED CONTENT IS NOT REQUIRED BECAUSE ON OTHER

17    THINGS OF CLAIM DIFFERENTIATION BETWEEN THE PARENT APPLICATION

18    AND THE CONTINUATION APPLICATION.

19        MY POINT WAS JUST THAT THE SAME ARGUMENT APPLIES FOR THE

20    PROCESSING AT THE CLIENT COMPUTER BECAUSE THAT LIMITATION WAS

21    SPECIFICALLY ALSO REMOVED WHEN THE '154 WAS FILED AND ALLOWED

22    OVER THE PRIOR ART.

23        **THE COURT:**  MR. SMITH, ANY RESPONSE?

24        **MR. SMITH:**  THANK YOU, YOUR HONOR.

25    I THINK WHAT WE DIDN'T HEAR WAS ANY IDENTIFICATION OF

1    WHERE IN THE SPECIFICATION IN THERE IS ANY DISCLOSURE

2    INDICATING THAT THE CONTENT PROCESSOR COULD BE LOCATED

3    ANYWHERE OTHER THAN THE, WHAT THEY CALL THE CLIENT COMPUTER IN

4    THE SPECIFICATION OR MORE BROADLY THE COMPUTER BEING

5    PROTECTED.

6         THERE'S NO REFERENCE TO THAT IN THE SPECIFICATION.  THE

7    ISSUE WE'RE ADDRESSING IS WHERE IS THE CONTENT PROCESSOR.

8         **THE COURT:**  LET ME STOP YOU RIGHT THERE.

9         MR. HANNAH, YOUR BEST LOCATIONS TO ANSWER THAT QUESTION.

10         **MR. HANNAH:**  SURE, YOUR HONOR.

11         **THE COURT:**  I DON'T NEED ARGUMENT, I JUST NEED CITES.

12         **MR. HANNAH:**  THOSE ARE THE CITES THAT I STARTED OFF

13    WITH.  I'M JUST SHOWING THE PATENT ON THE SCREEN NOW, WHICH IS

14    STARTING 627.

15                        (DISPLAYED ON SCREEN.)

16         IT TALKS ABOUT IT DOESN'T HAVE A REQUIREMENT THAT IT BE ON

17    THE CLIENT COMPUTER.  IT JUST SAYS A COMPUTING DEVICE IN

18    GENERAL.  THESE ARE -- AND THESE ARE -- THE EMBODIMENTS I'M

19    GOING TO CITE YOU ARE THE ONES IN WHICH THEY BASE THE '154 OFF

20    OF.

21         THESE OTHER EMBODIMENTS, WHICH REQUIRE THE CLIENT

22    COMPUTER, ARE WHAT THE '289 WAS BASED ON, BUT THEY SHARE THE

23    SAME SPEC, SO THIS IS THE BROADENING CONTINUATION I'M TALKING

24    ABOUT.

25         WE ALSO HAVE AT 668, LINES 7 -- I'M SORRY, 665 THROUGH

1    LINE 77, AGAIN, IT JUST TALKS ABOUT A COMPUTER MEDIUM --

2    STARTING -- CAUSING A COMPUTING --

3         **COURT REPORTER:**  EXCUSE ME --

4         **MR. HANNAH:**  -- CONTENT.  IT DOESN'T HAVE ANYTHING

5    ABOUT A CLIENT COMPUTING DEVICE, OR ANYTHING OF THAT NATURE.

6         YOU ALSO HAVE 7, 8 THROUGH 9, WHICH IS THIS IS EMBODIMENT

7    RIGHT HERE.  I'M SORRY, 7, 8 THROUGH 19.

8         THEN WE HAVE 720, WHICH SAYS RIGHT HERE.  THERE'S A

9    FURTHER -- IN ACCORDANCE WITH A PREFERRED EMBODIMENT OF THE

10   PRESENT INVENTION ASSISTING OR PROTECTING A COMPUTER.  IT

11   DOESN'T SAY ANYTHING ABOUT --

12        **COURT REPORTER:**  EXCUSE ME, COUNSEL.

