1  EDWARD G. POPLAWSKI (SBN 113590)      RYAN R. SMITH (SBN 229323)
   epoplawski@wsgr.com                   rsmith@wsgr.com
2  OLIVIA M. KIM (SBN 228382)            CHRISTOPHER D. MAYS (SBN 266510)
   okim@wsgr.com                         cmays@wsgr.com
3  TALIN GORDNIA (SBN 274213)            WILSON SONSINI GOODRICH & ROSATI
   tgordnia@wsgr.com                     Professional Corporation
4  STEPHANIE C. CHENG (SBN 319856)       650 Page Mill Road
   stephanie.cheng@wsgr.com              Palo Alto, CA 94304-1050
5  WILSON SONSINI GOODRICH & ROSATI      Telephone: (650) 493-9300
   Professional Corporation              Facsimile:  (650) 493-6811
6  633 West Fifth Street, Suite 1550
7  Los Angeles, CA 90071
   Telephone: (323) 210-2900
8  Facsimile: (866) 974-7329
9
   *Attorneys for Defendant*
10 QUALYS INC.

11            **IN THE UNITED STATES DISTRICT COURT**

12         **FOR THE NORTHERN DISTRICT OF CALIFORNIA**

13                       **OAKLAND DIVISION**

14

15  FINJAN LLC                    )    CASE NO.: 4:18-cv-07229-YGR (TSH)
                                  )
16          Plaintiff,            )    **DEFENDANT QUALYS INC.'S**
                                  )    **NOTICE OF CROSS-MOTION AND**
17       v.                       )    **CROSS-MOTION FOR SUMMARY**
                                  )    **JUDGMENT AND OPPOSITION TO**
18  QUALYS INC.,                  )    **PLAINTIFF FINJAN LLC'S MOTION**
                                  )    **FOR SUMMARY JUDGMENT**
19          Defendant.            )
                                  )     **Judge: Hon. Yvonne Gonzalez**
20                                )     **Rogers**
                                  )
21                                )     **Date: July 6, 2021**
                                  )     **Time: 2:00 P.M.**
22                                )     **Location: Courtroom 1, 4th Floor[1]**
                                  )
23 _____   )

24

25

26

27

_____
28     [1] Per the Court's Notice regarding Civil Law and Motion Calendars and its Order at D.I. 48,
hearings are via Zoom videoconference.

1

**<u>TABLE OF CONTENTS</u>**

2
                                                                                                                              **PAGE**

I.       INTRODUCTION ............................................................................................................ 1

II.      PARTIAL SUMMARY JUDGMENT OF NONINFRINGEMENT ................................ 2

         A.      Factual Background ............................................................................................ 2

         B.      The Accused Qualys Scanner Products Do Not Infringe the '408 Patent ............... 3

                 1.      The Same Computer Does Not Perform Each Claimed Step ..................... 3

                 2.      Qualys Does Not Indicate "potential *exploits*" ............................................ 6

                         a.      The '408 Patent Covers Behavioral Analysis, Not Signature-
                                 Based Analysis .......................................................................... 7

                         b.      Qualys's Products Perform Only Signature-Based Analysis
                                 That Is Not Covered By the '408 Patent. ...................................... 9

                 3.      Qualys Does Not Perform "Dynamically Building" *While*
                         "Receiving The Incoming Stream" .......................................................... 10

         C.      Qualys Does Not Infringe the '844 and '494 Patents ............................................ 13

III.     PARTIAL SUMMARY JUDGMENT OF NO DAMAGES ........................................... 16

         A.      Required Notice of Infringement for Patent Damages ............................................ 16

         B.      Finjan Cannot Recover Damages Because It Failed to Provide Sufficient
                 Notice Prior to Patent Expiration ........................................................................ 17

IV.      OPPOSITION TO FINJAN'S MOTION FOR SUMMARY JUDGMENT .................... 19

         A.      DSAVT is Admissible Prior Art. ........................................................................ 19

                 1.      Qualys Will Show at Trial That DSAVT Is Authentic and
                         Admissible ............................................................................................ 19

                 2.      Finjan Is Not Entitled to S.J. About Whether DSAVT Is Prior Art. ......... 21

         B.      Mounji and Thomson Are Admissible Prior Art .................................................. 23

                 1.      Authenticity of Mounji and Thomson ...................................................... 23

                 2.      Public Accessibility of Mounji .............................................................. 24

                 3.      Public Accessibility of Thomson ............................................................ 25

V.       CONCLUSION ............................................................................................................. 25

1

## **TABLE OF AUTHORITIES**

2

**PAGE(S)**

3

### CASES

4

*Abbott Diabetes Care Inc. v. Roche Diagnostics Corp.*, C04- 02123MJJ, 2007 WL
    1239220 (N.D. Cal. Apr. 27, 2007) ...................................................................... 4

5

*Amazon.com, Inc. v. Barnesandnoble.com, Inc.*, 239 F.3d 1343 (Fed. Cir. 2001) ...................... 10

6

*American Medical Sys., Inc. v. Medical Eng'g Corp.*, 6 F.3d 1523 (Fed. Cir. 1993) .................. 16

7

*Amsted Indus. Inc. v. Buckeye Steel Castings Co.*, 24 F.3d 178 (Fed. Cir. 1994) ....................... 16

8

*Arctic Cat Inc. v. Bombardier Rec. Prods.*, 876 F.3d 1350 (Fed. Cir. 2017) .......................... 16, 17

9

*Arista Networks, Inc. v. Cisco Sys., Inc.*, No. 16-CV-00923-BLF, 2017 WL
    6102804 (N.D. Cal. Oct. 10, 2017) ......................................................................... 4

10

*Aylus Networks, Inc. v. Apple Inc.*, 856 F. 3d 1353 (Fed. Cir. 2017) ........................................... 9

11

*Bruckelmyer v. Ground Heaters, Inc.,* 445 F.3d 1374 (Fed. Cir. 2006) ...................................... 21

12

*Chrimar Sys. v. Ruckus Wireless, Inc.*, No. 16-cv-00186-SI, 2020 U.S. Dist. LEXIS
    136656 (N.D. Cal. July 31, 2020) ....................................................................... 18, 19

13

14

*Erhart v. Bofi Holding, Inc.,* 445 F. Supp. 3d 831 (S.D. Cal. 2020) ...................................... 20, 24

15

*Finjan v. Eset*, LLC, 17-cv-183-CAB-BGS, 2019 U.S. Dist. LEXIS 179296 (S.D.
    Cal. Oct. 16, 2019) ................................................................................................. 18

16

*Finjan v. Juniper*, 387 F. Supp. 3d 1004 (N.D. Cal. 2019) ................................................... 17, 20

17

*Finjan, Inc. v. Blue Coat Systems, Inc.*, 879 F. 3d 1299 (Fed. Cir. 2019) ................................... 13

18

*Fresenius Medical Care Holdings, Inc. v. Baxter Int'l, Inc.,* No. C 03-1431 SBA,
    2006 WL 1330001 (N.D. Cal. May 15, 2006) ................................................... 20, 24

19

20

*Funai Elec. Co. v. Daewoo Elecs. Corp.*, 616 F.3d 1357 (Fed. Cir. 2010) ........................... 17, 18

21

*Maxwell v. J. Baker, Inc.*, 86 F.3d 1098 (Fed. Cir. 1996) .......................................................... 16

22

*Nike Inc. v. Wal-Mart Stores, Inc.*, 138 F.3d 1437 (Fed. Cir. 1998) .......................................... 16

23

*Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314 (Fed. Cir. 2003) ........................................... 8

24

*Oyeniran v. Holder*, 672 F.3d 800 (9th Cir. 2012) ...................................................................... 4

25

*Siemens Medical Sys. v. Nuclear Cardiology Sys.*, 945 F. Supp. 1421 (D. Colo.
    1996) ........................................................................................................................ 4

26

*SRI Int'l, Inc. v. Internet Sec. Sys., Inc.,* 511 F.3d 1186 (Fed. Cir. 2008) ................................. 21

27

28

## STATUTES & RULES

35 U.S.C. § 102 ................................................................................................................ 21

35 U.S.C. § 287 ......................................................................................................... 16, 17

Fed. R. Evid. 901 ............................................................................................... 19, 20, 23, 24

Fed. R. Evid. 803 ..................................................................................................... 20, 24