13        **MR. HANNAH:**  -- IT HAVING TO BE LOCATED ON A CLIENT

14   COMPUTER OR ANYTHING OF THAT NATURE.

15        AND 732, LINE 43.  I THINK THOSE ARE SOME OF THE CLEANEST

16   IN TERMS OF WHERE THERE'S SPECIFIC REFERENCE TO A COMPUTING

17   DEVICE BUT THERE'S NO LIMITATION IN TERMS OF IT HAVING TO BE

18   ON THE CLIENT COMPUTING DEVICE.

19        **THE COURT:**  ALL RIGHT.  SO, MR. SMITH, NOW YOUR

20   RESPONSE.  THAT'S HIS BEST ARGUMENT.

21        **MR. SMITH:**  OUR RESPONSE TO THAT IS, WE'RE NOT SAYING

22   IT'S SPECIFICALLY LIMITED TO A CLIENT COMPUTER.  IT HAS TO BE

23   THE COMPUTER BEING PROTECTED.

24        AND SO I THINK ALL OF THESE CITATIONS INDICATE MAYBE

25   BROADER LANGUAGE THAN CLIENT COMPUTER, WHICH IS WHY OUR

1    CONSTRUCTION WAS A BIT BROADER THAN WHAT WAS ARGUED IN

2    *JUNIPER*.  SO WE ARE SAYING IT MAY BE POSSIBLE THAT IT'S

3    SOMETHING OTHER THAN A CLIENT COMPUTER, BUT WHATEVER THAT

4    COMPUTER IS, IT'S THE COMPUTER THAT'S BEING PROTECTED.  THAT'S

5    THE WHOLE IDEA OF MODIFYING THIS CONTENT SO YOU DON'T EXECUTE

6    SOMETHING THAT TURNS OUT TO BE MALICIOUS; IS YOU'RE

7    PROTECTING -- YOU'RE DOING THAT TO PROTECT THE COMPUTER THAT

8    HAS THIS CONTENT PROCESSOR ON IT.

9         **THE COURT:**  ALL RIGHT.

10    NEXT.  NEXT PHRASE, SECURITY COMPUTER.

11        **MR. SMITH:**  OKAY, YOUR HONOR.

12        **THE COURT:**  AND ON YOUR PRESENTATION, MR. SMITH, IT

13    SEEMED TO ME WHEN I LOOKED AT THE CLAIM, THAT THE CLAIM

14    ALREADY REQUIRES THE SECURITY PROCESSOR TO INSPECT CONTENT AND

15    PROVIDE SOME INDICATION OF WHETHER INVOKING THE ORIGINAL

16    FUNCTION IS SAFE.

17    SO WHY DO I NEED TO ADD ALL OF WHAT YOU'RE SAYING TO THE

18    CONSTRUCTION?  I'M NOT SURE WHAT IT REALLY ADDS.

19        **MR. SMITH:**  I THINK REALLY WHAT WE WERE TRYING TO

20    ACCOMPLISH WAS, AND JUST TO GO TO THE CONSTRUCTION, REALLY THE

21    IDEA OF EXPLAINING WHEN THEY SAY SAFE, THAT WE ARE TALKING

22    ABOUT MALICIOUS --

23        **THE COURT:**  THE WORD "SAFE" ISN'T IN THE TERM.  THE

24    TERM IS "SECURITY COMPUTER."  THAT'S THE TERM.

25        **MR. SMITH:**  RIGHT.  AND I THINK WHAT WE WERE LOOKING

1    AT WAS -- SO IT IS SECURITY COMPUTER FOR INSPECTION, AND THEN

2    LATER DOWN -- AND THIS IS ON CLAIM -- SLIDE --

3         **THE COURT:**  I CAN'T SEE YOUR SCREEN IF YOU THOUGHT --

4    IF YOU ARE THINKING THAT I CAN.

5         **MR. SMITH:**  I'M SORRY.