## **TABLE OF ABBREVIATIONS**

| | |
|---|---|
| Finjan | Plaintiff Finjan LLC (f/k/a Finjan Inc.) |
| Qualys | Defendant Qualys, Inc. |
| Fact | Fact identified in Qualys's Statement of Undisputed Material Facts in Support of Cross-Motion, filed concurrently herewith |
| A.F. | Additional Fact identified in Qualys's Responsive Separate Statement of Undisputed Material Facts, filed concurrently herewith |
| Mays Decl. | Declaration of Christopher Mays, filed concurrently herewith |
| Hall-Ellis Decl. | Declaration of Dr. Sylvia D. Hall-Ellis, filed concurrently herewith |
| Stubblebine Decl. | Declaration of Dr. Stuart Stubblebine, filed concurrently herewith |
| '408 Patent | U.S. Patent No. 8,225,408 [Mays Decl., Ex. 1] |
| '844 Patent | U.S. Patent No. 6,154,844 [Mays Decl., Ex. 2] |
| '494 Patent | U.S. Patent No. 8,677,494 [Mays Decl., Ex. 3] |
| Medvidovic Rpt. | Excerpts of Expert Report of Nenad Medvidović, Ph.D., dated Dec. 1, 2020 [Mays Decl., Ex. 4] |
| Medvidovic Tr. | Excerpts of the Deposition Transcript of Nenad Medvidovic, Ph.D. taken Feb. 28, 2021 [Mays Decl., Ex. 12] |
| Medvidovic IPR Decl. | Declaration of Nenad Medvidovic, Ph.D., Case No. IPR2015-2001 (June 21, 2016) [Mays Decl., Ex. 16] |
| Cole Rpt. | Excerpts of Opening Expert Report of Eric Cole, Ph.D., dated Dec. 1, 2020 [Mays Decl., Ex. 6] |
| Hall-Ellis Tr. | Excerpts of Deposition Transcript of Syvlia Hall-Ellis, Ph.D., taken Mar. 1, 2021 [Mays Decl., Ex. 38] |
| Stubblebine Tr. | Excerpts of Deposition Transcript of Stuart Stubblebine, Ph.D., taken Mar. 5, 2021 [Mays Decl., Ex. 36] |

| Cole Tr. | Excerpts of the Deposition Transcript of Eric Cole, Ph.D. taken Mar. 2, 2021 [Mays Decl., Ex. 9] |
| --- | --- |
| Bachwani Tr. | Excerpts of the Deposition Transcript of Dilip Bachwani taken Sept 18, 2020 [Mays Decl., Ex. 22] |
| Kruse Tr. | Excerpts of the Deposition Transcript of Holger Kruse taken Sept. 14, 2020 [Mays Decl., Ex. 19] |
| Goodrich Rpt. | Excerpts of the Expert Report of Michael Goodrich Ph.D., dated Jan. 12, 2021 [Mays Decl., Ex. 10] |
| Goodrich Tr. | Excerpts of the Deposition Transcript of Michael Goodrich Ph.D., taken Feb. 26, 2021 [Mays Decl., Ex. 15] |
| Goodrich Blue Coat Rpt. | Excerpts of the Rebuttal Expert Report of Michael Goodrich, Ph.D. in the Finjan v. Blue Coat Case No. 15-cv-03295-BLF-SVK, dated Apr. 21, 2017 [Mays Decl., Ex. 13] |
| Goodrich Rapid7 Rpt. | Excerpts of the Rebuttal Expert Report of Michael T. Goodrich, Ph.D. in the Finjan v. Rapid7 Case, No. 18-cv-01519-MN, dated July 31, 2020 [Mays Decl., Ex. 14] |
| Goodrich Sonicwall Rpt. | Excerpts of the Rebuttal Expert Report of Michael T. Goodrich, Ph.D. in the Finjan v. Sonicwall Case, No. 17-cv-04467-BLF, dated Oct. 9, 2020 [Mays Decl., Ex. 30] |
| Sonicwall Order | Order Granting in Part and Denying In Part Defendant's Motion For Partial Summary Judgment, No. 17-cv-04467-BLF, D.I. 320 (Mar. 5, 2021) [Mays Decl., Ex. 11] |
| '494 IPR | Patent Owner's Response, Case No. IPR2015-01892 (June 21, 2016) [Mays Decl., Ex. 31] |
| '844 IPR | Patent Owner's Response, Case No. IPR2019-00026 (July 2, 2019) [Mays Decl., Ex. 32] |
| Merriam-Webster Dictionary | Excerpts of 1997 Merriam-Webster Dictionary [Mays Decl., Ex. 24] |
| Microsoft Computer Dictionary | Excerpts of Microsoft Computer Dictionary [Mays Decl., Ex. 8] |
| Medvidovic 10/28/16 Tr. | Excerpts of the Deposition Transcript of Nenad Medvidovic, Ph.D. taken Oct. 28, 2016 [Mays Decl., Ex.17] |

## NOTICE OF CROSS-MOTION AND CROSS-MOTION

PLEASE TAKE NOTICE that on July 6, 2021 at 2:00 P.M., or as soon thereafter as this matter may be heard before Judge Gonzalez Rogers of the United States District Court for the Northern District of California in Courtroom 1, 4th Floor, of 1301 Clay Street in Oakland, California,[1] Qualys will and hereby moves the Court for summary judgment that the '408, '844, and '494 Patents are not infringed and summary judgment of no damages for the '844 and '494 Patents due to insufficient notice. The cross-motion is based on this notice of cross-motion and supporting memorandum of points and authorities, supporting declaration and exhibits, Qualys's Statement of Undisputed Material Facts, and such other written or oral argument as may be presented at or before the time this motion is deemed submitted by the Court. Qualys's Opposition to Finjan's Motion for Summary Judgment (D.I. 192) is included herein.

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.      INTRODUCTION

Qualys seeks partial summary judgment on the ground that the '408, '844, and '494 Patents are not infringed and there are no damages for the '844 and '494 Patents due to insufficient notice of infringement. Regarding the '408 Patent, the Court should grant summary judgment of no infringement for three independent reasons: (1) the asserted claims require that a *single* computer perform three temporally overlapping steps, yet Finjan improperly accuses *multiple* distinct scanners and Qualys's cloud platform of collectively performing these steps; (2) Finjan disclaimed signature-based pattern matching to avoid invalidating prior art in an *inter partes* review proceeding, but now accuses Qualys' signature-based pattern matching of infringement; and (3) the claims of the '408 Patent require three temporally overlapping steps ("receiving," "dynamically building," and "dynamically detecting"), but Finjan puts forth no evidence that a computer performs the steps concurrently.

As to the '844 and '494 Patents, there is no evidence that any aspect of the accused Qualys Scanner *receives* a "Downloadable" as defined by the parties' agreed-upon construction. Even if Qualys had infringed, Finjan cannot recover damages for the '844 and '494 Patents since Finjan did not provide Qualys with sufficient notice of infringement until *after* both patents had expired.

Qualys also opposes Finjan's motion for summary judgment regarding the prior art status of three references. Qualys has proffered evidence, in the form of two experts' opinions, that these references were each publicly available and locatable by persons of ordinary skill in the art exercising reasonable diligence ***before*** the applicable priority date. There is, at minimum, a genuine factual dispute regarding the prior art status of these references.

## II. PARTIAL SUMMARY JUDGMENT OF NONINFRINGEMENT[2]

### A. Factual Background

Qualys provides an Internet-based cloud platform (the "Qualys Cloud Platform") for customers to scan devices on their local networks for vulnerabilities. Qualys receives metadata from its client's systems to assess for vulnerabilities. These vulnerability checks are often as simple as checking whether the client's computer being scanned has the most up-to-date software installed. These checks are important because outdated software may possess known security flaws. Qualys checks for vulnerabilities in two alternative ways: ***First***, Qualys provides scanners that are deployed either within the customer's internal network or on the Internet. Ex. 4 (Medvidovic Rpt.), ¶¶ 96-98. ***Second***, Qualys collects data by using a Cloud Agent ("CA"), which is a piece of software that is installed directly on endpoint devices "to simply capture the version numbers and other metadata about the operating system and installed applications and send[] the data to the platform for analysis and reporting." Ex. 6 (Cole Rpt.) ¶ 159 (quoting from Ex. 7 QUALYS00325126). Qualys Cloud Platform includes a variety of optional subscriptions: Vulnerability Management (VM), Policy Compliance (PC), and Web Application Scanning (WAS). Ex. 6 (Cole Rpt.) ¶¶ 338, 371, 1230, 1263. At a high level, VM scans customers' devices to discover any vulnerabilities, such as outdated software, PC looks at whether those devices are violating any company policies (*e.g.*, password formatting requirements), and WAS checks web servers for vulnerabilities or misconfigurations specific to web applications. *Id.* at ¶¶ 264-278.

---

[2] Finjan asserts claims 1, 3-8, 22, 23, and 35 of the '408 Patent; claims 1, 4-8, 11, 15-17, 41, and 43 of the '844 Patent; claims 10-16, and 18 of the '494 Patent; and claim 17 of the '731 Patent. This motion seeks summary judgment of all claims except for claim 15 of the '844 and claim 17 of the '731 Patent. Facts 1, 16, and 19.

### B.	The Accused Qualys Scanner Products Do Not Infringe the '408 Patent
#### 1.	The Same Computer Does Not Perform Each Claimed Step

The '408 Patent, is generally directed to a method for scanning content received by a computer and analyzing that content by dynamically building parse trees to determine the existence of malicious code. Figure 2 of the '408 Patent depicts a preferred embodiment where a "byte source" is received as an incoming stream from the source of the content being scanned. The incoming data is tokenized and then the tokens are placed within a parse tree for subsequent analysis. Each asserted claim of the '408 Patent (claims 1, 3-8, and 22, 23, and 35) requires that all claimed steps be performed by or located within the *same* computer. Specifically, claims 1 and 23 recite "a computer-processor based" method wherein one step is "receiving by ***a computer***"[3] and subsequent steps are performed "by ***the computer***" recited in the receiving step. Ex. 1 ('408 Patent) at 19:45-20:7 (claim 1) and 22:1-27 (claim 23); *see also id.* at 21:42-67 (claim 22) and 24:7-31 (claim 35) (both claims reciting "program code for causing ***a computer*** to perform" each of the recited steps); Fact 2.[4]

To satisfy the claims, therefore, the same computer that receives an incoming stream of code must also perform each of the additional recited steps. Yet, Finjan makes no such allegations. As discussed below, Finjan's infringement allegations are that a first "computer" (either a Qualys scanner or cloud agent) performs some of the claimed steps while other "computers" (such as different scanners, cloud agents, or Qualys' cloud platform servers), perform the rest. This is incorrect as a matter of claim construction. While "a computer" can mean one or more computers,

---

[3] Qualys filed a Renewed Motion to Strike Portions of Medvidovic's Expert Report. D.I. 194. To the extent that the Court grants the motion, Finjan would be left with no remaining evidence that Qualys infringes the "receiving" step required by each asserted claim of the '408 Patent. Summary judgment is appropriate for this additional reason.