6         **THE COURT:**  I HAVE --

7         **MR. SMITH:**  I THINK THE BASIC IDEA WAS THAT LOOKING

8    JUST AT THE CLAIM LANGUAGE, WE HAVE THE RECITATION OF A

9    SECURITY COMPUTER THAT IS DOING AN INSPECTION, AND THEN THE

10   LAST ELEMENT INDICATES THAT WHAT THE SECURITY COMPUTER DOES IS

11   INDICATE WHETHER IT'S SAFE TO INVOKE THE SECOND FUNCTION WITH

12   THE INPUT.

13        AND SO BASED ON THAT LANGUAGE FROM THE CLAIM, WE KNOW THAT

14   THE SECURITY COMPUTER IS A COMPUTER THAT DETERMINES WHETHER

15   IT'S SAFE TO DO THE INVOCATION OR RUNNING THE CONTENT --

16        **THE COURT:**  MR. SMITH -- ALL RIGHT.  I'M GOING TO

17   STOP YOU.

18        AND EVERYBODY, I'M LOOKING AT 8.3 OF HIS SLIDE DECK.  THE

19   PART THAT YOU HAVE HIGHLIGHTED READS:  "THE CLIENT COMPUTER

20   PASSES THE INPUT TO THE FUNCTION TO THE SECURITY COMPUTER FOR

21   INSPECTION, AND SUSPENDS PROCESSING THE NETWORK CONTENT

22   PENDING A REPLY BACK FROM THE SECURITY COMPUTER."

23        SO WHAT YOU'RE ASKING ME TO DO IS, IS TO HAVE THE JURY, IN

24   EFFECT, IMPORT A COMPUTER THAT DETERMINES WHETHER THE CONTENT

25   RECEIVED BY THE CONTENT PROCESSOR IS MALICIOUS WHEN -- AND MY

1    QUESTION IS, ISN'T THAT WHAT THAT SECTION ALREADY SAYS?  I

2    MEAN, ISN'T THE POINT THAT IT HAS -- IT RECEIVES IT FOR

3    INSPECTION AND THEN IT SUSPENDS THE PROCESSING?

4        I MEAN --

5              **MR. SMITH:**  THAT'S RIGHT.

6              **THE COURT:**  WHAT ARE YOU TRYING TO ADD HERE?

7              **MR. SMITH:**  REALLY JUST THE PREAMBLE SAYS OF CLAIM 1,

8    FOR EXAMPLE, SAYS A SYSTEM FOR PROTECTING A COMPUTER FROM

9    DYNAMICALLY GENERATED MALICIOUS CONTENT.  AND THEN AT THE END

10   OF THE CLAIM IT INDICATES -- IT SAYS THE SECURITY COMPUTER

11   BASICALLY DETERMINES WHETHER IT IS SAFE TO INVOKE THE SECOND

12   FUNCTION.

13       SO WHAT WE ARE TRYING TO DO IS PUT A LITTLE EXPLANATION

14   ABOUT WHEN THE CLAIM SAYS WHEN IT'S SAFE TO INVOKE THE SECOND

15   FUNCTION, EXPLAIN A LITTLE BIT MORE ABOUT WHAT THE SECURITY

16   COMPUTER IS DOING.  AND SO IT'S INDICATING WHETHER SOMETHING

17   IS SAFE OR NOT IN TERMS OF WHETHER OR NOT THERE IS --

18             **THE COURT:**  WHY AREN'T YOU HAVING ME CONSTRUE SAFE?

19   THAT SEEMS TO ME TO BE YOUR CONCERN.

20             **MR. SMITH:**  LOOKING AT IT I WOULD AGREE THAT WOULD BE

21   A... CERTAINLY ANOTHER WAY OF GETTING AT THE SAME POINT IS

22   TRYING TO GET THE IDEA THAT THE CLAIM IS TALKING ABOUT

23   MALICIOUS CONTENT.  SO WHEN WE SAY WHETHER IT'S SAFE TO INVOKE

24   THE SECOND FUNCTION, TO PROVIDE A LITTLE BIT MORE EXPLANATION

25   TO THE JURY IT'S LIKELY GOING TO BE HEARING ABOUT THINGS LIKE

1    MALICIOUS CONTENT TO UNDERSTAND WHAT IT MEANS TO BE -- WHETHER

2    IT'S SAFE TO INVOKE SOMETHING.

3         BUT WE THOUGHT THAT WAS TIED UP WITH THE... REALLY WHAT

4    THE SECURITY COMPUTER DID.

5              **THE COURT:**  ALL RIGHT.  A RESPONSE, MR. HANNAH.

6              **MR. HANNAH:**  YES, YOUR HONOR.

7         I AGREE WITH THE INDICATION FROM YOUR HONOR THAT THE --

8    THERE'S NO NEED TO CONSTRUE THIS TERM.  IT IS ALREADY SET

9    FORTH IN THE CLAIM.  I THINK THAT SAFE IS BROADER THAN

10   MALICIOUS, AND IT ACTUALLY CUTS AGAINST THE ACTUAL CLAIM

11   LANGUAGE BECAUSE THE SECURITY COMPUTER IS JUST CHECKING IF

12   THE -- I'M GOING TO HIGHLIGHT THIS -- ONLY IF A SECURITY

13   COMPUTER INDICATES THAT SUCH INVOCATION IS SAFE.

14        SO IT'S TALKING ABOUT THE INPUT THAT'S BEING SENT OVER OR

15   TRANSMITTED TO THE SECURITY COMPUTER AND THEN CHECKING TO SEE

16   IF THE INVOCATION IS SAFE.

17        I THINK THAT'S DIFFERENT THAN THIS DETERMINATION OF

18   MALICIOUS CONTENT, AND I THINK THEY ARE JUST TRYING TO IMPORT

19   A NONINFRINGEMENT ARGUMENT TO SAY THAT THEY DON'T LOOK FOR

20   MALICIOUS CONTENT, OR SOMETHING ALONG THOSE LINES, WHEN THE

21   CLAIM IS CLEAR ON ITS FACE IN TERMS OF WHAT IT DOES.  AND I

22   THINK THAT THEIR CLAIM CONSTRUCTION IS ACTUALLY READING OUT

23   LIMITATIONS AND MAKING IT NARROWER WITHOUT ANY CLEAR

24   DISAVOWAL.

25              **THE COURT:**  OKAY.  I DON'T THINK I NEED ANYTHING MORE

1    ON THAT ONE.

2        THEN NEXT AND LAST IS --

3            **MR. SMITH:**  AND, YOUR HONOR -- SORRY.