[4] The claims use the term "computer" consistently with contemporaneous technical dictionaries, such as the 2002 edition of the Microsoft Computer dictionary (repeatedly relied on by Finjan's expert Dr. Goodrich to construe terms regarding the '408 Patent), which defines a "computer" as "***any device*** [singular] capable of processing information to produce a desired result." *See* Ex. 8 (Microsoft Computer Dictionary) at 118; *see also* Ex. 9 *(*Cole Tr.) at 50:12-16 ("Q. And a web client would be a separate computer from the web server typically, right? [objection omitted] A. In this example in the time frame 2009, I will -- I would agree with that statement."), *Id* at 65:18-21("Q. … [W]hat were you referring to by 'a computer'? A. A computer is a machine [singular] that has an operating system, performs operations, performs activity."); *see also* Ex. 10 (Goodrich Rpt.) at ¶¶ 74, 79, 101, 140; Fact 3.

*each* of the one or more computers must perform the recited steps attributed to that computer.

This is not the first time that Finjan has attempted to skirt the plain language of the '408 Patent. In *Finjan v. Sonicwall*, Finjan similarly accused a defendant of infringing the '408 Patent based on a theory involving multiple discrete computing devices. Fact 4. The *Sonicwall* court grappled with the question of "with respect to the '408 Patent, can the receiving, determining, instantiating, identifying, dynamically building, dynamically detecting, and indicating be performed by different computers?" Ex. 11 (Sonicwall Order) at p.20, ll.10-11; Fact 4. The *Sonicwall* court found "as a matter of law that the recited steps in claims 1 and 22 of the '408 Patent **must be performed by the same computer.**" *Id.* at 24 (emphasis added); Fact 5. On that basis, it entered summary judgment of no infringement as to the '408 Patent. *Id.*

Finjan is therefore collaterally estopped from disputing that the '408 Patent must be performed by the same computer. Indeed, the claim construction issue is "identical in both proceedings" and in view of the *Sonicwall* court's summary judgement opinion, "the issue was actually litigated and decided," "there was a full and fair opportunity to litigate the issue", and "the issue was necessary to decide the merits.'" *Arista Networks, Inc. v. Cisco Sys., Inc.*, No. 16-CV-00923-BLF, 2017 WL 6102804, at *11 (N.D. Cal. Oct. 10, 2017) (*quoting Oyeniran v. Holder*, 672 F.3d 800, 806 (9th Cir. 2012)). Under Ninth Circuit law, a summary judgment order satisfies the requirement of a "final judgment" for the purpose of collateral estoppel, regardless of whether it is appealable yet. *Abbott Diabetes Care Inc. v. Roche Diagnostics Corp.*, C04- 02123MJJ, 2007 WL 1239220, at *12 (N.D. Cal. Apr. 27, 2007); *Siemens Medical Sys. v. Nuclear Cardiology Sys.*, 945 F. Supp. 1421 (D. Colo. 1996).

Even if Finjan isn't barred by collateral estoppel, this Court should nevertheless find that the steps of the '408 Patent must be performed on a single computer. Finjan's theory that some steps are performed on one Qualys scanner while other steps are performed by a ***different device*** like a Qualys server in the cloud belies the plain language and structure of the claims. As noted by Judge Freeman in *Sonicwall*, the issue was squarely addressed by the Federal Circuit in *Unwired Planet L.L.C. v. Google, Inc.*, where the claims recited "a server node" performing certain steps. The Federal Circuit found that each "server node" (a computer) must perform each one of the

1    claimed functions. 660 F. App'x 974 (Fed. Cir. 2016).

2           Finjan falls far short of proving that Qualys performs the claimed steps of the '408 Patent

3    on a single computer. Indeed, Medvidovic's report opines that the various claimed steps

4    ("receiving," "dynamically building," and dynamically detecting") are performed by unspecified

5    portions of "Qualys's cloud platform." *See, e.g.,* Ex. 4 (Medvidovic Rpt.) at ¶¶ 185, 262, 302.[5] But

6    "Qualys cloud platform" comprises multiple different computers, including scanners deployed in

7    a customer's network, cloud agent software installed on customer endpoint devices, and servers

8    operated by Qualys at various locations throughout the world. *See, e.g., id.* at ¶¶ 88-107; Fact 6.

9    Finjan's expert report lacked any opinion that a single computer performs the steps of the '408

10   Patent. *See id.* at ¶¶ 196 (the computer is the "scanner engine"), 205 ("the computer" is the "WAS

11   scanner"), 235 (the computer is "the server associated with the Cloud Agent"), 309 (the computer

12   is "*multiple* scanner appliances in parallel"), 333 ("the computer" can be "the backend computer

13   present [that] prepares reports to present to the user identifying the potential vulnerabilities.").

14          At his deposition, Medvidovic initially testified that the computer on which the "parse tree

15   is generated during the scan" was at "a level of detail *below*" what he had analyzed. Ex. 12

16   (Medvidovic Tr.) at 212:12-18. In other words, Dr. Medvidovic did not know where the various

17   steps of the '408 Patent are allegedly performed. Later, Medvidovic clarified that at least portions

18   of the "dynamically building" and/or "dynamically detecting" were—in his opinion—performed

19   by a Qualys server. Ex. 12 (Medvidovic Tr.) at 214:14-22 ("Q. [W]hen the XML data arrives at

20   the Qualys server, is it already in a parse tree or does the server create the parse tree? A. I think

21   when the XML data arrives at the server in the specific instantiation that you're discussing, the

22   data itself is not processed to that point yet. In other words, *it's just being reported and it's actually*

23   *processed on the server*…."); 215:5-23 (Q. Then once the byte stream is sent over to the server,

24   then the server creates the parse tree in your view, right? A. Whatever code is running on the

25   server, as I said, scan.php, *at least parts of this, quite likely would run on the server* … Based on

26   everything that I've read, it doesn't sound like that kind of functionality is relegated to the customer,

27   _____

28          [5] While not agreeing Medvidovic's product groupings, Qualys uses them for purposes of this motion.

1  and ***it's rather on Qualy's own end***.") (emphasis added).

2        At his deposition, Medvidovic was pressed to reconcile his infringement opinions with the

3  plain language of the '408 Patent requiring that the steps be performed on a "computer." Faced

4  with the fundamental deficiency of his analysis, Medvidovic testified that the computer recited by

5  the claims of the '408 Patent "would be portions of the Qualys server, portions of the scanner,

6  portions of the cloud agent." Ex. 12 (Medvidovic Tr.) at 230:14-19.[6] Elsewhere, Medvidovic

7  testified that the claimed computer is "whatever would be processed or accomplished in the context

8  of the entire claim element," and could include multiple "processors [i.e. devices] from what

9  you're calling the customer's machine and also procedure processors from Qualys's own cloud

10  platform." *See id.* at 81:19-82:7; 83:2-84:6 (opining that "the computer" is "the collection of

11  processors ***and other peripherals*** [i.e. devices]"); 86:3-22 (opining that "the computer" "may

12  involve hardware or processors that are owned by Qualys's customers"). By this admission,

13  Medvidovic has not shown that all steps of the '408 Patent were performed on a ***single*** computer.

14  To the extent that he has shown anything, it is that the allegedly infringing functions are spread-

15  out among multiple distinct devices like Qualys scanners (which may reside within a customer's

16  network), Qualys' cloud (which is located at Qualys or a third-party datacenter) and in some cases

17  customer computers (which run cloud agent software).

18        In summary, the claims of the '408 Patent require that each step is performed on the same

19  computer and Finjan is collaterally estopped from arguing otherwise. To the extent Finjan has any

20  evidence as to where the steps are performed, the evidence shows that the steps are performed on

21  multiple different computers, including cloud agents, scanners, and servers within Qualys's cloud.

22  Summary judgment is appropriate.

23      **2.**    **Qualys Does Not Indicate "potential *exploits*"**

24        The asserted claims of the '408 Patent each require "dynamically detecting … [patterns or

25  combinations] of nodes in the parse tree which are indicators of potential exploits" and "indicating,

26  by the computer, the presence of ***potential exploits*** within the incoming stream." Ex. 1 ('408

---

[6] Finjan's other technical expert, Dr. Cole, agrees that a "scanner" is itself a "computer." Ex. 9 (Cole Tr.) at 150:7-9 ("Q … And the appliance would be the computer, right? A That is correct.").

Patent) at 20:1-7, 21:62-67, 22:20-27, and 24:24-31; Fact 7. Both of Finjan's technical experts regarding the '408 Patent have stressed the importance of this limitation in distinguishing prior art, and both have stated that signature-based pattern matching—the type of analysis performed by Qualys's products—cannot satisfy this limitation.

### a. The '408 Patent Covers Behavioral Analysis, Not Signature-Based Analysis

First, Finjan's technical expert on prior art to the '408 Patent, Goodrich, specifically opined that "indicating the presence of potential exploits within the incoming stream" cannot be satisfied by signature-based scanning techniques. Goodrich himself stated "Signature scanning is ***not*** looking for the presents of exploits; it is looking to match a file." *See* Ex. 13 (Goodrich Blue Coat Rpt.) at ¶ 208; *see also id.* at ¶ 135 (opinion that "it is not sufficient to look for specific ***signatures***" to satisfy the '408 Patent's "indicators of potential exploits" limitation). Goodrich opined that the '408 Patent covers "behavior-based analysis," but not signature-based analysis. *See id.* at ¶¶ 74, 136, 176, 208; *see also* Ex. 14 (Goodrich Rapid7 Rpt.) at ¶¶ 292 (opining that signature-based pattern matching does not teach "instantiating" limitation of '408 claims); 310 (signature scanning "does not teach or render obvious indicating, by the computer, the presence of potential exploits within the incoming stream"). Goodrich reaffirmed these statements at his deposition in this case. *See* Ex. 15 (Goodrich Tr.) at 99:14-100:8 (testifying that the '408 Patent is "not about traditional signature scanning" and "traditional signature scanning was well known in the prior art").