4            **THE COURT:**  -- RECEIVER AND TRANSMITTER FROM THE

5    '494, '968, AND '154 PATENTS.

6            **MR. SMITH:**  THANK YOU, YOUR HONOR.

7        AND I TREATED THESE COLLECTIVELY JUST IN THE HOPE OF

8    SAVING SOME TIME ON THAT BECAUSE I THINK THEY ARE VERY SIMILAR

9    ISSUES.

10       AND REALLY WHAT THIS ISSUE COMES DOWN TO IS, FOR THESE

11   PATENTS, THESE ARE NONCE TERMS IN THE SENSE THEY ARE

12   STATEMENTS OF -- WHICH ARE NOT REALLY STRUCTURE AT ALL.  THEY

13   ARE JUST LIKE THE TERM "MODULE" THAT THE FEDERAL CIRCUIT SAID

14   WAS A NONCE TERM IN THE *WILLIAMSON* DECISION.

15       AND I THINK THAT CAN BE VERY WELL ILLUSTRATED WHEN -- IF

16   WE GO TO SLIDE ID.6, IF YOU SUBSTITUTE THE WORD "MEANS" FOR

17   THE TERM A "TRANSMITTER" OR A "RECEIVER," YOU GET A CLAIM THAT

18   HAS REALLY THE IDENTICAL READ OR MEANING.

19       SO, THE TERM "TRANSMITTER," WHILE IT ON ITS FACE SUGGESTS

20   SOME SORT OF STRUCTURE, IT'S JUST LIKE THE TERM "MODULE" IN

21   *WILLIAMSON* WHERE IT DOESN'T ACTUALLY CONNOTE ANY SORT OF

22   STRUCTURE WHATSOEVER BECAUSE IT IS A TRANSMITTER FOR

23   TRANSMITTING.  JUST LIKE SAYING A MEANS FOR TRANSMITTING.  SO

24   YOU REALLY HAVE TO -- IN THIS CIRCUMSTANCE, THAT WOULD MEAN

25   THAT THE TERM SHOULD BE TREATED AS A MEANS-PLUS-FUNCTION

1    CLAIMING TERM, AND AS SUCH, THEN THERE WOULD BE A REQUIREMENT

2    TO GO TO THE SPECIFICATION AND ACTUALLY FIND THE STRUCTURE TO

3    SUPPORT THAT SORT OF TERM.

4        AND HERE WE CAN SEE THAT, TOO, IN THE '494 PATENT.  THIS

5    IS AN EXCERPTED PART OF THE CLAIM.  BUT REALLY TAKING OUT A

6    RECEIVER FOR RECEIVING AND PUTTING IN MEANS FOR RECEIVING, YOU

7    END UP WITH AN IDENTICAL CLAIM.  SO, AGAIN, IT'S JUST A BLACK

8    BOX LIKE THE COURT -- THE FEDERAL CIRCUIT FOUND IN *WILLIAMSON*.

9    AND SAYING FOR THE INDEPENDENT -- DEPENDENT CLAIMS OF THE '968

10   PATENT, AS WE SEE HERE --

11           **THE COURT:**  BUT IT IS DIFFERENT.  I MEAN IT DOES

12   REFER SPECIFICALLY TO A TRANSMITTER AND IT DOES REFER

13   SPECIFICALLY TO A RECEIVER.  SO HOW AM I SUPPOSED TO IGNORE

14   THOSE WORDS AND SOMEHOW SUGGEST THAT IT'S ONLY DIRECTED TO

15   SOFTWARE?

16           **MR. SMITH:**  WELL, I DON'T THINK WE ARE NECESSARILY

17   SAYING IT MUST BE ONLY DIRECTED TO SOFTWARE, AND I THINK