Second, in defending the '408 Patent's validity in an IPR proceeding before the Patent Office, Finjan's technical expert on alleged infringement, Medvidovic, offered a sworn declaration asserting that a "key feature that distinguishes the '408 Patent from the prior art is its focus on detecting exploits 'being portions of program code that are malicious,' ***rather than simply recognizing previously known malware***." Ex. 16 (Medvidovic IPR Decl.) ¶ 49 (emphasis added); Fact 8. Like Goodrich, Medvidovic distinguished the "token pattern match" technique of the prior art:

> [The prior art's] token pattern match, used to detect "viral code," does not require that the pattern to be matched correspond to an exploit or any other malicious code. Rather, ***it is only important that the pattern faithfully identify the code being scanned as corresponding to code that was previously sampled***. On the other hand, the scanning techniques disclosed in the '408 Patent, facilitate the "zero-day" recognition of malicious code, even

> if it is surrounded by otherwise benign and/or not previously encountered code, ***based only on the behavior associated with the exploit***.

*Id.* at ¶87 (emphasis added). More succinctly, Medvidovic opined that the prior art merely taught "***signature matching*** of token patterns." Ex. 17 (Medvidovic 10/28/16 Tr.) at 37:19-24 (emphasis added); *see also id.* at 91:25-92:5 ("[prior art] teaches identifying patterns of tokens in the context of virus scanning. So that's what sometimes in literature is referred to or in the art is referred to as '***signature matching***.'"); *see also id.* at 99:12-19 ("you might run an incoming stream through a signature checker ***before the claimed invention*** of the 408 patent is brought to bear.").[7] Finjan reiterated Medvidovic's opinions in its arguments before the PTAB:

> Detecting individual exploits, particularly using the behavior-based scanning techniques disclosed in the '408 Patent, facilitates the "zero-day" recognition of malicious code, even if it is surrounded by otherwise benign and/or not previously encountered code, ***based only on the behavior associated with the exploit***. This is the reason the independent claims of the '408 Patent recite dynamically detecting patterns or combinations "of nodes in the parse tree which are ***indicators of potential exploits***."

Ex. 23 (Patent Owner Response) at 39-40; Fact 9. The PTAB ultimately agreed Finjan's arguments rejecting the challenger's invalidity arguments. Ex. 18 (Final Written Decision) at 24-25. This Court recognized the same distinction in its Claim Construction Order noting that the '408 Patent uses "adaptive rule-based (ARC) scanners" that are ***unlike traditional anti-virus software that uses "discrete 'signatures'"***. *See* D.I. 74 at 5 (emphasis added).

Finjan is now attempting to walk-away from its prior positions by, in essence, arguing that Qualys' signature-based approach infringes. But Finjan cannot escape its own experts' prior opinions that signature-based scanning does not "indicate the presence of potential exploits." Finjan's about-face is precluded by the doctrine prosecution disclaimer. Prosecution disclaimer "preclud[es] patentees from recapturing through claim interpretation specific meanings disclaimed during prosecution." *Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1323 (Fed. Cir. 2003). "[W]hen the patentee unequivocally and unambiguously disavows a certain meaning to obtain a patent, the doctrine of prosecution history disclaimer narrows the meaning of the claim consistent with the scope of the claim surrendered." *Aylus Networks, Inc. v. Apple Inc.*, 856 F. 3d 1353, 1359

---

[7] In his report in this case, Medvidovic describes the differences between signature-based and behavioral analysis. *See* Ex. 4 (Medvidovic Rpt.) at ¶¶ 76-81.

1   (Fed. Cir. 2017). The prosecution disclaimer doctrine applies to IPR proceedings. *Id.* at 1360.

2   Finjan's successful arguments before the PTAB became part of the intrinsic record of the '408

3   Patent. Since Finjan clearly and unmistakably disclaimed the scope of "indicators of potential

4   exploits" to be ***based only on the behavior associated with the exploit*** and not on signature-based

5   analysis, patent law requires that Finjan be held to its prior positions.

### b.   Qualys's Products Perform Only Signature-Based Analysis That Is Not Covered By the '408 Patent

8   Qualys's products cannot infringe the "indicators of potential exploits" limitation of the

9   '408 Patent's claims because it is undisputed that Qualys's products perform only a signature-

10   based analysis that Finjan and its experts repeatedly disclaimed. It is likewise undisputed that

11   Qualys's products **<u>cannot</u>** perform the behavioral analysis required by this limitation.

12   Medvidovic opined in his infringement report that "[t]he scanner engine used with

13   Vulnerability Features ***relies upon selecting signatures*** in a ***signature*** repository and executing

14   those ***signatures***." Ex. 4 (Medvidovic Rpt.) ¶ 223; *see also id.* at ¶¶ 136, 144, 173, 225, 229-231,

15   237, 241, 242, 248, 306, 343, 344, 372, 375, 394-397, 401, 407, 427, 429. He further opined that

16   "[o]ne such type of scanning ***based on signatures*** offered by the scanner engine used with

17   Vulnerability Features is the ability to scan and parse the programming language used by the

18   incoming data stream…" *Id.* at ¶ 225. He further opinioned that "the Qualys Vulnerability Features

19   leverage Qualys's KnowledgeBase of ***known*** vulnerabilities." *Id.* at ¶ 231. Medvidovic's opinions

20   are corroborated by the testimony of Qualys's 30(b)(6) witness. *See, e.g.*, Ex. 19 (Kruse Tr.) at

21   18:6-19:13, 35:2-36:16, 46:13-48:4, 59:22-60:6, 71:2-11, 81:5-11, and 136:4-14 ("In general,

22   vulnerability signatures drive a scan. They determine what a scan should do").

23   The documentation of Qualys's products that Medvidovic relies on further shows that

24   Qualys's products perform the proscribed type of signature-based analysis. *See, e.g.,* Ex. 4

25   (Medvidovic Rpt.) at ¶ 231; *see also* Ex. 20 (QUALYS00289149) at 36 ("Qualys Vulnerability

26   Management (VM) ***can identify known vulnerabilities***…. Multiple ***signatures*** exist to identify

27   weak encryption configuration for legacy protocols, along with ***signatures*** to identify applications

28   no longer supported by the vendor (EOL)."); Ex. 21 (FINJAN-QUALYS 037712)

("KnowledgeBase includes more than 18,000 vulnerability ***signatures***."). Medvidovic also relies

1  on testimony from Qualys's 30(b)(6) who stated that "at a high level, what VM does is it collects

2  metadata from endpoints, you know, we bring that up to the platform. ***We check that against our,***

3  ***you know, vulnerability set, and if we find a match, we store that in our database.***" Ex. 4

4  (Medvidovic Rpt.) at ¶ 238 (*quoting* Ex. 22 (Bachwani Tr.) at 41:3-42:20, emphasis added).

5          To survive summary judgment, Finjan bears the burden of showing a genuine factual

6  dispute. In view of its representations to the PTAB, Finjan must show that the alleged "dynamically

7  detecting … indicators of potential exploits" element in Qualys is ***based only on the behavior***

8  ***associated with the exploit,*** *i.e.*, not signature based. Finjan falls far short of this showing and, on

9  the contrary, has presented ample expert evidence that Qualys detects exploits using signatures

10  based on previously identified code and not the behavior associated with the exploit. Finjan cannot

11  therefore twist its patent "like a nose of wax" one way to avoid invalidity and another to find

12  infringement. *Amazon.com, Inc. v. Barnesandnoble.com, Inc.*, 239 F.3d 1343, 1351 (Fed. Cir.

13  2001). Summary judgment of non-infringement on this ground is therefore appropriate.

14          **3.      Qualys Does Not Perform "Dynamically Building"** *While* **"Receiving
                    The Incoming Stream"**

15          The asserted claims of the '408 Patent requires, among other limitations, three temporally

16  overlapping steps: (1) "receiving incoming content," (2) "dynamically building," and (3)

17  "dynamically detecting." Ex. 1 ('408 Patent) at 19:45-20:7, 21:42-67, 22:1-27, and 24:7-31; Fact

18  10.  As explained below, Finjan's infringement case fails because there is no evidence that Qualys

19  performs these steps during overlapping time periods. If anything, the evidence shows that Qualys

20  operates in distinct stages, just like the prior art that Finjan overcame in the IPR challenge of the

21  '408 Patent.

22          The plain language of the '408 Patent is clear that the three steps must overlap in time. For

23  instance, claim 1 recites "dynamically building, by the computer ***while*** said receiving receives the

24  incoming stream" and "dynamically detecting, by the computer ***while*** said dynamically building

25  builds the parse tree…". Ex. 1 ('408 Patent) at 19:65-20:2 (emphasis added); Fact 10. During IPR

26  proceedings, Finjan emphasized the importance of these temporal limitations in distinguishing

27  from the prior art:

28

           In stark contrast to the dynamic building and detecting techniques disclosed
           and claimed in the '408 Patent, each one the references cited against the

10

claims teaches that analysis should be conducted in ***distinct stages***, in which the ***fully formed output*** of one stage is used as the input to later stages.