18   THAT'S REALLY THE PROBLEM.  IS -- AND AS WE HAD IN THE

19   DECLARATION OF DR. RUBIN, HIS VIEW WAS, IF YOU ARE LOOKING AT

20   TERM "TRANSMITTER" AND "RECEIVER" AND APPLYING IT SO BROADLY

21   THAT IT COULD BE, LET'S SAY, A PHYSICAL RECEIVER HARDWARE OR A

22   SOFTWARE-BASED RECEIVER, THEN YOU ARE REALLY OPENING IT UP TO

23   ANYTHING.

24       HIS BASIC OPINION IS THAT A PIECE OF SOFTWARE NECESSARILY

25   RECEIVES DATA, NECESSARILY TRANSMITS DATA, AND THAT'S

1    BASICALLY ANY PIECE OF SOFTWARE.  SO, IN EFFECT, IT DOESN'T

2    REALLY HAVE ANY MEANING.  IT'S JUST TAKING IN DATA OR SPITTING

3    OUT DATA, WHICH IS, EFFECTIVELY, IN HIS VIEW, SOMETHING YOU

4    WOULD DO FOR ANY PIECE OF SOFTWARE.

5        SO WHEN YOU HAVE IT THAT BROADLY CONSTRUED, YOU END UP

6    WITH A NONCE TERM.  AND I THINK THE WAY THAT DR. GOODRICH,

7    FINJAN'S EXPERT, THE WAY HE DESCRIBED, WHEN HE ATTEMPTED TO

8    COME UP WITH A CONSTRUCTION, I MEAN HIS CONSTRUCTION, AS WE

9    HAVE HERE ON SLIDE 11, IS -- REALLY MAKES THE POINT THAT IT IS

10   A NONCE TERM.  BECAUSE HE TRIED TO DEFINE RECEIVER AS A

11   COMPONENT THAT ACCEPTS DATA FROM ANOTHER COMPONENT VIA

12   COMMUNICATION SYSTEM OR NETWORK.

13       THE TERM "COMPONENT" IS -- IF YOU LOOK IT UP, IT'S

14   SYNONYMOUS WITH MODULE.  HE'S BASICALLY SAYING A MODULE THAT

15   GETS DATA FROM ANOTHER MODULE.  THAT'S ONE BOX THAT GETS

16   SOMETHING FROM ANOTHER BOX.

17       SO EVEN WHEN HE TRIED TO COME UP WITH A DEFINITION, HE

18   ENDED UP WITH SOMETHING THAT WAS SO, SO AMORPHOUS THAT IT

19   REALLY SHOWS IT IS A NONCE TERM.

20           **THE COURT:**  ALL RIGHT.  MR. HANNAH.

21         **MR. HANNAH:**  THANK YOU, YOUR HONOR.

22       SO IF THAT WAS THE RIGHT TEST THAT YOU CAN REPLACE ANY

23   TERM THAT PRECEDED THE WORD "FOR" WITH "MEANS," EVERY SINGLE

24   TERM IN THE -- IN ANY PATENT WOULD BE CONSIDERED A NONCE TERM.

25       THE RIGHT TEST IS TO SAY, OKAY, IF REALLY RECEIVER AND

1   TRANSMITTER ARE NONCE TERMS, THEN THEY SHOULD BE

2   INTERCHANGEABLE.  IF YOU PUT IN A TRANSMITTER -- AND, RYAN, I

3   NEED THE CONTROL BACK.

4           **MR. SMITH:**  I'M SORRY.

5                   (DISPLAYED ON SCREEN.)

6           **MR. HANNAH:**  CAN YOU SEE MY SCREEN, YOUR HONOR?

7           **THE COURT:**  I CAN.  THANK YOU.