Ex. 23 (Patent Owner Statement) at 2 (emphasis added); Fact 11. Prosecution disclaimer precludes Finjan from attempting to recapture the distinction it emphasized to avoid the prior art. In other words, Qualys cannot infringe if its alleged analysis is conducted in distinct stages in which the fully formed output of one stage is used as the input to later stages.

Additionally, Finjan's expert Goodrich has also repeatedly opined that the requirement of "an incoming stream of program code" cannot be satisfied by a system that performs operations on a completely received set of data, such as a "complete document." *See* Ex. 15 (Goodrich Tr.) at 107:18-109:3, 167:17-168:25, 190:3-190:18, 192:23-194:4, 195:2-196:2. As such, Goodrich opined that prior art systems that build a parse tree after receiving a "complete input" would not meet the requirement of dynamically building a parse tree while receiving an incoming stream of program code. *See id.* at 211:12-19 ("Q And so, again, with respect to the Zurko reference, you're drawing a distinction between the claim language while said receiving receives the incoming stream and something that you characterize as a complete input, correct? A **Yes** with respect to what Dr. Jha was identifying as the incoming stream with respect to Zurko."), 199:10-200:10, 201:8-20; *see also* Ex. 13 (Goodrich Blue Coat Rpt.) at ¶¶ 128, 189; Ex. 14 (Goodrich Rapid7 Rpt.) at ¶ 204; Ex. 30 (Goodrich Sonicwall Rpt.) at ¶¶ 476, 514.

Finjan's infringement expert, Medvidovic, skirts this crucial issue in his expert report. Medvidovic opines merely that "[t]he scanning engine generates output during the scanning process." Ex. 4 (Medvidovic Rpt.) ¶ 282. Critically, he never identifies evidence showing that "dynamically build[ing]" occurs while receiving the "incoming stream." For this proposition, Medvidovic's only citation to evidence is a passage from the deposition of Qualys's technical witness (Holger Kruse). But Kruse was not asked about "building" while "receiving an incoming stream." Rather, he was asked where the "parsed data," which is the result of the alleged "dynamically building" is stored. Ex. 19 (Kruse Tr.) 22:4-8 ("Q Is there some type of file that holds the parsed data? A No, there isn't. The data is immediately processed and used in the generation of the scan result."). At this deposition, Medvidovic agreed that Kruse's testimony pertained to the parsed data, <u>not</u> an incoming stream. Ex. 12 (Medvidovic Tr.) at 184:12-17.

1   Plainly, there is no evidence of temporal overlaps between receiving the alleged "incoming

2   stream" and "dynamically building."

3       Finjan alternatively contends that "scan results are built *while* the scanning is occurring

4   (and thus, while scanner engine used with the Vulnerability Features is receiving an incoming

5   stream of data) through the use of 'parallelization.'" Ex. 4 (Medvidovic Rpt.) ¶ 284; Fact 12.

6   Specifically, "[i]f multiple scans are operating in parallel, then scan results are being created while

7   the scan is ongoing." *Id.*; Fact 12. For support, he quotes a Qualys document involving "using

8   multiple scanner appliances in parallel." *Id.* at ¶ 309; Fact 12. Stated differently, Medvidovic's

9   infringement theory is that if Scanner A begins a scan on Target A and, subsequently, Scanner B

10  begins a scan on Target B, then Scanner A *may* finish "receiving the incoming stream" and begin

11  "dynamically building" while Scanner B is still "receiving the incoming stream." Fact 12.

12      Finjan's "parallel" infringement theory fails for three reasons: First, as discussed above,

13  Medvidovic's opinions fail the "one computer" requirement discussed above, because Medvidovic

14  points to one computer/scanner as receiving an incoming stream while a second computer/scanner

15  is building a parse tree.

16      Second, the claims require the temporally overlapping steps must be performed with

17  respect to <u>the</u> incoming stream (*i.e.,* the same incoming stream). Fact 13. Indeed, claim 1 recites

18  "receiving, by a computer, *an incoming stream* of program code … dynamically building, by the

19  computer *while* said receiving receives *the incoming stream*, a parse tree." Ex. 1 ('408 Patent) at

20  19:47-48, 19:64-65; Fact 13. Medvidovic emphasized this point during the IPR. "Importantly, in

21  the context of the claims 'the incoming stream' is not just any stream of data—it refers to *the*

22  *stream from which the parse tree is being built*." Ex. 16 (Medvidovic IPR Decl.) ¶ 99 (emphasis

23  added); Fact 14. Further, Medvidovic argued that the prior art's "parallel" embodiment did not

24  meet the claim language:

25          That is, *a system with stages that can operate in parallel will not meet the*
            *claim language* if the stages are not interleaved and working to build *the*
26          *same parse tree during time periods that overlap*. In Petitioner's scenario,
            the hypothetical "upstream portions of code" would be used to build a
27          different AST, so the receiving and building steps are not interleaved even if
            new code could be received while an AST was being built.
28

*Id.* (emphasis added); Fact 15. Finjan again takes the opposite position in attempting to prove

infringement. Indeed, Finjan's "parallel" theory is premised on generating multiple different parse trees which according to Finjan, collectively satisfy the overlapping steps. Medvidovic confirmed this at his deposition. Ex. 12 (Medvidovic Tr.) 163:1-3 ("[Qualys] would have *different parse trees*."), 178:16-20 ("Q. So a parse tree has to be built while the incoming stream is being received, right? A. Well, one of the parse trees does. I mean, it's, you know, the *system could have multiple parse trees*."), 213:21-22 ("*there are multiple parse trees* generated in Qualys's technology."), 222:7-8 ("*multiple different parse trees* get generated"), 285:4-6 ("by using the scanners, essentially, *to build these parse trees* [plural], which use these patterns of tokens in this specific way. (emphasis added); Fact 12.

Finally, even if Finjan is permitted to satisfy the claims of the '408 Patent collectively with multiple parse trees, Medvidovic's "parallel" theory is sheer speculation about a possible use case. He provided no evidence that any customer ever used the parallel feature or that Qualys committed any act which could constitute infringement. Summary judgment is, therefore, appropriate.

## C.   Qualys Does Not Infringe the '844 and '494 Patents.[8]

The Federal Circuit previously addressed the '844 Patent, explaining that "[t]he '844 [P]atent is directed to a method of providing computer security by scanning a downloadable and attaching the results of that scan to the downloadable itself in the form of a 'security profile.'" *Finjan, Inc. v. Blue Coat Systems, Inc.*, 879 F. 3d 1299, 1303 (Fed. Cir. 2019). The Federal Circuit further explained that "Claim 1 of the '844 patent scans a downloadable and attaches the virus scan results to the downloadable in the form of a newly generated file: a 'security profile that identifies suspicious code in the received Downloadable.'" *Id*. at 1304 (emphasis added). The '494

---

[8] In Finjan's case against ESET in the Southern District of California. Judge Bencivengo recently invalidated the '844 Patent and U.S. Patent No. 8,079,086 ("the '086 Patent"), which is a parent to the '494 Patent. Finjan has moved for reconsideration in the ESET case and has agreed to dismiss the '844 Patent in its case against Qualys if its motion for reconsideration is denied. Concurrently, Cisco, a defendant in another Finjan case before Judge Freeman in this District, moved for judgement of collateral estoppel as to the '494 Patent because it is a continuation of the '086 Patent and has the same "Downloadable" term, same specification, and same intrinsic record on which the ESET Order relied. Finjan then agreed to sever and stay the '844 and '494 Patents pending appellate review of the ESET decision. Qualys attaches the ESET Order and Cisco Motion. Mays Decl. Exs. 26-27. Qualys believes that severance and a stay of the '494 Patent is also appropriate in this action considering that Finjan is collaterally estopped form pursuing the '494 Patent in this action.

1   Patent pertains to similar subject matter.

2          Relevant to this motion, asserted claims 1, 4-8, and 11 of the Ex. 2 ('844 Patent) recite

3   "receiving by an inspector a Downloadable." *Id.* 11:14; Fact 17. The parties agreed to construe

4   "Downloadable" as "an executable application program, which is downloaded from a source

5   computer and run on the destination computer". D.I. 40 at 1; Fact 18. In other words, based on the

6   parties' agreed construction, the '844 Patent requires that the "inspector" receive an "executable

7   application program, which is downloaded from a source computer and run on the destination

8   computer." *Id.* 11:14-17; Ex. 6 (Cole Rpt.), at ¶ 88 (citing Ex. 2, '844 Patent, 2:20-3:7). The

9   asserted claims of the '494 Patent (claims 10-16 and 18) recite "a receiver for receiving an

10  incoming Downloadable". Ex. 3 ('494 Patent), 22:8 (emphasis added). Fact 20. The term

11  "receiving" was not construed but does have a plain and ordinary meaning— "to come into

12  possession of" or "get". Ex. 24 (1997 Merriam-Webster Dictionary), at 613; Fact 21. Likewise, in

13  the *Finjan v. Sonicwall* Case (in which the same construction of Downloadable was applied), Judge

14  Freeman held that Sonicwall's products do not infringe because there was "no evidence that the

15  accused Gateways ever ***possess*** a reassembled file or executable application."  Ex. 11 (Sonicwall

16  Order) at 17-18 (emphasis added); Fact 22.  For similar reasons as those discussed above, Finjan

17  is collaterally estopped from arguing that "receive" means something other than coming into

18  possession of an executable application program.