8           **MR. HANNAH:**  SO, YOUR HONOR, LET'S START WITH

9   TRANSMITTER.

10      IF TRANSMITTER WAS A NONCE TERM, THAT MEANS IF YOU REPLACE

11   TRANSMITTER FOR RECEIVER HERE, IT WOULD STILL MEAN THE SAME

12   THING.  SO IT WOULD READ, THE TRANSMITTER FOR RECEIVING AN

13   INDICATOR FROM A SECURITY COMPUTER.  THAT MAKES ABSOLUTELY NO

14   SENSE.

15      THAT'S BECAUSE ONE OF SKILL IN THE ART, AND I WOULD EVEN

16   SAY LAY PERSONS KNOW, THAT A TRANSMITTER DOES NOT RECEIVE.

17   AND SO IT CAN'T BE A NONCE TERM.  IT ABSOLUTELY HAS THE

18   SUFFICIENT STRUCTURE FOR ONE TO KNOW THAT THIS IS A COMPONENT

19   THAT IS GOING TO BE FOR TRANSMITTING.  IT TRANSMITS

20   WHATEVER -- IT'S A TRANSMITTER FOR TRANSMITTING WHATEVER THE

21   CLAIM REQUIRES.

22      SAME THING WITH A -- IF A RECEIVER IS REALLY A NONCE TERM,

23   THEN I CAN REPLACE A RECEIVER IN THIS CLAIM AND IT WOULD READ,

24   A RECEIVER FOR TRANSMITTING THE INPUT.  AGAIN, THAT DOESN'T

25   MAKE SENSE BECAUSE IT'S NOT A NONCE TERM.

1     WHEN YOU LOOK AT *WILLIAMS* (SIC) AND YOU LOOK AT THOSE

2     OTHER CASES, YOU'RE LOOKING AT MODULE.  IF THEY REPLACE MODULE

3     WITH SOMETHING ELSE, OKAY, THEN IT BECOMES A NONCE TERM

4     BECAUSE MODULE IS AMORPHOUS AND YOU CAN PUT IN A, YOU KNOW, A

5     VARIETY OF DIFFERENT TERMS TO REPLACE THAT.

6     BUT A TRANSMITTER, I THINK, ONE OF SKILL IN THE ART

7     KNOWS -- AND THIS IS FULLY SUPPORTED WITH THE DECLARATION OF

8     DR. GOODRICH.  MANY COURTS, JUDGE GILLIAM FOUND THAT RECEIVER

9     WAS THE PLAIN AND ORDINARY MEANING.  JUDGE BENCIVENGO FOUND

10    THAT A TRANSMITTER WAS THE PLAIN AND ORDINARY MEANING BASED ON

11    THIS EXACT SAME ARGUMENT THAT HAS BEEN RAISED.

12    AND, FURTHERMORE, WE HAVE PROVIDED THE DICTIONARY

13    DEFINITIONS.  THE DICTIONARY DEFINITIONS AREN'T THERE TO SAY

14    WHAT THE DEFINITIONS ARE, BUT THEY ARE THERE TO SAY THIS IS A

15    KNOWN TERM.  THIS IS A KNOWN CONCEPT THAT ONE OF SKILL IN THE

16    ART KNOWS.  IT'S NOT AN AMORPHOUS TERM.  IT'S NOT SOMETHING

17    THAT'S JUST MADE UP.  AND IT SPECIFICALLY HAS A PARTICULAR

18    STRUCTURE.  AND SO BASED ON THAT, THE ARGUMENT FAILS.

19            **THE COURT:**  ANY -- MR. SMITH, ANY RESPONSE?

20            **MR. SMITH:**  YES, YOUR HONOR.

21    I THINK ONE POINT IS THAT THEY -- ON ONE HAND FINJAN IS

22    ADVANCING A DICTIONARY DEFINITION, FOR EXAMPLE, FOR THE TERM

23    "RECEIVE," WHICH IS TO ACCEPT DATA FROM AN EXTERNAL

24    COMMUNICATION SYSTEM SUCH AS A LOCAL AREA NETWORK OR TELEPHONE

25    LINE AND STORE THE DATA AS A FILE.  AND I IMAGINE THERE'S A

1   SIMILAR DEFINITION FOR TRANSMIT.

2       AND, FRANKLY, IF THAT'S REALLY WHAT WAS DEFINED IN THE

3   PATENT AND IDENTIFIED IN THE PATENT, I DON'T THINK THERE WOULD

4   BE AN ISSUE.  I THINK THOSE ARE PERFECTLY FINE DEFINITIONS.

5       BUT, INTERESTINGLY, THEY DON'T -- ON THE ONE HAND THEY

6   ADVANCE THE DEFINITION, BUT THEN THEIR EXPERT REJECTS IT AND

7   COMES UP WITH A CONSTRUCTION THAT REALLY SHOWS WHY WE HAVE AN

8   ISSUE IN THIS CASE.

9       HIS CONSTRUCTION, DR. GOODRICH'S CONSTRUCTION SHOWS THIS

10  IS ENTIRELY AN AMORPHOUS TERM THAT REALLY HAS NO MEANING.

11  IT'S JUST A COMPONENT THAT ACCEPTS DATA FROM ANOTHER

12  COMPONENT.  SO IT REALLY COULD BE ANYTHING.  AND THAT REALLY

13  IS THE HEART OF THE PROBLEM WITH THESE CLAIM TERMS.

14          **THE COURT:**  MR. HANNAH, DOES THE WORD "RECEIVER" AND

15  "TRANSMITTER" HAVE SPECIFIC MEANINGS AS STRUCTURES IN HARDWARE

16  OR ARE YOU TRYING TO EXPAND LIKE TRANSMITTER TO SOFTWARE?  OR

17  HOW -- HOW AM I SUPPOSED TO UNDERSTAND THAT GIVEN THE

18  SUGGESTION THAT MR. SMITH IS CLAIMING THAT IT'S TOO AMORPHOUS?

19          **MR. HANNAH:**  SURE.