19          Here, Finjan's infringement allegations focus on Qualys Vulnerability Management (VM)

20  and Web Application Scanning (WAS) products. Finjan's allegations fail because what it alleges

21  to be the "inspector" or "receiver" never come into possession of a "Downloadable." Finjan's

22  technical expert, Dr. Eric Cole, alleges that VM "includes an inspector (e.g., VM Scanning Engine)

23  that receives Downloadables" and also alleges that the inspector for WAS is the "WAS Scanning

24  Engine." Ex. 6 (Cole Rpt.) ¶¶ 338, 371; Fact 23.

25

26

27

28

1  Cole further alleges that "Qualys products include a receiver for

2  receiving a Downloadable, which is indicated in the image [reproduced

3  on right] by reference to 'switches,' which indicate receiving hardware

4  or software." *Id.* ¶ 1256; Fact 24. Cole explained that "[t]he engine is

5  what runs on the scanner appliance." *Id* ¶ 388 (quoting Ex. 19, Kruse

6  Tr. at 11:10-11). In other words, according to Cole, the alleged

7  "inspector" resides within a scanner appliance while the "receiver" is

8  the switch.

9  Nowhere in Cole's voluminous expert report does he assert that

10  the alleged "inspector" or "receiver" come into possession of (or get)

11  the alleged Downloadable. On the contrary, Cole explains that the

12  scanner "collects ***configuration data*** from customer systems" using data collection modules. Ex.

13  6 (Cole Rpt.) ¶ 340 (quoting Ex. 25, QUALYS00263186) (emphasis added); Fact 25. Stated

14  differently, Finjan's only evidence pertains to receiving data from customer system, not

15  "Downloadables," which must be executable software applications. At his deposition, Cole

16  admitted that the Qualys scanner "doesn't actually take the downloadable and download it to the

17  physical appliance itself." Ex. 9 (Cole Tr.) at 132:15-17. This admission made clear that Finjan is

18  reading-out the term "receiving," and basing its infringement allegations on receiving data (which

19  may be about a Downloadable), but not on receiving the "Downloadable" itself.

20  As to Qualys Cloud Agents, Cole alleges that the claimed "inspector" is "lightweight Cloud

21  Agent installed on host systems." Ex. 6 (Cole Rpt.) ¶ 358; Fact 26. But then, abandoning all

22  pretense of applying the agreed-upon construction of "Downloadable," Cole opines that the

23  "Downloadables" for Cloud Agents are "metadata regarding installed software." *Id.* Cole nowhere

24  shows that such "metadata" is either an "executable application program" or that it is ever

25  "downloaded from a source computer and run on the destination computer" as the agreed-upon

26  construction requires.  The *Sonicwall* court found non-infringement of the '844 and '494 Patents

27  for similar reasons.  There, the court determined that Sonicwall's accused products did not infringe

28  because the products only received "IP packets".  Ex. 11 (Sonicwall Order) at 16.  The court found

that "any given IP packet itself is not executable." *Id.* Here, as well, neither Finjan nor Cole have any evidence that the "metadata" collected by Cloud Agents are executable.

With respect to the '494 Patent, Finjan's infringement allegations fail for another reason. The asserted claims require "a receiver for receiving an *incoming* Downloadable…" '494 Patent at 22:8; Fact 20. As Finjan explained in opposing an IPR, "[t]he invention described in the '494 Patent protects against potentially malicious content by receiving *incoming* content (i.e. a Downloadable) from the Internet and establishing that the code will not cause any harm *before it is allowed to run on the computer*." Ex. 31 ('494 IPR) at 2 (emphasis added); Fact 27. Cole's report is devoid of any explanation as to how the "incoming" limitation is practiced by the accused products. There is no evidence that Qualys sits between source and destination computers and, therefore, could not receive a "Downloadable" before that "Downloadable" is downloaded to a destination computer. Again, Finjan's infringement theory appears to have read-out key claims limitations.

Finjan, therefore, cannot meet its burden of proving infringement based on the "receiving" a Downloadable limitation of claims 1, 4-8, 11, 41 and 43 of the '844 Patent or claims 10-16 and 18 of the '494 Patent.

## III.   PARTIAL SUMMARY JUDGMENT OF NO DAMAGES

### A.   Required Notice of Infringement for Patent Damages

35 U.S.C. § 287 entitles a patentee to damages from the time when it either began marking its product in compliance with section 287(a)—referred to as constructive notice—or when it notified the accused infringer of its infringement—referred to as actual notice. *Maxwell v. J. Baker, Inc.*, 86 F.3d 1098, 1111 (Fed. Cir. 1996) (quoting *American Medical Sys., Inc. v. Medical Eng'g Corp.*, 6 F.3d 1523, 1537 (Fed. Cir. 1993)). In the event there is a failure to mark, "no damages shall be recovered by the patentee in any action for infringement, except on proof that the infringer was notified of the infringement and continued to infringe thereafter, in which event damages may be recovered *only for infringement occurring after such notice*." 35 U.S. Code § 287 (emphasis added). "In order to satisfy the constructive notice provision of the marking statute, [the patentee] must have shown that substantially all of the [practicing products] being distributed were marked,

1  and that once marking was begun, the marking was substantially consistent and continuous." *Nike*
2  *Inc. v. Wal-Mart Stores, Inc.*, 138 F.3d 1437, 1446 (Fed. Cir. 1998). Marking requirements extend
3  to licensed products and not just those products sold directly by the patentee. *Arctic Cat Inc. v.*
4  *Bombardier Rec. Prods.*, 876 F.3d 1350, 1366 (Fed. Cir. 2017).

5         The law on "actual notice" is likewise well settled. "Actual notice [under Section 287(a)]
6  requires the affirmative communication of a specific charge of infringement by a specific accused
7  product or device." *Amsted Indus. Inc. v. Buckeye Steel Castings Co.*, 24 F.3d 178, 187 (Fed. Cir.
8  1994). "The correct approach to determining notice under Section 287 must focus on the action of
9  the patentee, not the knowledge or understanding of the infringer." *Id.* If a patentee wishes to rely
10 on a letter to establish actual notice—as is the case here—then the "letter must be sufficiently
11 specific to support an objective understanding that the recipient may be an infringer." *Funai Elec.*
12 *Co. v. Daewoo Elecs. Corp.*, 616 F.3d 1357, 1373 (Fed. Cir. 2010).

13     **B.**    **Finjan Cannot Recover Damages Because It Failed to Provide Sufficient Notice Prior to Patent Expiration**

14        Finjan failed to comply with the patent marking requirements based on unmarked sales of
15 its own products and those of its licensees. Qualys raised Finjan's failure to mark as an affirmative
16 defense, specifically identifying unmarked products including "SurfinGate and SurfinShield" D.I.
17 26 ¶ 240. In its Local Patent Rule disclosures, Finjan confirmed Qualys's allegations by admitting
18 that it sold products which practiced the '844 and '494 Patents. Ex. 29 (Infringement Contentions)
19 at 10-11. Finjan proffered no evidence of marking.

20        Qualys' affirmative defense also specifically identified numerous licensees to further
21 notify Finjan of its marking violations. D.I. 1 at ¶ 241. Finjan admitted that its "licensees have
22 touted the benefits of the inventions disclosed in the '494 Patent and obtained significant sales ***as***
23 ***a result of products that practice the recitations*** of the challenged claims." Ex. 31 ('494 IPR) at
24 54 (emphasis added); Fact 28. Finjan also represented that Avast's Endpoint Protection, F-Secure
25 Products, Websense, and Proofpoint all sold products embodying the '494 Patent. *Id.* at 56-60;
26 Fact 28. Finjan made similar representations regarding its licensees of the '844 Patent. Ex. 32 ('844
27 IPR) at 60-62; Fact 29. Section 287 requires that these licensees mark practicing products with the
28 '844 and '494 Patents. Yet, Finjan has presented no evidence of patent marking.

17 CROSS-MOTION FOR SUMMARY JUDGMENT AND OPP'N TO SUMMARY JUDGMENT MOTION

"There is no dispute that the patentee bears the burden of pleading and proving he complied with § 287(a)." *Arctic Cat*, 876 F. 3d at 1367. Finjan's Complaint does not allege that it complied with patent marking. Summary judgment is appropriate for that reason alone. Even if it had properly pled marking, Finjan cannot prove that substantially all practicing products were marked, and that once marking was begun, the marking be substantially consistent and continuous.  Finjan failed to meet this burden in other cases, as two other courts have granted summary judgment against Finjan on this issue. *See Finjan v. Juniper*, 387 F. Supp. 3d 1004, 1018 (N.D. Cal. 2019) ("Nor is there any dispute that none of Finjan's licensees actually marked their products."); *Finjan v. ESET*, LLC, 17-cv-183-CAB-BGS, 2019 U.S. Dist. LEXIS 179296, at *18 (S.D. Cal. Oct. 16, 2019). Finjan cannot meet its burden in this case either.

Because of Finjan's inability to prove marking compliance, Finjan ability to recover damages hinges on proving actual notice of infringement ***before*** the '844 and '494 Patents expired in January 2017. "To serve as actual notice, a letter must be sufficiently specific to support an objective understanding that the recipient may be an infringer. The letter must communicate a charge of infringement of specific patents by a specific product or group of products." *Funai Elec.*, 616 F. 3d at 1373.