20      FIRST OF ALL, THE FIRST THING HE SAID IS THAT A

21  TRANSMITTER COULD BE ANYTHING.  I WILL TELL YOU ONE THING, A

22  TRANSMITTER CAN'T BE, IT CAN'T BE A RECEIVER.  IT HAS TO BE

23  ABLE TO TRANSMIT.  SO THAT RIGHT THERE DENOTES A SUFFICIENT

24  STRUCTURE, AND THAT IS NOT A NONCE TERM.

25      I WOULD SAY, YOUR HONOR, IN TERMS OF CLAIMS -- I WOULD SAY

1    '154, A TRANSMITTER IS GOING TO BE -- CAN YOU STILL SEE MY

2    SCREEN, YOUR HONOR?

3              **THE COURT:**  I CAN.

4         **MR. HANNAH:**  SO THE PARTICULAR TYPE OF TRANSMITTER

5    THAT WE ARE TALKING ABOUT HERE IS A TRANSMITTER THAT TRANSMITS

6    THE INPUT TO THE SECURITY COMPUTER FOR INSPECTION.  SO IT'S

7    GOING TO -- IT CAN BE SOFTWARE AND/OR HARDWARE THAT'S GOING TO

8    BE USED TO TRANSMIT THE INPUT.  THAT'S WHAT THE SPECIFIC

9    TRANSMITTER IS HERE.

10             **THE COURT:**  SO YOU'RE SUGGESTING IT IS FUNCTIONAL NOT

11   STRUCTURAL.

12             **MR. HANNAH:**  I'M SUGGESTING IT'S BOTH.  SO THE

13   FUNCTIONAL LANGUAGE DEFINES THE TYPE OF TRANSMITTER.  BUT THE

14   ONE OF SKILL IN THE ART, AN ENGINEER LOOKING AT THIS -- I

15   THINK THAT THE DEFENSE COUNSEL HAS THE TEST BACKWARDS IN THAT

16   WE'RE NOT PROVIDING A CONSTRUCTION FOR IT WHEN WE USE THE

17   DICTIONARY DEFINITIONS.

18     AS THE FEDERAL CIRCUIT HAS SHOWN AND WE CITE IN OUR BRIEF

19   IS THAT YOU CAN LOOK TO A DICTIONARY DEFINITION TO SEE IF YOU

20   SATISFY THE FIRST PART OF THE TEST.  IS THIS A KNOWN TERM

21   THAT'S IN THE ART TO ENGINEERS?  AN ENGINEER WITH THE

22   REQUISITE REQUIREMENTS THAT WE BOTH SET FORTH KNOWS WHAT A

23   TRANSMITTER IS AND THEY KNOW WHAT A RECEIVER IS, FOR INSTANCE.

24             **THE COURT:**  RIGHT, BUT WOULDN'T IT BE TRUE THAT THOSE

25   DICTIONARY DEFINITIONS DEFINE IT AS HARDWARE?

1          **MR. HANNAH:**  I THINK THAT IT CAN BE -- I THINK THAT

2     IT CAN BE HARDWARE, BUT I THINK THAT'S WHY I WAS TRYING TO

3     PULL UP THE CONTEXT OF THE CLAIMS DEPENDING ON WHAT TYPE OF

4     TRANSMITTER IT IS.

5          IT'S GOING TO BE A STRUCTURE THAT'S GOING TO -- FOR

6     TRANSMITTING.  AND THAT'S EXACTLY WHAT'S BEING SET FORTH IN

7     THE CLAIMS.  THIS IS A SPECIFIC TRANSMITTER THAT TRANSMITS THE

8     INPUT TO THE SECURITY COMPUTER.

9          **THE COURT:**  SO WHAT BASIS DO I HAVE IN THE RECORD FOR

10    SAYING THAT IT'S WELL KNOWN THAT IT'S SOFTWARE?  THAT IT HAS

11    AN -- OR I SHOULD SAY THAT IT HAS A WELL KNOWN MEANING AS

12    SOFTWARE?

13         **MR. HANNAH:**  IF YOU LOOK AT DR. GOODRICH'S

14    DECLARATION, HE GOES THROUGH AND HE DESCRIBES HOW THESE TERMS

15    ARE WELL KNOWN.

16         IF YOU LOOK INTO THE *FINJAN VERSUS ESET*, THIS IS CITED IN

17    OUR BRIEF WHERE SHE SPECIFICALLY SAID THAT TRANSMITTER -- I

18    HAVE THE SLIDE UP HERE -- TRANSMITTER IS NOT A NONCE TERM,

19    IT'S A COMMON NAME FOR A KNOWN PROGRAM CONSTRUCT.  A PROGRAM

20    CONSTRUCT IS SOFTWARE, YOUR HONOR, THAT WOULD BE FAMILIAR TO

21    ONE OF SKILL IN THE ART.