Finjan cannot make this showing. The only piece of evidence Finjan might rely on to show notice is a November 12, 2015 letter from Finjan's then in-house counsel to Qualys. Ex. 33 (Letter to Qualys), at 1; Fact 30. That letter, however, falls short of the requirements for providing actual notice. In the letter, Finjan goes to great lengths not to accuse Qualys of infringing the '844 and '494 Patents. For example, Finjan writes "we believe one or more of Finjan's patents reads on Qualys' Cloud Platform" without identifying any particular patent. *Id*. A few pages later, again without specifying any patent numbers, Finjan writes "we believe several of our patents read on several products offered by Qualys through its Cloud." *Id.* at 4. On page 7, Finjan references an appendix which it characterizes as including "[a] detailed list of Qualys' Cloud Platform solutions" "with citations to Finjan patents we believe have exposure, including" the '844 and '494 patents along with three other patents. Ex. 33 (letter) at 7. Nowhere in the Appendix, however, is there any mention of infringement, much less an allegation that specific patent claims are infringed by

1   any specific product. *Id.* at 9. Indeed, there are over 137 claims across the five patents listed and

2   no indication as to which claims, if any, Finjan believes are infringed. *Id.*

3         Finjan's letter, thus, "fails to provide enough detail to support an objective understanding

4   of the specific charge of infringement." *Chrimar Sys. v. Ruckus Wireless, Inc.*, No. 16-cv-00186-

5   SI, 2020 U.S. Dist. LEXIS 136656, at *20 (N.D. Cal. July 31, 2020) (granting summary judgment

6   based on insufficient notice). In fact, Finjan's letter is even more deficient than Chrimar's because

7   while both failed to identify which claim and product combinations allegedly infringed, Chrimar

8   at least stated that the defendants "infringed" the patent in question. *Id.* at 19. By contrast, nowhere

9   in Finjan's letter does it state that the '494 and '844 Patents are infringed.

10         Finjan could have wrote that Qualys "infringed," could have identified at least one

11   allegedly infringed claim, and could have explained why it believed Qualys infringed. Finjan chose

12   to be vague amorphously suggesting that Qualys had "exposure." Ex. 33 (Letter to Qualys), at 7.

13   Finjan also could have filed its lawsuit many years earlier but delayed doing so for years.

14   Accordingly, Qualys is entitled to summary judgment of no damages because Finjan is foreclosed

15   from recovering damages.

16   **IV.   OPPOSITION TO FINJAN'S MOTION FOR SUMMARY JUDGMENT**

17         Finjan's motion does not seek to dispose of any invalidity claim or even any invalidity

18   theory in the case. Instead, Finjan's motion seeks to prevent Qualys from using three specific

19   pieces of evidence at trial by denying Qualys the opportunity to lay the required foundation. As

20   such, Finjan's motion should be denied as premature. In any event, Qualys has proffered sufficient

21   evidence to overcome summary judgment that the three references are authentic, admissible, and

22   prior art to the '731 and '494 Patents.[9]

23        **A.   DSAVT is Admissible Prior Art**

24             **1.   Qualys Will Show at Trial That DSAVT Is Authentic and Admissible**

25         As noted above, Finjan's motion is premature because Qualys should be permitted at trial

---

[9] At issue in this motion are the following: (1) "DSAVT," a user manual titled *Dr. Solomon's Anti-Virus Toolkit for Windows and DOS*; (2) "Mounji," a published technical report titled "Preliminary Report on Distributed ASAX" by Abdelaziz Mounji, *et al.*; and (3) "Thomson," a published research paper titled "Proxy Servers and Databases for Managing Web-based Information" by Judi R. Thomson.

1    to lay the foundation for authenticity and a motion for summary judgment is an inappropriate

2    procedural vehicle to exclude evidence.   In any event, Qualys intends to lay an acceptable

3    foundation for DSAVT's authenticity at trial.

4        First, Qualys will be able to lay the foundation for DSAVT under Fed. R. Evid. 901(b)(3).

5    Qualys's librarian expert, Dr. Hall-Ellis, will testify that in a previous litigation—*Finjan, Inc. v.*

6    *Juniper Networks, Inc.* (3:17-cv-05659-WHA)—she obtained from Juniper's counsel a printed

7    copy and an electronic copy of DSAVT.  Hall-Ellis Decl. at ¶¶ 7-10, 18. Hall-Ellis confirmed at

8    the time that the printed copy of DSAVT and the electronic copy were the same.  *Id.* at ¶ 7. Hall-

9    Ellis will also testify that, in preparing her report in this case, she was unable to obtain another

10   printed copy of DSAVT but obtained from Qualys's Counsel another electronic copy of DSAVT.

11   Hall-Ellis will testify that this second electronic copy she obtained in this case was materially

12   identical to the electronic copy previously provided to her by Juniper's counsel. *Id.* at ¶ 8. Thus,

13   Hall-Ellis will be able to establish the authenticity of the DSAVT reference in this case through

14   her chain of comparisons originating with the printed book itself.

15       Moreover, Hall-Ellis will be able to establish authenticity under Fed. R. Evid. 901(b)(8).

16   DSAVT itself indicates a 1995 copyright date, more than twenty years ago. Hall-Ellis has

17   specifically opined that DSAVT creates no suspicion about its authenticity. A.F. 1; Hall-Ellis Decl.

18   at ¶ 12.[10]  Also, because Qualys can establish a chain of custody for this copy of DSAVT going

19   back to the original published version that Hall-Ellis reviewed in the *Juniper* case,[11] Qualys will

20   be able to establish that DSAVT "was in a place where, if authentic, it would likely be"; namely,

21   a law firm representing a defendant accused of infringing the same patent at issue in this litigation.

22   *See* Fed. R. Evid. 901 (b)(8)(B).  Moreover, as DSAVT is authentic under FRE 901(b)(8) and was

23   prepared before January 1, 1998, it is considered admissible prior art under FRE 803(16) and may

24   be used for the proof the matter asserted, thus rebutting Finjan's hearsay argument.  *See Fresenius*

25

26       [10] Finjan incorrectly argues that Hall-Ellis never saw or inspected the contents of the physical
     DSAVT copy.  As Hall-Ellis explains, her testimony on this point referred contemporaneously to
27   her work in this case and did not refer to her work in the *Juniper* Case where she in fact did review
     a physical copy of DSAVT.

28       [11] Mays Decl. at ¶ 2.

1  *Medical Care Holdings, Inc. V. Baxter Int'l, Inc.,* No. C 03-1431 SBA, 2006 WL 1330001, \*3

2  (N.D. Cal. May 15, 2006).  Further, "experts may offer opinions based on otherwise inadmissible

3  testimonial hearsay if 'experts in the particular field would reasonably rely on those kinds of facts

4  or data in forming an opinion on the subject.'"  *Erhart v. Bofi Holding, Inc.,* 445 F. Supp. 3d 831,

5  839 (S.D. Cal. 2020).

6                                **2.      Finjan Is Not Entitled to S.J. About Whether DSAVT Is Prior Art**

7          Finjan's motion at most speaks to a dispute of fact over whether the copy of DSAVT at

8  issue in this case qualifies as a "printed publication" under 35 U.S.C. § 102(b).  Specifically,

9  Finjan's motion is directed to a dispute as to whether the referenced MARC record pertains to

10  DSAVT or some other publication. Finjan also argues that Qualys needed to take discovery on the

11  authors, custodians or publishers of the three references, which imposes strict requirements for

12  determining whether a reference is a printed publication directly contradicted by caselaw. *See SRI*

13  *Int'l, Inc. V. Internet Sec. Sys., Inc.,* 511 F.3d 1186, 1194-95 (Fed. Cir. 2008) ("The decision

14  whether a particular reference is a printed publication 'must be approached on a case-by-case

15  basis.'"); *In re NTP,* 654 F.3d 1279. 1295 (Fed. Cir. 2011) (Letter from Director of Norwegian

16  University's library authenticating Telenor reference and describing its public availability sufficed

17  for statutory printed publication. Foreign patent attorney also opined that one of skill in the art

18  could locate Telenor after a reasonable search.).  A reference qualifies as "printed publication"

19  prior art under 35 U.S.C. § 102 if it was publicly accessible before the priority date of the patent.[12]

20  "A given reference is 'publicly accessible' upon a satisfactory showing that such document has

21  been disseminated or otherwise made available to the extent that persons interested and ordinarily

22  skilled in the subject matter or art exercising reasonable diligent, can locate it." *See Bruckelmyer*

23  *v. Ground Heaters, Inc.,* 445 F.3d 1374, 1378 (Fed. Cir. 2006). Here, Finjan incorrectly argues

24  that "[t]he MARC record establishes nothing because it is not a record of public accessibility of

25  the DSAVT reference upon which Qualys's invalidity expert relies." D.I. 192 at 8. At trial, Qualys

26  will offer the testimony of Dr. Stuart Stubblebine ("Stubblebine"), a noted professor of computer

28          [12] Solely for purposes of this motion, Qualys accepts Finjan's assertion that the relevant priority date is November 6, 1997. *See* D.I. 192 at 4.

1   science, who will rely on **Hall-Ellis's** opinion that DSAVT was published and publicly accessible

2   no later than April 3, 1996.  Notably, Finjan has not filed a *Daubert* challenge nor sought to exclude

3   Stubblebine's or Hall-Ellis's expert opinions.  Thus, Stubblebine's and Hall-Ellis's opinions are

4   admissible expert opinion that alone warrant summary judgment as inappropriate.

5          Finjan improperly attempts to cast Hall-Ellis's opinions about DSAVT as

6   methodologically unsound and mischaracterizes the relevant evidence of publication as being

7   limited to only the disputed MARC record.  In fact, the MARC record is only one of multiple bases

8   for Hall-Ellis's opinion about DSAVT's publication date.  Other bases include, for example, a

9   printed copyright date of **1995** and a printed "edition" date of **November 1995** (both dates appear

10  in DSAVT itself).  *See* A.F. 2; D.I. 192-3 at QUALYS00002807; Hall-Ellis Decl. at ¶¶ 11-18.