22         SO, I THINK, BASED ON BOTH OTHER COURTS' DECISIONS AND

23    BASED ON THE DECLARATION OF DR. GOODRICH, YOU CAN SEE THAT A

24    TRANSMITTER ABSOLUTELY COULD BE SOFTWARE IF IT IS CONFIGURED

25    TO TRANSMIT INFORMATION, AND IT WILL BE THE TYPE OF

1    TRANSMITTER IS GOING TO BE DEFINED BY THE CLAIMS, BY WHAT IT

2    CAN TRANSMIT.

3              **THE COURT:**  ALL RIGHT.  MR. SMITH, WANT TO COMMENT?

4              **MR. SMITH:**  YOUR HONOR, I THINK THAT'S THE PROBLEM,

5    IS, AS WE HEARD IT, THAT WE HAVE A CLAIM WHERE IT SAYS, A

6    RECEIVER FOR RECEIVING AND A TRANSMITTER FOR TRANSMITTING, AND

7    FINJAN'S POSITION IS, WELL, IT COULD BE HARDWARE, IT COULD BE

8    SOFTWARE --

9              **THE COURT:**  HOLD ON JUST A MOMENT.

10                   (PAUSE IN THE PROCEEDINGS.)

11       ALL RIGHT.  WE ARE GOING TO WRAP THIS UP HERE.  I THINK I

12   MAY HAVE GOTTEN -- WE'VE GOT SO MUCH GOING ON, I THINK I MAY

13   HAVE GOTTEN MY TIME SLIGHTLY OFF.  IT LOOKS LIKE WE ARE AT THE

14   END.

15       SO LET'S GO AHEAD -- SORRY ABOUT THAT, JUST FINISH OFF

16   YOUR THOUGHT.

17             **MR. SMITH:**  APPRECIATE YOUR TIME, YOUR HONOR.

18       AND I WOULD, JUST IN CLOSING, THAT IS THE HEART OF THE

19   PROBLEM FROM WHAT MR. HANNAH INDICATED; THAT THEY ARE CLAIMING

20   THAT THE RECEIVER AND TRANSMITTER CAN BE ANYTHING, BOTH

21   HARDWARE, SOFTWARE, THERE'S NO BOUND ON THAT TERM.

22       AND WHEN -- EVEN WHEN DR. GOODRICH, FINJAN'S EXPERT, IN

23   HIS DECLARATION TRIED TO IDENTIFY STRUCTURE, ALL HE COULD COME

24   UP WITH WAS SIMPLY BLACK BOXES THAT SAID RECEIVER AND

25   TRANSMITTER.  THAT'S IT.  SO THERE REALLY IS NO BOUNDS ON WHAT

1   THIS TERM COULD BE, AND FOR THAT REASON WE BELIEVE IT IS AN

2   INDEFINITE PURSUANT TO THE *WILLIAMSON* CASE.

3        **THE COURT:**  OKAY.  I THINK I UNDERSTAND THE

4   ARGUMENTS.

5      SO, I DO TRY TO GET THESE THINGS OUT RELATIVELY SOON AFTER

6   I TAKE THE *MARKMAN* HEARING WHILE IT'S STILL FRESH.  I'VE GOT

7   TWO *MARKMANS* AHEAD OF YOURS, AND WE'RE GOING TO TRY TO GET

8   THESE COURTS OPEN, AND I'M GOING TO GET THIS ALL BACK TO YOU

9   AS SOON AS I POSSIBLY CAN.  OKAY?

10        **MR. HANNAH:**  OKAY.  THANK YOU, YOUR HONOR.

11        **THE COURT:**  THANK YOU ALL VERY MUCH.  WE ARE

12   ADJOURNED.

13        **MR. SMITH:**  THANK YOU.

14        **MR. HANNAH:**  HAVE A GOOD NIGHT.

15        **THE COURT:**  THANK YOU.  YOU, TOO.

16             (PROCEEDINGS CONCLUDED AT 4:03 P.M.)

17                    **CERTIFICATE OF REPORTER**

18        I, DIANE E. SKILLMAN, OFFICIAL REPORTER FOR THE

19   UNITED STATES COURT, NORTHERN DISTRICT OF CALIFORNIA, HEREBY

20   CERTIFY THAT THE FOREGOING IS A CORRECT TRANSCRIPT FROM THE

21   RECORD OF PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.

22

23             *Diane E. Skillman*

24        DIANE E. SKILLMAN, CSR 4909, RPR, FCRR

25             MONDAY, JUNE 29, 2020

**DIANE E. SKILLMAN, OFFICIAL COURT REPORTER, USDC**