11  These additional indicia support Hall-Ellis's conclusions and are further reasons why are opinions

12  should be taken as true for the purposes of summary judgment. *See* A.F.s 3-5.

13         Regarding the MARC record itself, at most Finjan has raised a dispute of fact.  While

14  Finjan contends that the MARC record is of a "different version," Hall-Ellis disagrees.  As Hall-

15  Ellis explains, it is her opinion that the MARC record is to the same printed publication, but simply

16  different reprints – one the U.K. printing of the book and the other the United States printing of

17  the book.  Hall-Ellis Decl.at ¶¶ 11-18; Ex. 38 (Hall-Ellis Tr.) at 43:20-44:20; 46:15-47:12; 48:16-

18  49:20; 51:15-22. She notes that the MARC record is consistent with the copy of DSAVT at issue

19  because it lists the same title, the same publisher, and a consistent date of publication as the

20  copyright and "edition dates" listed in DSAVT itself.  *See* A.F.s 3-5; D.I. 192-3 at

21  QUALYS00002807; D.I. 192-4 at Attachment 2a; Hall-Ellis Decl.at ¶¶ 11-18.

22         Finjan does not argue that reliance on a MARC record is methodologically unsound, but

23  instead speculates that certain discrepancies show the MARC record does not apply to DSAVT.

24  These discrepancies include the number of pages and a note about the phrase "Complete virus

25  Protection: Prevention, Detection and Repair" appearing on the cover.  Finjan offers no evidence

26  of its own that such a different publication exists.  Nor does it offer any expert opinion testimony

27  characterizing the significance of these discrepancies.  Instead, Finjan attempts to rebut Hall-Ellis

28  exclusively with attorney argument, which is itself not admissible evidence. Indeed, Hall-Ellis's

1  **undisputed opinion** is that these discrepancies are not unusual where the same publication is

2  printed in multiple countries. Hall-Ellis Decl.at ¶¶ 11-18; Ex. 38 (Hall-Ellis Tr.) at 43:20-44:20;

3  48:16-49:20; 51:15-22. Hall-Ellis's opinion remains that the MARC record refers to the same

4  DSAVT as the one that Stubblebine relies on for invalidity and that DSAVT was therefore

5  published no later than April 3, 1996.  Finjan may cross-examine Hall-Ellis at trial about this, but

6  it is not entitled to summary judgment.

7      As a final note, Qualys expects that Stubblebine will provide additional corroborating

8  testimony that DSAVT is prior art. A.F. 6. Specifically, Stubblebine will testify that DSAVT is a

9  user manual to a software product called "Dr Solomon's Anti-Virus Toolkit Version 7.5." *See*

10  Stubblebine Decl. at ¶ 4.  Stubblebine will testify that in preparing for his deposition in this matter,

11  he located additional information indicating that Version 7.5 of this software product was publicly

12  released prior to the November 6, 1997 priority date for the patents. *See id.*; Ex. 36 (Stubblebine

13  Tr.) at 23:15-24:7; Ex. 5; Ex. 28.  This corroborates Hall-Ellis.

14      **B.    Mounji and Thomson Are Admissible Prior Art**

15          **1.    Authenticity of Mounji and Thomson**

16      For Mounji and Thomson, Finjan blends the tests of authenticity and public accessibility.

17  Finjan incorrectly argues that Mounji and Thomson are not authentic because Hall-Ellis located

18  them in repositories that Finjan contends did not exist before the priority dates of the patents.

19      Authenticity is shown if an "ancient document" "(A) is in a condition that creates no

20  suspicion about its authenticity; (C) was in a place where, if authentic, it would likely be; and (C)

21  is at least 20 years old when offered."  Fed. R. Evid. 901(b)(8)(B).  Hall-Ellis opined that both

22  Mounji and Thomson are in a condition that creates no suspicion about their authenticity. *See* A.F.s

23  7, 12; Hall-Ellis Decl. at ¶ 19.  Finjan does not dispute these opinions, offers no rebuttal evidence,

24  and gives no reason why either Thomson or Mounji is suspect.

25      Hall-Ellis explains that she personally retrieved copies of both Thomson and Mounji from

26  well-known digital repositories; namely, *CiteSeer*[x], *ResearchGate,* and *Semantic Scholar*. Hall-

27  Ellis Decl. at ¶ 19; A.F.s 8, 13.  These are places where, if authentic, a copy of such technical

28  papers would likely be because they are industry-standard repositories for indexing and sharing

1  technical research. Hall-Ellis Decl. at ¶¶ 20-25. Finjan does not dispute this but points only to the

2  irrelevant fact that these repositories did not exist when Mounji or Thomson were published.

3  Finjan offers no authority that an ancient document must be located in a repository predating the

4  document itself.

5          As to the third factor, both Mounji and Thomson are more than twenty-years old. Mounji

6  is dated May 27, 1994. *See* A.F. 9; D.I. 192-5 at QUALYS00024282. Thomson's entry in the

7  *ResearchGate* repository lists a publication date of May 1997. *See* A.F. 14; Hall-Ellis Decl. at

8  ¶ 23. Further, Stubblebine testified that he located an archived version of the University of

9  Saskatchewan's website—listed in Thomson as the authors' university—dated August 27, 1997,

10  listing the Thomson reference by name. *See* A.F. 19; Stubblebine Decl. at ¶¶ 5-6; Ex. 36

11  (Stubblebine Tr.) at 228:3-237:22; Ex. 35 (Stubblebine Depo Ex. 31). These facts establish the

12  authenticity of Thomson and Mounji under FRE 901(b)(8). As with DSAVT, because Mounji and

13  Thomson are authentic and prepared before January 1, 1998, they are considered admissible prior

14  art under FRE803(16) and may be used as proof of the matter asserted.

15                          **2.      Public Accessibility of Mounji**

16          Finjan incorrectly argues that Hall-Ellis solely relied on the date shown on the face of

17  Mounji. Hall-Ellis relied on several indicia to form her opinion, including both Mounji's listed

18  date as well as information found in the *CiteSeer^x* repository. *See* A.F.s 9-10; Hall-Ellis Decl. at

19  ¶ 24. Specifically, Hall-Ellis uses *CiteSeer^x* to corroborate the date listed on Mounji. As Hall-Ellis

20  notes, *CiteSeer^x* is widely used among librarians. *See* Hall-Ellis Decl. at ¶¶ 20-21.

21          Finjan argues that *CiteSeer^x* cannot corroborate Mounji's listed publication date because

22  *CiteSeer^x* did not exist in 1994. When *CiteSeer^x* was created is irrelevant – Finjan does not dispute

23  the credibility, accuracy, or reliability of the information contained in *CiteSeer^x*. As Hall-Ellis

24  notes, although Mounji may not have been published in *CiteSeer^x **itself*** on a given date does not

25  mean that the information it provides regarding the date of its publication is wrong. Hall-Ellis

26  Decl. at ¶ 25. Hall-Ellis is permitted to base her opinion on her analysis of *CiteSeer^x,* an

27  authoritative digital repository of scientific and technical information that is a commonly used in

28  library sciences. Tellingly, Finjan offers no rebuttal evidence or expert opinion (other than

inadmissible attorney argument) that suggests that Hall-Ellis's methodology was flawed.  Thus, Hall-Ellis's opinions create a genuine issue of material fact that warrants denial of Finjan's motion. *See* A.F. 11.

### 3.     Public Accessibility of Thomson

For Thomson, Finjan similarly criticizes Hall-Ellis's reliance on two distinct librarian databases, *ResearchGate* and *Semantic Scholar,* because those repositories did not exist in 1997. As discussed above, the date that the repositories were created is not relevant. Both *ResearchGate* and *Semantic Scholar* are authoritative repositories that are commonly used by professionals in library sciences, and Hall-Ellis is entitled to rely on the information presented in those repositories to form her opinions regarding a publication date. Hall-Ellis Decl. at ¶ 20, 22-23, 25.  Based on her analysis of Thomson and *ResearchGate*'s information page about Thomson, Hall-Ellis opined that Thomson was published no later than May 31, 1997. *See* A.F.s 14-15; Hall-Ellis Decl. at ¶ 23.

Qualys also has corroborating evidence of Thomson's prior art status from Stubblebine. *See* A.F. 19.  As noted above, Stubblebine testified that he reviewed an archived version of the University of Saskatchewan's ("USask") webpage dated August 27, 1997 that refers to a 1997 Graduate Student Symposium for USask's Department of Computer Science. A.F.s 17-18; Ex. 36 (Stubblebine Tr.) at 228:3-237:22; Stubblebine Decl. at ¶¶ 5-6; Ex. 35 (Stubblebine Depo Ex. 31). The archived web page lists the name title of the Thomson reference along with its author (Judi Thomson), leading Stubblebine—a professor of computer science himself—to independently conclude that Thomson was likely publicly available through the USask Computer Science Department no later than August 27, 1997.  *Compare* D.I. 192-8 *with* Ex. 35 (Stubblebine Depo Ex. 31); *see* A.F.s 16-19.   Hall-Ellis's and Stubblebine's opinions—together with the underlying facts—establish genuine issues of material fact regarding.

## V.     CONCLUSION

For the foregoing reasons, the Court should grant Qualys's cross-motion for summary judgment and deny Finjan's motion (D.I. 192).

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Respectfully submitted,

WILSON SONSINI GOODRICH & ROSATI

Dated: May 10, 2021              By:    */s/ Christopher D. Mays*
                                        CHRISTOPHER D. MAYS

                                        *Counsel for*
                                        QUALYS INC.